ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Evan C. Hollander
Raniero D'Aversa, Jr.
Monica A. Perrigino

*Counsel for the Petitioners, Simon Appell and Eleanor Fisher,*
*in their capacities as the Joint Provisional Liquidators*
*and Proposed Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| OCEAN RIG UDW INC., *et al.*,[1] | ) | Case No. 17-_____( ) |
| | ) | |
| Debtors in Foreign Proceedings. | ) | (Joint Administration Requested) |
| | ) | |

**VERIFIED PETITION OF OCEAN RIG UDW INC., ET AL. (IN PROVISIONAL
LIQUIDATIONS) AND MOTION OF THE JOINT PROVISIONAL LIQUIDATORS
FOR (A) RECOGNITION OF THE CAYMAN PROCEEDINGS AS FOREIGN MAIN
PROCEEDINGS OR, IN THE ALTERNATIVE, AS FOREIGN NONMAIN
PROCEEDINGS AND (B) CERTAIN RELATED RELIEF**

---

[1] UDW (defined below), a foreign Debtor, is a Cayman Islands exempted company with registration number 310396. DRH (defined below), DFH (defined below), and DOV (defined below) are each foreign Debtors that are non-resident corporations registered in the RMI (defined below) with RMI registration numbers 32563, 61701, and 55652, and which are registered as foreign companies in the Cayman Islands with Cayman Islands registration numbers 316134, 316135, and 316137, respectively. The Debtors have a registered address in the Cayman Islands of P.O. Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands, and business address c/o Ocean Rig Cayman Management Services, SEZC Limited, 3rd Fl. Flagship Building, Harbour Drive, Grand Cayman, Cayman Islands.

766595938

Simon Appell and Eleanor Fisher of AlixPartners, LLP, in their capacities as the joint provisional liquidators and authorized foreign representatives (in such capacities, the "**Petitioners**" or "**JPLs**") of Ocean Rig UDW Inc. ("**UDW**"), Drill Rigs Holdings Inc. ("**DRH**"), Drillships Financing Holding Inc. ("**DFH**") and Drillships Ocean Ventures Inc. ("**DOV**," and, together with DRH and DFH, the "**Subsidiary Debtors**," and together with UDW, DRH and DFH, the "**Debtors**" and each a "**Debtor**") (in provisional liquidations) in the Debtors' provisional liquidation proceedings under Part V of the Cayman Islands Companies Law (2016 Revision) (the "**Companies Law**") pending before the Grand Court of the Cayman Islands (the "**Cayman Court**"), Financial Services Division Cause Nos. FSD0057/2017 (UDW), FSD0059/2017 (DRH), FSD0056/2017 (DFH) and FSD0058/2017 (DOV) (the "**Cayman Provisional Liquidation Proceedings**"), by and through the undersigned counsel to the JPLs on behalf of the Debtors, hereby submit this *Verified Petition of Ocean Rig UDW Inc., et al. (in Provisional Liquidations) and Motion of the Joint Provisional Liquidators for (A) Recognition of the Cayman Proceedings as Foreign Main Proceedings or, in the Alternative, as Foreign Nonmain Proceedings, and (B) Certain Related Relief* in furtherance of each Debtor's Form of Voluntary Petition [ECF No. 1] filed concurrently herewith (together with each Debtor's Form of Voluntary Petition, the "**Verified Petition**") pursuant to sections 105, 1515-1517 and 1519-1522 of title 11 of the United States Code (the "**Bankruptcy Code**") for (i) entry of an order, substantially in the form attached hereto as Exhibit A (the "**Recognition Order**") after notice and a hearing (the "**Recognition Hearing**"), granting recognition of (a) the Cayman Provisional Liquidation Proceedings and (b) subsequent applications for the sanctioning of schemes of arrangement in respect of the Debtors under section 86 of Part IV of the Companies Law (the "**Cayman Schemes**," and, together with the Cayman Provisional Liquidation Proceedings, the

2

"**Cayman Proceedings**") as foreign main proceedings or, in the alternative, as foreign nonmain proceedings, and (ii) certain related relief.

In support hereof, the Petitioners respectfully refer the Court to the *Memorandum of Law in Support of the Verified Petition* (the "**Memorandum of Law**") [ECF No. 3], the *Declaration of Simon Appell Pursuant to 28 U.S.C. § 1746 and Statements and Lists Required by Bankruptcy Rule 1007(a)(4)* (the "**Appell Declaration**") [ECF No. 4], the *Declaration of Antonios Kandylidis Pursuant to 28 U.S.C. § 1746* (the "**Kandylidis Declaration**") [ECF No. 5], the *Declaration of Rachael Reynolds Pursuant to 28 U.S.C. § 1746 in Support of the Verified Petition* (the "**Reynolds Declaration**") [ECF No. 6] and the *Declaration of Dennis Reeder Pursuant to 28 U.S.C. § 1746* (the "**Reeder Declaration**") [ECF No. 7], each of which is filed concurrently herewith and incorporated herein by reference.  In further support hereof, the Petitioners respectfully represent as follows:

<u>**STATUS OF THE CASE AND JURISDICTION**</u>

1.      On March 24, 2017, the Debtors filed winding up petitions with the Cayman Court and issued summonses for the appointment of joint provisional liquidators.  By orders of the Cayman Court dated March 27, 2017 (the "**Cayman Orders**"), Simon Appell and Eleanor Fisher were appointed as the JPLs and duly authorized foreign representatives, and the Cayman Provisional Liquidation Proceedings were commenced.  *See* Appell Declaration ¶ 4.

2.      By the Cayman Orders, the Cayman Court granted the JPLs the broad authority to undertake various actions with respect to each Debtor, including the authority to:

    a.  act jointly and severally in their capacity as JPLs of the Debtors;

    b.  review and supervise the day-to-day operations of the Debtors and the actions taken by the directors and to attend meetings with the directors and/or other officers of the Debtors and their subsidiaries, including all meetings of the boards of directors of the Debtors;

3

c.   for the purpose or in furtherance of the restructuring, do all acts and execute, in the name and on behalf of the Debtors, all deeds, receipts and other documents, and for that purpose, use the Debtors' company seals when necessary;

d.   in consultation with the management of the Debtors, deal with all questions in any way relating to or affecting the restructuring of the Debtors;

e.   seek recognition of their appointment in any jurisdiction the JPLs deem necessary;

f.   appoint attorneys and professional advisors, whether in the Cayman Islands, the United States, the United Kingdom, the Marshall Islands or elsewhere, as they may consider necessary to advise and assist them in the performance of their duties and to cause them to be remunerated out of the assets of the Debtors as an expense of the provisional liquidations;

g.   prove, rank, claim and / or receive dividends in the bankruptcy, insolvency or sequestration of any debtor;

h.   discharge costs, expenses and debts incurred by the Debtors after the commencement of the Cayman Proceedings as expenses or disbursements properly incurred in the provisional liquidation;

i.   in consultation with the Debtors, engage staff (whether or not as employees of the Debtors and whether located in the Cayman Islands or elsewhere) to assist them in the performance of their duties for the purpose of the Cayman Proceedings;

j.   make payments to creditors which may have the effect of preferring such creditors, in order to minimize the interruption of the day to day activities of the Debtors;

k.   send any appropriate letters to creditors of the Debtors notifying them of the proposed Cayman Schemes;

l.   authorize the directors of the Debtors to exercise their powers relating to the Debtors on such terms as the JPLs consider fit; and

m.   do all other things incidental to the exercise of their powers.

*See* Cayman Orders ¶ 5; Reynolds Declaration ¶ 53.  However, this case is a

"light touch" restructuring, and the Debtors' officers and directors have retained all powers of

4

management conferred on them and continue to conduct the ordinary, day-to-day business operations.  *See* Reynolds Declaration ¶ 30.

3.      Each Cayman Order also specifically authorizes the JPLs "to seek relief under Chapter 15 of Title 11 of the United States Bankruptcy Code, and to take such steps arising in connection therewith that the JPLs may consider appropriate."  Cayman Orders ¶ 3.

4.      On the date hereof (the "**Petition Date**"), the JPLs commenced the cases (the "**Chapter 15 Cases**") by filing the Verified Petition for relief under chapter 15 of the Bankruptcy Code.  The JPLs seek recognition of the Cayman Proceedings as foreign main proceedings or, in the alternative, as foreign nonmain proceedings under section 1517 of the Bankruptcy Code.

5.      Additional information regarding the Debtors and the JPLs, and additional information relevant to these Chapter 15 Cases and the Verified Petition, is set forth in the Memorandum of Law, the Appell Declaration, the Kandylidis Declaration, the Reynolds Declaration and the Reeder Declaration.

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, sections 109 and 1501 of the Bankruptcy Code and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, dated as of January 31, 2012, Reference M¬431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).

7.      These Chapter 15 Cases have been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of the Verified Petition under section 1515 of the Bankruptcy Code.  Recognition of a foreign proceeding and other matters under chapter 15 of the Bankruptcy Code have been designated core matters under 28 U.S.C. § 157(b)(2)(P).

5

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1410.

9.      The statutory predicates for the relief requested herein are sections 105,

362, 1519, and 1521 of the Bankruptcy Code.

### BACKGROUND OF THE DEBTORS

10.     UDW is the holding company of the Ocean Rig Group (the "Group") and

the direct parent of the Subsidiary Debtors.  *See* Kandylidis Declaration ¶ 3; Appell Declaration

¶ 7.  The Group operates as an international offshore oil drilling contractor, owner and operator

of drilling rigs.  *See* Kandylidis Declaration ¶ 7; Appell Declaration ¶ 10.

11.     Since April 2016, UDW has been registered as an exempted company

limited by shares under s. 202 of the Companies Law (registration number 310396).  Prior to that

time, UDW had been registered as a non-resident corporation in the Republic of the Marshall

Islands (the "**RMI**").  The Subsidiary Debtors are all registered as non-resident corporations in

the RMI (RMI registration numbers: DFH – 61701; DOV – 55652; DRH – 32563) and are

registered as foreign companies under s. 186 of the Companies Law (Cayman registration

numbers DFH – 316135; DOV – 316137; DRH – 316134)  where, together with UDW, they

maintain offices.  None of the Debtors has ever conducted operations or directed their affairs

from the RMI.  *See* Kandylidis Declaration ¶ 4; Appell Declaration ¶ 7.

12.     The Group is composed of four separate operating divisions.  Each of the

Subsidiary Debtors is itself a holding company and the parent of one of three of these operating

divisions.  The parent holding company of the fourth operating division, Drillship Alonissos

Shareholders Inc. ("**DAS**"), is not a debtor herein or a part of the restructuring.   Each of the

operating divisions has secured its own financing.  The financing obtained by each of the

Subsidiary Debtors has been guaranteed by UDW and UDW has pledged the shares of the

6

applicable Subsidiary Debtor to secure its respective guaranty obligations (e.g., the shares of DRH have been pledged to secure the DRH facility).  *See* Kandylidis Declaration ¶ 5; Appell Declaration ¶ 8.

13.    Each Debtor has incurred financing as follows:

a.    UDW has issued $500 million of 7.25% Senior Unsecured Notes due 2019 (the "**SUNs**") pursuant to that certain Indenture, dated as of March 26, 2014 (the "**SUN Indenture**").  Deutsche Bank Trust Company Americas is the Indenture Trustee under the SUN Indenture.  The SUNs are not guaranteed by any member of the Group.  Approximately $131 million of SUNs remain outstanding under the SUN Indenture.

b.    DRH has issued $800 million of 6.50% Senior Secured Notes due 2017 (the "**SSNs**") pursuant to that certain Indenture, dated as of September 20, 2012 2012 (as amended by a supplemental indenture dated January 23, 2013) (as amended, the "**DRH Indenture**").  U.S. Bank National Association is the Indenture Trustee under the DRH Indenture and Deutsche Bank Trust Company Americas is the collateral trustee.  The SSNs are guaranteed by UDW (the "**DRH Indenture Guaranty**") and certain of DRH's direct and indirect subsidiaries (the "**DRH Subsidiary Guarantees**").  UDW has pledged the shares of DRH to secure the DRH Indenture Guaranty, and DRH and its subsidiary guarantors have pledged their assets (including shares of their subsidiaries) to secure their obligations in respect of the DRH Indenture.  All pledged shares are held

7

by the collateral trustee in the United States.  Approximately $460 million remains outstanding under the DRH Indenture.

c.   DFH is a borrower under a $1.9 billion Credit Agreement dated as of July 12, 2013 (as amended and restated from time to time, including on February 7, 2014) between, among others, DFH and Drillships Projects Inc., as borrowers, and Deutsche Bank AG New York Branch, as administrative and collateral agent (the "**DFH Credit Agreement**").  The DFH Credit Agreement has been guaranteed by UDW (the "**DFH Credit Agreement Guaranty**") and certain of DFH's direct and indirect subsidiaries (the "**DFH Subsidiary Guarantees**").  UDW has pledged the shares of DFH to secure the DFH Credit Agreement Guaranty, and DFH and its subsidiary guarantors have pledged their assets (including the shares of their subsidiaries) to secure their obligations in respect of the DFH Credit Agreement.  All pledged shares are held by the collateral agent in the United States.  Approximately $1.83 billion remains outstanding under the DFH Credit Agreement.

d.   DOV is a borrower under a $1.3 billion Credit Agreement, dated as of July 25, 2014 between, among others, DOV and Drillships Ventures Projects Inc., as borrowers, and Deutsche Bank AG New York Branch, as administrative and collateral agent (the "**DOV Credit Agreement**" and, together with the DFH Credit Agreement, the "**Credit Agreements**").  The DOV Credit Agreement has been guaranteed by UDW (the "**DOV Credit Agreement Guaranty**" and together with the DRH Indenture

8

Guaranty and the DFH Credit Agreement Guaranty, the "**UDW Guarantees**") and certain of DOV's direct and indirect subsidiaries (the "**DOV Subsidiary Guarantees**").  UDW has pledged the shares of DOV to secure the DOV Credit Agreement Guaranty, and DOV and its subsidiary guarantors have pledged their assets (including the shares of their subsidiaries) to secure their obligations in respect of the DOV Credit Agreement.  All pledged shares are held by the collateral agent in the United States.  Approximately $1.27 billion remains outstanding under the DOV Credit Agreement.  The amounts outstanding in respect of the SUN Indenture, the DRH Indenture and the Credit Agreements are collectively referred to as the "**Scheme Indebtedness**."

*See* Kandylidis Declaration ¶ 6; Appell Declaration ¶ 9.

14.    The Group provides drilling services for offshore oil and gas exploration, development and production, and specializes in the ultra-deepwater and harsh-environment segments of the offshore drilling industry.  *See* Kandylidis Declaration ¶ 7; Appell Declaration ¶ 10.

15.    Through various subsidiaries, the Group operates 11 ultra-deepwater offshore drilling units:

a.    The DRH Division.  Through its DRH division, the Group owns two fifth generation harsh weather ultra-deepwater semisubmersible offshore drilling units, the *Leiv Eiriksson* and the *Eirik Raude*.

b.    The DFH Division.  Through its DFH division, the Group owns four sixth generation advanced capability ultra-deepwater drilling units, the *Ocean Rig*

9

*Corcovado*, the *Ocean Rig Olympia*, the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos*, delivered in January 2011, March 2011, July 2011 and September 2011, respectively.  These four ships are capable of drilling in water depths of up to 10,000 feet.

c.   <u>The DOV Division</u>.  Through its DOV division, the Group owns three seventh generation drilling units, the *Ocean Rig Mylos*, the *Ocean Rig Skyros*, and the *Ocean Rig Athena*.  These units were delivered in August 2013, December 2013, and March 2014, respectively. These seventh generation drilling units are capable of drilling in water depths of up to 12,000 feet.

d.   <u>The DAS Unit</u>.  Through DAS, the Group owns another seventh generation ultra-deepwater drilling unit, the *Ocean Rig Apollo*, delivered March 2015, which is also capable of drilling to water depths of 12,000 feet.

e.   <u>The Agon Shipping Inc. Unit</u>.  Through a separate subsidiary of UDW, Agon Shipping Inc., the Group owns another sixth generation ultra-deepwater drilling unit, the *Ocean Rig Paros*, which it acquired on April 28, 2016 through an auction.  The *Ocean Rig Paros* is capable of drilling in water depths of up to 10,000 feet.

*See* Kandylidis Declaration ¶ 8; Appell Declaration ¶ 11.

16.    In addition to its owned units, the Group has contracted for the construction of an additional three seventh generation drilling units (the *Ocean Rig Santorini*, the *Ocean Rig Crete* and the *Ocean Rig Amorgos*) with a major shipyard in Korea.  These units had previously been scheduled for delivery in 2017, 2018 and 2019, respectively, but the delivery dates of two of these units (the *Ocean Rig Santorini* and the *Ocean Rig Crete*) have been

10

postponed, and construction on the third (the *Ocean Rig Amorgos*) has been suspended.  The guarantees that were originally provided by UDW in respect of these drilling rigs have also been released.  *See* Kandylidis Declaration ¶ 9; Appell Declaration ¶ 11.

17.     The Group employs the drilling units primarily on a day rate basis for periods of between two months and six years to drill wells for its customers.  Payments are set at a fixed amount for each day that the unit is operating under a contract at full efficiency.  A higher "day rate" is charged on days when actual drilling operations are being undertaken and lower rates are charged during periods of mobilization, or when drilling operations are interrupted or restricted by equipment breakdowns, adverse environmental conditions or other conditions beyond the company's control.  Contracts are generally obtained through a competitive bidding process with other contractors.  The Group's customers are typically major oil companies, integrated oil and gas companies, state-owned national oil companies and independent oil and gas companies.  *See* Kandylidis Declaration ¶ 10.

18.     The Group maintains that its sixth and seventh generation drilling units are among the most sophisticated and technologically advanced drilling units in the world.  Among other technological enhancements, most of its drilling units are equipped with dual derrick technology, which involves two drilling systems that permit two drilling-related operations to take place simultaneously. The Group estimates this technology saves between 15% and 40% in drilling time, depending on the well parameters.  The sixth generation drilling units are capable of drilling up to 40,000 feet deep at water depths of up to 10,000 feet and the seventh generation drilling units have the capacity to drill up to 40,000 feet deep at water depths of up to 12,000 feet.  *See* Kandylidis Declaration ¶ 11.

766595938

19.     Currently, the Group's revenues are dependent on five units; the *Leiv Eiriksson*, which is operating offshore Norway; the *Ocean Rig Corcovado* and the *Ocean Rig Mykonos*, which are operating offshore Brazil; and the *Ocean Rig Poseidon* and the *Ocean Rig Skyros*, which are operating offshore Angola.  The other six units, the *Eirik Raude*, the *Ocean Rig Olympia*, the *Ocean Rig Mylos*, the *Ocean Rig Athena*, the *Ocean Rig Paros* and the *Ocean Rig Apollo* are currently uncontracted and have been laid-up in Greece.  Laid-up rigs must be either "cold stacked" or "warm stacked" in order to preserve the units pending reactivation. "Cold stacked" rigs require a longer period of time and greater cost to reactivate than "warm stacked" rigs.  Rig deactivation costs are approximately $5 million per unit.  The daily costs for "warm stacked" rigs are $40,000 per day.  The daily costs for "cold stacked" rigs are approximately $5,000.00 per day.  *See* Kandylidis Declaration ¶ 12; Appell Declaration ¶ 12.

20.     The oil and gas drilling industry is currently in a down-cycle, as crude oil prices have fallen during the past several years.  The price of crude oil has fallen from over $100 per barrel in March 2014, to approximately $52 per barrel in March 2017, and UDW's share price has fallen from a high of $19.87 on June 20, 2014, to $0.73 as of March 24, 2017.  The significant decrease in oil prices is expected to continue to reduce customer demand in the industry during 2017.  In fact, a number of the Group's customers have revised their budgets to decrease projected expenditures for offshore drilling on multiple occasions.  Declines in capital spending levels, coupled with an oversupply of newbuilding, have and are likely to continue to put significant pressure on "day rates" and utilization. The Group has come under severe financial pressure as a result of these factors.  The Group does not expect that its inactive rigs will begin work under new contracts until January 1, 2020 at the earliest.  According to an energy industry expert report commissioned by the Group, deepwater rig demand is currently at

12

utilization rates of only approximately 45% of available rigs and is not expected to begin to improve until 2019. Even by the first quarter of 2020, utilization rates are expected to remain below 60% of rig availability. *See* Kandylidis Declaration ¶ 13.

21.     As a result of the foregoing, the Group will continue to face significant challenges in the near and mid-term. Of the Group's five operational units, two are under contracts that will expire during the second half of 2017, and two are under contracts that will expire during 2018. Only one unit, the *Ocean Rig Skyros*, is under a long term contract (expiring September 30, 2021). *See* Kandylidis Declaration ¶ 14.

22.     Prior to commencing the Cayman Provisional Liquidation Proceedings, the Debtors were facing significant challenges with respect to their Scheme Indebtedness. DRH and UDW both have obligations to make sizeable payments on April 3, 2017. DRH has an interest payment of $14.9 million due in respect of the SSNs. DRH had to consider that if it made this payment its projected cash balances would be depleted to approximately $4 million by the end of June 2017. UDW has an interest payment of $4.7 million due in respect of the SUNs. UDW does not have sufficient cash to make this payment without borrowing funds that it will be unable to repay. Both entities are insolvent. The failure to pay these obligations beyond thirty days after the scheduled payment dates would trigger cross-defaults under the Credit Agreements. *See* Kandylidis Declaration ¶ 15; Appell Declaration ¶ 15.

23.     The Debtors also had to consider that, even if they made the April 3, 2017 payments, the Group would face another critical inflection point at the October 1, 2017 maturity of the $460 million SSNs. *See* Reynolds Declaration ¶ 9. Neither DRH nor UDW, as guarantor, will have sufficient cash or financeable assets to pay the SSNs at maturity. Failure to repay the SSNs would trigger cross-defaults under the Credit Agreements and the SUN Indenture. Such

13

cross-defaults could cause an acceleration of approximately $3.7 billion in debt, the loss of

critical customer contracts, and the destruction of a substantial portion of the value of the Group.

Further, beyond the SSN maturity date, the Debtors are projected to breach the leverage covenant

in the Credit Agreements at the latest by December 31, 2017.  *See* Kandylidis Declaration ¶ 16;

Appell Declaration ¶ 16.

24.     For these reasons, the Group retained legal and financial advisors in early

2016 to consider various restructuring alternatives.  The Group ultimately decided to engage

primarily with an ad hoc group of lenders under the DFH Credit Agreement and the DOV Credit

Agreement (the "**Ad Hoc Group**"), as the units owned by those divisions are among the most

technologically advanced and valuable in the fleet, and because the members of the Ad Hoc

Group were willing to engage constructively with the Group on a restructuring founded on

realistic valuations of the Group's assets, the benefits of a significant deleveraging and the

prognosis for the industry.  *See* Kandylidis Declaration ¶ 17.

25.     Negotiations with the Ad Hoc Group have culminated in a restructuring

agreement (the "**RSA**") that is supported by approximately 73%[1] of the aggregate amount of

Scheme Indebtedness at UDW.  If the Cayman Schemes are ultimately sanctioned by the

Cayman Court, the Group will achieve its much needed deleveraging.  The Cayman Schemes

contemplate the exchange of approximately $3.7 billion of existing financial indebtedness of the

Group for new equity in UDW (the "**New Parent Equity**"), cash payments of about $288

million (the "**Cash Consideration**") and new secured debt of $450 million (the "**New Secured**

**Debt**").  If the contemplated restructuring is achieved, the Group will be well placed to continue

---

[1] Includes pending trades that have not yet closed.

to operate as the market recovers and to effectively compete as an industry leader.  *See*

Kandylidis Declaration ¶ 17; Appell Declaration ¶ 17.

26.     The RSA contemplates that the restructuring of the Group will be

implemented through four separate Cayman Schemes, one for each Debtor.  The Cayman

Schemes are all interrelated, but only the UDW scheme, the DOV scheme and the DFH scheme

are inter-conditional (*i.e.*, for any one of those schemes to become effective, all three must be

sanctioned by the Cayman Court).  The terms of the contemplated Cayman Schemes are as

follows:

a.  <u>UDW Scheme</u>: The SUNs and the UDW Guarantees will be discharged in

exchange for New Parent Equity.  This New Parent Equity will be valued at the

asset value of UDW immediately prior to the restructuring of DRH, DFH and

DOV (i.*e.*, while SSNs, the DOV loans and the DFH loans remain outstanding in

the hands of the third-party creditors).   The New Parent Equity will be allocated

among the holders of the UDW Guarantees and the SUNs pro rata on the basis of

the notional amount of the claims of such holders.

b.  <u>DRH Scheme</u>: The claims of the SSNs will be transferred to UDW in exchange

for (i) New Parent Equity and (ii) Cash Consideration.  The Cash Consideration

will be shared pro rata with the lenders under the Credit Agreements under the

DFH and the DOV schemes from a pool of available cash.  The value of the New

Parent Equity received in exchange for the transfer of the SSNs to UDW will

equal the going concern value of DRH, less the Cash Consideration received by

holders of the SSNs in the exchange.

15

c. <u>DFH and DOV Schemes</u>: In the DOV and DFH schemes, the lenders under the Credit Agreements will transfer their loans to UDW in exchange for (i) New Parent Equity, (ii) New Secured Debt and (iii) Cash Consideration. The Cash Consideration will be shared pro rata among the lenders under the Credit Agreements and, if the DRH scheme is also sanctioned, the holders of the SSNs. The New Secured Debt will be shared pro rata among the lenders under the Credit Agreements. The value of the New Parent Equity received in exchange for the transfer of the loans under the DOV Credit Agreement to UDW will equal the going concern value of DOV, less the Cash Consideration and New Secured Debt received by the lenders under the DOV Credit Agreement in the exchange. The value of the New Parent Equity received in exchange for the transfer of the loans under the DFH Credit Agreement to UDW will equal the going concern value of DFH, less the Cash Consideration and New Secured Debt received by the lenders under the DFH Credit Agreement.

*See* Kandylidis Declaration ¶¶ 18-21; Appell Declaration ¶¶ 18-21.

27.     In accordance with the requirements of the RSA, the Group entered into a global settlement agreement (the "**GSA**") pursuant to which (i) it canceled approximately $369 million of SUNs and approximately $340 million of SSNs held by certain subsidiaries of UDW, Alley Finance Co., and Algarve Finance Limited, and (ii) all intragroup liabilities among the members of the Group were released. The effect of the GSA is that the scheme consideration to be received by UDW, DOV and DRH scheme creditors will be of a greater value in any event than if the GSA had not been entered into. DFH creditors will receive slightly less, but, as of the

16

date hereof, 84.25% of the DFH lenders support the proposed RSA.  *See* Kandylidis Declaration ¶ 22; Appell Declaration ¶ 22.

28.     As a consequence of the filing of winding up petitions and the commencement of the Cayman Provisional Liquidation Proceedings, the Debtors have triggered defaults and cross-defaults under their financial indebtedness and have exposed themselves to any number of adverse actions in the United States.  If provisional relief in the form of a stay is not granted, there is substantial risk that certain creditors may place the company in imminent peril in an effort to jeopardize the restructuring.  As stated in the Kandylidis Declaration, the Debtors are already the target of aggressive litigation tactics initiated by certain holders of the SSNs and by UDW's largest individual shareholder, who through his company is also the largest holder of the SUNs and is a holder of loans under the Credit Agreements.  These parties are positioning themselves to stymy the Debtors' reorganization efforts in order to extract value to which they are not entitled to under any reasonable restructuring scenario.  *See* Kandylidis Declaration ¶ 35.

**RELIEF REQUESTED**

29.     By this Verified Petition, the JPLs seek entry of an order granting ancillary relief in order to effectuate the restructuring of the Debtors.  The JPLs seek to obtain certain immediate stays and protections for the Debtors in the United States and, ultimately, to receive recognition of the Cayman Proceedings in the United States.  Specifically, the JPLs seek:

(A)     entry of the Recognition Order after notice and a hearing:[2]

---

[2] The Petitioners have requested a date and time for the Recognition Hearing to consider entry of the Recognition Order pursuant to the *Application by Joint Provisional Liquidators Simon Appell and Eleanor Fisher for Order (I) Scheduling Hearing on Verified Petition of Ocean Rig UDW Inc., et al. (in Provisional Liquidations) and Motion for Recognition and Related Relief and (II) Specifying Form and Manner of Service of Notice* (the **"Notice Motion"**) [ECF No. 9], filed contemporaneously herewith.

(i)      granting recognition of the Cayman Proceedings as foreign main proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code and granting related relief or, in the alternative, granting recognition of the Cayman Proceedings as foreign nonmain proceedings pursuant to section 1517(b)(2) of the Bankruptcy Code and granting related relief;

(ii)     granting relief as of right upon recognition of the Cayman Proceedings as foreign main proceedings pursuant to section 1520 of the Bankruptcy Code if the Cayman Proceedings are recognized as foreign main proceedings;

(iii)    whether the Cayman Proceedings are recognized as foreign main proceedings or foreign nonmain proceedings, granting additional relief under section 1521 of the Bankruptcy Code including;

   (a)   staying the commencement or continuation of any actions or proceedings concerning the Debtors' assets, rights, obligations or liabilities;

   (b)   staying execution against the Debtors' assets;

   (c)   suspending the right to transfer, encumber or otherwise dispose of the Debtors' assets; and

(iv)     granting such further relief as the Court deems just and proper.

## **BASIS FOR RELIEF REQUESTED**

30.      For the reasons set forth in the Memorandum of Law, the Court should enter the Recognition Order.  The JPLs meet the standards for obtaining the relief requested herein and otherwise satisfy the statutory requirements for recognition and related relief under chapter 15 of the Bankruptcy Code.

31.      Section 1517(a) of the Bankruptcy Code authorizes the Court to enter a final order, after notice and a hearing, recognizing a foreign proceeding if (i) such proceeding is

a foreign main proceeding or a foreign nonmain proceeding, (ii) the foreign representative

applying for recognition is a person or body and (iii) the application for recognition was properly

filed in accordance with section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a).  Section

1517(b) of the Bankruptcy Code further provides that a proceeding shall be recognized as a

foreign main proceeding if it is pending in the country where the debtor has the center of its main

interests.  *See* 11 U.S.C. § 1517(b).

   32. For the reasons discussed in the Memorandum of Law, the Court should

enter the Recognition Order because the Debtors are eligible for chapter 15 relief, because the

JPLs are foreign representatives and because the Verified Petition satisfies all of the statutory

requirements for recognition and related relief under chapter 15 of the Bankruptcy Code as a

foreign main proceeding.[3]

   33. First, the Debtors satisfy section 109(a) of the Bankruptcy Code, which is

a precondition for chapter 15 eligibility under Second Circuit jurisprudence.  As explained in the

Memorandum of Law, a debtor need only have minimal "property" in the United States in order

to comply with the terms of section 109(a).  The Debtors easily satisfy this requirement given the

retainer of $250,000 paid by each Debtor herein and held in a trust account at Citibank Private

Bank in New York, the location of the Debtors' pledged share certificates, and the choice of law

provisions and forum selection clauses in their debt documents.

---

[3] Although the JPLs believe that the Cayman Proceedings are undoubtedly foreign main proceedings, the JPLs have requested, in the alternative, that the Cayman Proceedings be recognized as foreign nonmain proceedings out of an abundance of caution.

766595938

34.    Second, the Chapter 15 Cases were duly and properly commenced as required by sections 1504 and 1509(a) of the Bankruptcy Code by filing the Verified Petition and all other required documents in accordance with section 1515 of the Bankruptcy Code.

35.    Third, as described in the Appell Declaration and the Memorandum of Law, the JPLs qualify as a person or body, and each is a foreign representative within the meaning of section 101(24) of the Bankruptcy Code, *i.e.*, the JPLs are authorized in the Cayman Proceedings to administer the reorganization or liquidation of the Debtors' assets and affairs as determined by the Cayman Court.  *See* Appell Declaration ¶¶ 23-26; *see also* Reynolds Declaration ¶¶ 52-53.

36.    Fourth, the Cayman Proceedings are pending in the Cayman Islands, the Debtors' COMI.  As described in detail in the Memorandum of Law, the Cayman Islands are the main situs of each Debtor's business operations, and this fact is readily apparent to third parties. The Debtors clearly established the Cayman Islands as their COMI well in advance of the Petition Date by taking a number of steps to actively centralize their operations there (to the extent that they have operations on land).  Moreover, the Court should not find that the Debtors improperly manipulated their COMI because they relocated to the Cayman Islands in order to effectuate their restructuring and serve their creditors' interests.  *See also* Kandylidis Declaration ¶¶ 23-34.

37.    As described in the Memorandum of Law and above, this Court's recognition the Cayman Proceedings as foreign main proceedings or, in the alternative, as foreign nonmain proceedings, and granting the relief requested herein pending a hearing on the Recognition Order—in addition to the relief automatically granted upon recognition pursuant to section 1520 of the Bankruptcy Code—is consistent with the purposes of chapter 15 of the

Bankruptcy Code and with the public policy of the United States.  Therefore, the JPLs

respectfully request that, upon notice and a hearing, the Court grant the Recognition Order and

such other and further relief as the Court may deem just and proper.

### NOTICE

38.    No trustee, examiner or statutory committee has been appointed in these

Chapter 15 Cases.  Notice of this Verified Petition has been provided to (i) the United States

Trustee for the Southern District of New York, (ii) the United States Securities and Exchange

Commission, (iii) the Internal Revenue Service, and (iv) each of the Debtors.  In light of the

nature of the relief requested herein, the Petitioners submit that no other or further notice is

necessary.

766595938

WHEREFORE, the Petitioners respectfully request (i) entry of the Recognition

Order, substantially in the form attached hereto as <u>Exhibit A</u> and (iii) such other and further

relief as the Court deems just and proper.


Dated: New York, New York
      March 27, 2017

ORRICK, HERRINGTON & SUTCLIFFE LLP


By: <u>/s/ Evan C. Hollander</u>
      Evan C. Hollander

51 West 52nd Street
New York, New York 10019
Telephone:  (212) 506-5000
Facsimile:  (212) 506-5151
Evan C. Hollander
Raniero D'Aversa, Jr.
Monica A. Perrigino

*Counsel for the Petitioners, Simon Appell and
Eleanor Fisher, in their capacities as Joint
Provisional Liquidators and Proposed Foreign
Representatives*

766595938

## <u>VERIFICATION OF PETITION</u>

Simon Appell, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury under the laws of the United States of America as follows:

I am a Managing Director at AlixPartners and the duly appointed proposed foreign representative of the Debtors.  As such, I have full authority to verify the foregoing Verified Petition on behalf of the Debtors.

I have read the foregoing Verified Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.


Dated: March 27, 2017
      Grand Cayman, Cayman Islands


By: <u>/s/ Simon Appell</u>

    By: Simon Appell
    Title: Managing Director at AlixPartners
    Authorized Foreign Representative of the
    Debtors

23