ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Evan C. Hollander
Raniero D'Aversa, Jr.
Monica A. Perrigino

*Counsel for the Petitioners, Simon Appell and Eleanor Fisher,*
*in their capacities as the Joint Provisional Liquidators*
*and Proposed Foreign Representatives*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| OCEAN RIG UDW INC., *et al.*,[1] | ) | Case No. 17-_____( ) |
| | ) | |
| Debtors in Foreign Proceedings. | ) | (Joint Administration Requested) |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF VERIFIED PETITION OF OCEAN RIG UDW INC., ET AL. (IN PROVISIONAL LIQUIDATIONS) AND MOTION OF THE JOINT PROVISIONAL LIQUIDATORS FOR (A) RECOGNITION OF THE CAYMAN PROCEEDINGS AS FOREIGN MAIN PROCEEDINGS OR, IN THE ALTERNATIVE, AS FOREIGN NONMAIN PROCEEDINGS, AND (B) CERTAIN RELATED RELIEF**

---

[1] UDW (defined below), a foreign Debtor, is a Cayman Islands exempted company with registration number 310396. DRH (defined below), DFH (defined below), and DOV (defined below) are each foreign Debtors that are non-resident corporations registered in the RMI (defined below) with RMI registration numbers 32563, 61701, and 55652, and which are registered as foreign companies in the Cayman Islands with Cayman Islands registration numbers 316134, 316135, and 316137, respectively. The Debtors have a registered address in the Cayman Islands of P.O. Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands, and business address c/o Ocean Rig Cayman Management Services, SEZC Limited, 3rd Fl. Flagship Building, Harbour Drive, Grand Cayman, Cayman Islands.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................ 2

RELEVANT FACTS .......................................................................................... 5

ARGUMENT ..................................................................................................... 16

I.   THE REQUIREMENTS FOR RECOGNITION OF THE CAYMAN
     PROCEEDINGS AS FOREIGN MAIN PROCEEDINGS UNDER CHAPTER 15
     HAVE BEEN MET .................................................................................... 16

     A.   The Debtors Satisfy Section 109(a) ............................................... 17

     B.   The Verified Petition Meets the Requirements of Section 1515 ........... 19

     C.   Each of the JPLs Qualifies as a "Foreign Representative" ................. 20

     D.   The Cayman Proceedings Are "Foreign Proceedings" ....................... 20

     E.   The Cayman Proceedings Are "Foreign Main Proceedings" ............... 22

          1.   Each Debtor's COMI Is the Cayman Islands ........................... 22

               a.   Place of Incorporation and Current Presence ................. 25

               b.   Location of Board of Directors and Officers ................. 26

               c.   Location of Officers ................................................. 27

               d.   Location of Operations ............................................. 27

               e.   Location of Assets ................................................... 28

               f.   Location of Bank Accounts ....................................... 28

               g.   Books and Records .................................................. 28

               h.   Restructuring Activities ........................................... 29

               i.   Notice of Relocation to Third Parties .......................... 29

          2.   Each Debtor Established its COMI in the Cayman Islands Prior to
               the Petition Date ............................................................. 31

          3.   The Debtors Have Not Manipulated COMI in Bad Faith .......... 35

     F.   In the Alternative, the Cayman Proceedings Are "Foreign Nonmain
          Proceedings" Because the Debtors Have Establishments There .......... 36

     G.   Recognition of the Cayman Proceedings Would Not Be Manifestly
          Contrary to United States Policy ................................................. 38

CONCLUSION .................................................................................................. 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ABC Learning Centres Ltd.*,
  445 B.R. 318 (Bankr. D. Del. 2010) *aff'd*, 728 F.3d 301 (3d Cir. 2013)................................23

*In re ABC Learning Centres Ltd.*,
  728 F.3d 301 (3d Cir. 2013) *cert. denied*, 134 S. Ct. 1283 (2014) .........................................17

*In re Ardent Harmony Fund, Inc.*,
  No. 16-12282 (MG) [ECF No. 17] (Bankr. S.D.N.Y. Sept. 1, 2016) ....................................22

*Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)*,
  480 B.R. 129 (S.D.N.Y. 2012) ...............................................................................................38

*In re Basis Yield Alpha Fund (Master)*,
  381 B.R. 37 (Bankr. S.D.N.Y. 2008) ...............................................................................33, 34

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
  374 B.R. 122 (Bankr. S.D.N.Y. 2007) ..............................................................................23, 24

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
  389 B.R. 325 (S.D.N.Y. 2008) ..........................................................................................32, 34

*In re Berau Capital Resources Pte Ltd.*,
  540 B.R. 80 (Bankr. S.D.N.Y. 2015) .....................................................................................18

*In re Betcorp Ltd.*,
  400 B.R. 266 (Bankr. D. Nev. 2009) ......................................................................................24

*In re British Am. Ins. Co.*,
  425 B.R. 884 (Bankr. S.D. Fla. 2010) ....................................................................................24

*In re Caledonian Bank Ltd.*,
  No. 15-10324 (MG) [ECF No. 39] (Bankr. S.D.N.Y. Mar. 17, 2015) ...................................22

*In re Creative Fin. Ltd.*,
  543 B.R. 498 (Bankr. S.D.N.Y. 2016) ....................................................................................37

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
  737 F.3d 238 (2d Cir. 2013)....................................................................................................16

*In re Fairfield Sentry Ltd.*,
  440 B.R. 60 (Bankr. S.D.N.Y. 2010) .................................................................................32, 35

*In re Fairfield Sentry Ltd.*,
   No. 10 Civ. 7311, 2011 WL 4357421 (S.D.N.Y. Sept. 16, 2011) ...........................................37

*Lavie v. Ran (In re Ran)*,
   607 F.3d 1017 (5th Cir. 2010) ...............................................................................................17

*In re LDK Solar Co.*,
   No. 14-12387 (PJW) [ECF Nos. 43, 44] (Bankr. D. Del. Nov. 21, 2014)..............................22

*In re Millard*,
   501 B.R. 644 (Bankr. S.D.N.Y. 2013) ....................................................................................17

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
   458 B.R. 63 (Bankr. S.D.N.Y. 2011) *aff'd*, 474 B.R. 88 (S.D.N.Y. 2012) ......................23, 34

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
   714 F.3d 127 (2d Cir. 2013)....................................................................................................24

*In re Octaviar Admin. Pty. Ltd.*,
   511 B.R. 361 (Bankr. S.D.N.Y. 2014) ....................................................................................17

*In re Paper I Partners, L.P.*,
   283 B.R. 661 (Bankr. S.D.N.Y. 2002) ....................................................................................18

*In re Platinum Partners Value Arbitrage Fund et al.*,
   No. 16-12925 (SCC) [ECF No. 27] (Bankr. S.D.N.Y. Nov. 23, 2016) ..................................22

*In re SPhinX, Ltd.*,
   351 B.R. 103 (Bankr. S.D.N.Y. 2006) ....................................................................................24

*In re Suntech Power Holdings Co.*,
   520 B.R. 399 (Bankr. S.D.N.Y. 2014) ................................................................17, 18, 22, 32

**Statutes**

11 U.S.C. § 101..............................................................................................................20, 21, 22

11 U.S.C. § 109..............................................................................................................16, 17, 18

11 U.S.C. § 1501.......................................................................................................................38

11 U.S.C. § 1502....................................................................................................... *passim*

11 U.S.C. § 1504.................................................................................................................19, 20

11 U.S.C. § 1506.................................................................................................................16, 38

11 U.S.C. § 1508.......................................................................................................................38

iii

11 U.S.C. § 1509 ................................................................................................19, 20

11 U.S.C. § 1515 ..................................................................................5, 17, 19, 20

11 U.S.C. § 1516 ........................................................................................ *passim*

11 U.S.C. § 1517 ........................................................................................ *passim*

11 U.S.C. § 1519 ................................................................................................5, 20

**Other Authorities**

Bankruptcy Rule 1007 ........................................................................................2, 19

Business Corporations Act ......................................................................................36

Cayman Islands Companies Law § 104 ................................................................22

Cayman Islands Companies Law § 105 ................................................................21

Cayman Islands Companies Law § 108 ................................................................22

Cayman Islands Companies Law § 115 ................................................................21

Cayman Islands Companies Law § 131-133 ........................................................22

Cayman Islands Companies Law § 139 ................................................................21

Cayman Islands Companies Law § 140 ................................................................21

Cayman Islands Companies Law § 163 ................................................................33

Uniform Foreign Money-Judgments Recognition Act ..........................................36

765997680

Simon Appell and Eleanor Fisher of AlixPartners, LLP are the joint provisional

liquidators and authorized foreign representatives (in such capacities, the "**Petitioners**" or

"**JPLs**") of Ocean Rig UDW Inc. ("**UDW**"), Drill Rigs Holdings Inc. ("**DRH**"), Drillships

Financing Holding Inc. ("**DFH**") and Drillships Ocean Ventures Inc. ("**DOV**," and, together with

DRH and DFH, the "**Subsidiary Debtors**," and together with UDW, DRH and DFH, the

"**Debtors**" and each a "**Debtor**") (in provisional liquidations) in the Debtors' provisional

liquidation proceedings under Part V of the Cayman Islands Companies Law (2016 Revision)

(the "**Companies Law**") pending before the Grand Court of the Cayman Islands (the "**Cayman**

**Court**"), Financial Services Division Cause Nos. FSD0057/2017 (UDW), FSD0059/2017

(DRH), FSD0056/2017 (DFH) and FSD0058/2017 (DOV) (the "**Cayman Provisional**

**Liquidation Proceedings**").

On the date hereof (the "**Petition Date**"), the Petitioners commenced chapter 15 cases for

each of the Debtors (collectively, the "**Chapter 15 Cases**") by filing a Form of Voluntary

Petition for each Debtor [ECF No. 1] under chapter 15 of title 11 of the United States Code (the

"**Bankruptcy Code**") and the *Verified Petition of Ocean Rig UDW Inc., et al. (in Provisional*

*Liquidations) and Motion of the Joint Provisional Liquidators for (A) Recognition of the Cayman*

*Proceedings as Foreign Main Proceedings or, in the Alternative, as Foreign Nonmain*

*Proceedings, and (B) Certain Related Relief* (together with each Debtor's Form of Voluntary

Petition, the "**Verified Petition**") [ECF No. 2] seeking (i) entry of an order, substantially in the

form attached to the Verified Petition as <u>Exhibit A</u> (the "**Recognition Order**") after notice and a

hearing (the "**Recognition Hearing**"), granting recognition of (a) the Cayman Provisional

Liquidation Proceedings and (b) subsequent applications for the sanctioning of schemes of

arrangement in respect of the Debtors under section 86 of Part IV of the Companies Law (the

765997680                                        1

"**Cayman Schemes**," and, together with the Cayman Provisional Liquidation Proceedings, the

"**Cayman Proceedings**") as foreign main proceedings or, in the alternative, as foreign nonmain

proceedings, and (ii) certain related relief.  In support of the Verified Petition, the JPLs

respectfully submit this Memorandum of Law (this "**Memorandum**").

The Petitioners also respectfully refer this Court to the *Declaration of Simon Appell*

*Pursuant to 28 U.S.C. § 1746 and Statements and Lists Required by Bankruptcy Rule 1007(a)(4)*

(the "**Appell Declaration**") [ECF No. 4], the *Declaration of Antonios Kandylidis Pursuant to 28*

*U.S.C. § 1746* (the "**Kandylidis Declaration**") [ECF No. 5], the *Declaration of Rachael*

*Reynolds in Support of the Verified Petition* (the "**Reynolds Declaration**") [ECF No. 6] and the

*Declaration of Dennis Reeder 28 Pursuant to U.S.C. § 1746* (the "**Reeder Declaration**") [ECF

No. 7], each of which contains facts relevant to this Memorandum and is incorporated herein by

reference.

## PRELIMINARY STATEMENT

1.      The Petitioners are seeking entry of the Recognition Order granting the Debtors'

Verified Petition and recognizing the Cayman Proceedings as foreign main proceedings or, in the

alternative, as foreign nonmain proceedings.  The Cayman Proceedings and the recognition

thereof in these proceedings are critical components of the Debtors' restructuring.  Without the

requested relief, the restructuring sought in the Cayman Proceedings would be undermined,

which, in turn, would threaten the Debtors' restructuring efforts and cause irreparable harm to

the Debtors and their creditors.

2.      In response to mounting financial pressure and unstable capital structures, as

further described below, on March 24, 2017, the Debtors filed winding up petitions with the

Cayman Court and issued summonses for the appointment of joint provisional liquidators.  By

765997680

orders of the Cayman Court dated March 27, 2017 (the "**Cayman Orders**"), Simon Appell and

Eleanor Fisher were appointed as the JPLs and duly authorized foreign representatives, and the

Cayman Provisional Liquidation Proceedings were commenced.  *See* Appell Declaration ¶ 4.

3.      By the Cayman Orders, the Cayman Court granted the JPLs the broad authority to

undertake various actions with respect to each Debtor, including the authority to:

  a.   act jointly and severally in their capacity as JPLs of the Debtors;

  b.   review and supervise the day-to-day operations of the Debtors and the actions
       taken by the directors and to attend meetings with the directors and/or other
       officers of the Debtors and their subsidiaries, including all meetings of the boards
       of directors of the Debtors;

  c.   for the purpose or in furtherance of the restructuring, do all acts and execute, in
       the name and on behalf of the Debtors, all deeds, receipts and other documents,
       and for that purpose, use the Debtors' company seals when necessary;

  d.   in consultation with the management of the Debtors, deal with all questions in any
       way relating to or affecting the restructuring of the Debtors;

  e.   seek recognition of their appointment in any jurisdiction the JPLs deem
       necessary;

  f.   appoint attorneys and professional advisors, whether in the Cayman Islands, the
       United States, the United Kingdom, the Marshall Islands or elsewhere, as they
       may consider necessary to advise and assist them in the performance of their
       duties and to cause them to be remunerated out of the assets of the Debtors as an
       expense of the provisional liquidations;

  g.   prove, rank, claim and / or receive dividends in the bankruptcy, insolvency or
       sequestration of any debtor;

  h.   discharge costs, expenses and debts incurred by the Debtors after the
       commencement of the Cayman Proceedings as expenses or disbursements
       properly incurred in the provisional liquidation;

  i.   in consultation with the Debtors, engage staff (whether or not as employees of the
       Debtors and whether located in the Cayman Islands or elsewhere) to assist them
       in the performance of their duties for the purpose of the Cayman Proceedings;

  j.   make payments to creditors which may have the effect of preferring such
       creditors, in order to minimize the interruption of the day to day activities of the
       Debtors;

765997680

     k.   send any appropriate letters to creditors of the Debtors notifying them of the proposed Cayman Schemes;

     l.   authorize the directors of the Debtors to exercise their powers relating to the Debtors on such terms as the JPLs consider fit; and

     m.  do all other things incidental to the exercise of their powers.

*See* Cayman Orders ¶ 5; Reynolds Declaration ¶ 53.  However, these cases are "light touch" provisional liquidation proceedings, and the Debtors' officers and directors have retained all powers of management conferred on them and continue to conduct the ordinary, day-to-day business operations of the Debtors, subject to the supervision of the JPLs.  *See* Reynolds Declaration ¶ 30.

4.     Each Cayman Order also specifically appointed the JPLs as "the duly authorised foreign representative[s] of the [Debtors]" and authorizes the JPLs "to seek relief under Chapter 15 of Title 11 of the United States Bankruptcy Code, and to take such steps arising in connection therewith that the JPLs may consider appropriate."  Cayman Orders ¶ 3.

5.     The JPLs have concluded that this Court's recognition of the Cayman Proceedings under chapter 15 of the Bankruptcy Code and the subsequent entry of an order of this Court giving effect to the Cayman Schemes in the United States are necessary for the successful restructuring of the Debtors.  For the reasons set forth below, the JPLs respectfully request the Court grant the relief sought in the Verified Petition and enter an order recognizing the Cayman Proceedings as "foreign main proceedings" or, in the alternative, "foreign nonmain proceedings," under section 1517 of the Bankruptcy Code.

6.     The Verified Petition satisfies all of the requirements set forth in sections 1515, 1517, and 1519 of the Bankruptcy Code, as applicable. Furthermore, the requested relief is necessary and appropriate under chapter 15 of the Bankruptcy Code.  Finally, granting

765997680

recognition of the Cayman Proceedings and giving effect in the United States to the contemplated Cayman Schemes, and related relief, are consistent with the goals of international cooperation and comity inherent in chapter 15.

## **RELEVANT FACTS**

7.      UDW is the holding company of the Ocean Rig Group (the "**Group**") and the direct parent of the Subsidiary Debtors.  *See* Kandylidis Declaration ¶ 3; Appell Declaration ¶ 7. The Group operates as an international offshore oil drilling contractor, owner and operator of drilling rigs.  *See* Kandylidis Declaration ¶ 7; Appell Declaration ¶ 10.

8.      Since April 2016, UDW has been registered as an exempted company limited by shares under s. 202 of the Companies Law (registration number 310396).  Prior to that time, UDW had been registered as a non-resident corporation in the Republic of the Marshall Islands (the "**RMI**").  The Subsidiary Debtors are all registered as non-resident corporations in the RMI (RMI registration numbers: DFH – 61701; DOV – 55652; DRH – 32563) and are registered as foreign companies under s. 186 of the Companies Law (Cayman registration numbers DFH – 316135; DOV – 316137; DRH – 316134)  where, together with UDW, they maintain offices. None of the Debtors has ever conducted operations or directed their affairs from the RMI.  *See* Kandylidis Declaration ¶ 4; Appell Declaration ¶ 7.

9.      The Group is composed of four separate operating divisions.  Each of the Subsidiary Debtors is itself a holding company and the parent of one of three of these operating divisions.  The parent holding company of the fourth operating division, Drillship Alonissos Shareholders Inc. ("**DAS**"), is not a debtor herein or a part of the restructuring.   Each of the operating divisions has secured its own financing.  The financing obtained by each of the Subsidiary Debtors has been guaranteed by UDW and UDW has pledged the shares of the

applicable Subsidiary Debtor to secure its respective guaranty obligations (e.g., the shares of

DRH have been pledged to secure the DRH facility).  *See* Kandylidis Declaration ¶ 5; Appell

Declaration ¶ 8.

10. Each Debtor has incurred financing as follows:

a. UDW has issued $500 million of 7.25% Senior Unsecured Notes due 2019

(the "**SUNs**") pursuant to that certain Indenture, dated as of March 26, 2014

(the "**SUN Indenture**").  Deutsche Bank Trust Company Americas is the

Indenture Trustee under the SUN Indenture.  The SUNs are not guaranteed by

any member of the Group.  Approximately $131 million of SUNs remain

outstanding under the SUN Indenture.

b. DRH has issued $800 million of 6.50% Senior Secured Notes due 2017 (the

"**SSNs**") pursuant to that certain Indenture, dated as of September 20, 2012

2012 (as amended by a supplemental indenture dated January 23, 2013) (as

amended, the "**DRH Indenture**").  U.S. Bank National Association is the

Indenture Trustee under the DRH Indenture and Deutsche Bank Trust

Company Americas is the collateral trustee.  The SSNs are guaranteed by

UDW (the "**DRH Indenture Guaranty**") and certain of DRH's direct and

indirect subsidiaries (the "**DRH Subsidiary Guarantees**").  UDW has

pledged the shares of DRH to secure the DRH Indenture Guaranty, and DRH

and its subsidiary guarantors have pledged their assets (including the shares of

their subsidiaries) to secure their obligations in respect of the DRH Indenture.

All pledged shares are held by the collateral trustee in the United States.

Approximately $460 million remains outstanding under the DRH Indenture.

6

c. DFH is a borrower under a $1.9 billion Credit Agreement dated as of July 12, 2013 (as amended and restated from time to time, including on February 7, 2014) between, among others, DFH and Drillships Projects Inc., as borrowers, and Deutsche Bank AG New York Branch, as administrative and collateral agent (the "**DFH Credit Agreement**"). The DFH Credit Agreement has been guaranteed by UDW (the "**DFH Credit Agreement Guaranty**") and certain of DFH's direct and indirect subsidiaries (the "**DFH Subsidiary Guarantees**"). UDW has pledged the shares of DFH to secure the DFH Credit Agreement Guaranty, and DFH and its subsidiary guarantors have pledged their assets (including the shares of their subsidiaries) to secure their obligations in respect of the DFH Credit Agreement. All pledged shares are held by the collateral agent in the United States. Approximately $1.83 billion remains outstanding under the DFH Credit Agreement.

d. DOV is a borrower under a $1.3 billion Credit Agreement, dated as of July 25, 2014 between, among others, DOV and Drillships Ventures Projects Inc., as borrowers, and Deutsche Bank AG New York Branch, as administrative and collateral agent (the "**DOV Credit Agreement**" and, together with the DFH Credit Agreement, the "**Credit Agreements**"). The DOV Credit Agreement has been guaranteed by UDW (the "**DOV Credit Agreement Guaranty**" and together with the DRH Indenture Guaranty and the DFH Credit Agreement Guaranty, the "**UDW Guarantees**") and certain of DOV's direct and indirect subsidiaries (the "**DOV Subsidiary Guarantees**"). UDW has pledged the shares of DOV to secure the DOV Credit Agreement Guaranty, and DOV and

7

its subsidiary guarantors have pledged their assets (including the shares of

their subsidiaries) to secure their obligations in respect of the DOV Credit

Agreement.  All pledged shares are held by the collateral agent in the United

States.  Approximately $1.27 billion remains outstanding under the DOV

Credit Agreement.  The amounts outstanding in respect of the SUN Indenture,

the DRH Indenture and the Credit Agreements are collectively referred to as

the "**Scheme Indebtedness**."

*See* Kandylidis Declaration ¶ 6; Appell Declaration ¶ 9.

11.     The Group provides drilling services for offshore oil and gas exploration,

development and production, and specializes in the ultra-deepwater and harsh-environment

segments of the offshore drilling industry.  *See* Kandylidis Declaration ¶ 7; Appell Declaration ¶

10.

12.     Through various subsidiaries, the Group operates 11 ultra-deepwater offshore

drilling units:

a.     The DRH Division.  Through its DRH division, the Group owns two fifth

generation harsh weather ultra-deepwater semisubmersible offshore drilling

units, the *Leiv Eiriksson* and the *Eirik Raude*.

b.     The DFH Division.  Through its DFH division, the Group owns four sixth

generation advanced capability ultra-deepwater drilling units, the *Ocean Rig*

*Corcovado*, the *Ocean Rig Olympia*, the *Ocean Rig Poseidon* and the *Ocean*

*Rig Mykonos*, delivered in January 2011, March 2011, July 2011 and

September 2011, respectively.  These four ships are capable of drilling in

water depths of up to 10,000 feet.

8

    c.   The DOV Division.  Through its DOV division, the Group owns three seventh generation drilling units, the *Ocean Rig Mylos*, the *Ocean Rig Skyros*, and the *Ocean Rig Athena*.  These units were delivered in August 2013, December 2013, and March 2014, respectively. These seventh generation drilling units are capable of drilling in water depths of up to 12,000 feet.

    d.   The DAS Unit.  Through DAS, the Group owns another seventh generation ultra-deepwater drilling unit, the *Ocean Rig Apollo*, delivered March 2015, which is also capable of drilling to water depths of up to 12,000 feet.

    e.   The Agon Shipping Inc. Unit.  Through a separate subsidiary of UDW, Agon Shipping Inc., the Group owns another sixth generation ultra-deepwater drilling unit, the *Ocean Rig Paros*, which it acquired on April 28, 2016 through an auction.  The *Ocean Rig Paros* is capable of drilling in water depths of up to 10,000 feet.

*See* Kandylidis Declaration ¶ 8; Appell Declaration ¶ 11.

13.    In addition to its owned units, the Group has contracted for the construction of an additional three seventh generation drilling units (the *Ocean Rig Santorini*, the *Ocean Rig Crete* and the *Ocean Rig Amorgos*) with a major shipyard in Korea.  These units had previously been scheduled for delivery in 2017, 2018 and 2019, respectively, but the delivery dates of two of these units (the *Ocean Rig Santorini* and the *Ocean Rig Crete*) have been postponed, and construction on the third (the *Ocean Rig Amorgos*) has been suspended.  The guarantees that were originally provided by UDW in respect of these drilling rigs have also been released.  *See* Kandylidis Declaration ¶ 9; Appell Declaration ¶ 11.

14.    The Group employs the drilling units primarily on a day rate basis for periods of

between two months and six years to drill wells for its customers.  Payments are set at a fixed amount for each day that the unit is operating under a contract at full efficiency.  A higher "day rate" is charged on days when actual drilling operations are being undertaken and lower rates are charged during periods of mobilization, or when drilling operations are interrupted or restricted by equipment breakdowns, adverse environmental conditions or other conditions beyond the company's control.  Contracts are generally obtained through a competitive bidding process with other contractors.  The Group's customers are typically major oil companies, integrated oil and gas companies, state-owned national oil companies and independent oil and gas companies.  *See* Kandylidis Declaration ¶ 10.

15.    The Group maintains that its sixth and seventh generation drilling units are among the most sophisticated and technologically advanced drilling units in the world.  Among other technological enhancements, most of its drilling units are equipped with dual derrick technology, which involves two drilling systems that permit two drilling-related operations to take place simultaneously.  The Group estimates this technology saves between 15% and 40% in drilling time, depending on the well parameters.  The sixth generation drilling units are capable of drilling up to 40,000 feet deep at water depths of up to 10,000 feet and the seventh generation drilling units have the capacity to drill up to 40,000 feet deep at water depths of up to 12,000 feet.  *See* Kandylidis Declaration ¶ 11.

16.    Currently, the Group's revenues are dependent on five units; the *Leiv Eiriksson*, which is operating offshore Norway; the *Ocean Rig Corcovado* and the *Ocean Rig Mykonos*, which are operating offshore Brazil; and the *Ocean Rig Poseidon* and the *Ocean Rig Skyros*, which are operating offshore Angola.  The other six units, the *Eirik Raude*, the *Ocean Rig Olympia*, the *Ocean Rig Mylos*, the *Ocean Rig Athena*, the *Ocean Rig Paros* and the *Ocean Rig*

10

*Apollo* are currently uncontracted and have been decommissioned for storage. Decommissioned rigs must be either "cold stacked" or "warm stacked" in order to preserve the units pending reactivation. "Cold stacked" rigs require a longer period of time and greater cost to reactivate than "warm stacked" rigs. Rig deactivation costs are approximately $5 million per unit. The daily costs for "warm stacked" rigs are approximately $40,000 per day. The daily costs for "cold stacked" rigs are approximately $5,000 per day. *See* Kandylidis Declaration ¶ 12; Appell Declaration ¶ 12.

17.    The oil and gas drilling industry is currently in a down-cycle, as crude oil prices have fallen during the past several years. The price of crude oil has fallen from over $100 per barrel in March 2014, to approximately $52 per barrel in March 2017, and UDW's share price has fallen from a high of $19.87 on June 20, 2014, to $0.73 as of March 24, 2017. The significant decrease in oil prices is expected to continue to reduce customer demand in the industry during 2017. In fact, a number of the Group's customers have revised their budgets to decrease projected expenditures for offshore drilling on multiple occasions. Declines in capital spending levels, coupled with an oversupply of newbuilding, have and are likely to continue to put significant pressure on "day rates" and utilization. The Group has come under severe financial pressure as a result of these factors. The Group does not expect that its inactive rigs will begin work under new contracts until January 1, 2020 at the earliest. According to an energy industry expert report commissioned by the Group, deepwater rig demand is currently at utilization rates of only approximately 45% of available rigs and is not expected to begin to improve until 2019. Even by the first quarter of 2020, utilization rates are expected to remain below 60% of rig availability. *See* Kandylidis Declaration ¶ 13.

18.    As a result of the foregoing, the Group will continue to face significant challenges

11

in the near and mid-term.  Of the Group's five operational units, two are under contracts that will expire during the second half of 2017, and two are under contracts that will expire during 2018. Only one unit, the *Ocean Rig Skyros*, is under a long term contract (expiring September 30, 2021).  *See* Kandylidis Declaration ¶ 14.

19.     Prior to commencing the Cayman Provisional Liquidation Proceedings, the Debtors were facing significant challenges with respect to their Scheme Indebtedness.  DRH and UDW both have obligations to make sizeable payments on April 3, 2017.  DRH has an interest payment of $14.9 million due in respect of the SSNs.  DRH had to consider that if it made this payment its projected cash balances would be depleted to approximately $4 million by June 2017.  UDW has an interest payment of $4.7 million due in respect of the SUNs.   UDW does not have sufficient cash to make this payment without borrowing funds that it will be unable to repay.  Both entities are insolvent.  The failure to pay these obligations beyond thirty days after the scheduled payment dates would trigger cross-defaults under the Credit Agreements.  *See* Kandylidis Declaration ¶ 15; Appell Declaration ¶ 15.

20.     The Debtors also had to consider that, even if they made the April 3, 2017 payments, the Group would face another critical inflection point at the October 1, 2017 maturity of the $460 million SSNs.  *See* Reynolds Declaration ¶ 9.  Neither DRH nor UDW, as guarantor, will have sufficient cash or financeable assets to pay the SSNs at maturity.  Failure to repay the SSNs would trigger cross-defaults under the Credit Agreements and the SUN Indenture.  Such cross-defaults could cause an acceleration of approximately $3.7 billion in debt, the loss of critical customer contracts, and the destruction of a substantial portion of the value of the Group. Further, beyond the SSN maturity date, the Debtors are projected to breach the leverage covenant in the Credit Agreements by December 31, 2017.  *See* Kandylidis Declaration ¶ 16; Appell

12

Declaration ¶ 16.

21.     For these reasons, the Group retained legal and financial advisors in early 2016 to

consider various restructuring alternatives.  The Group ultimately decided to engage primarily

with an ad hoc group of lenders under the DFH Credit Agreement and the DOV Credit

Agreement (the "**Ad Hoc Group**"), as the units owned by those divisions are among the most

technologically advanced and valuable in the fleet, and because the members of the Ad Hoc

Group were willing to engage constructively with the Group on a restructuring founded on

realistic valuations of the Group's assets, the benefits of a significant deleveraging and the

prognosis for the industry.  *See* Kandylidis Declaration ¶ 17.

22.     Negotiations with the Ad Hoc Group have culminated in a restructuring

agreement (the "**RSA**") that is supported by approximately 73%[2] of the aggregate amount of

Scheme Indebtedness at UDW.  If the Cayman Schemes are ultimately sanctioned by the

Cayman Court, the Group will achieve its much needed deleveraging.  The Cayman Schemes

contemplate the exchange of approximately $3.7 billion of existing financial indebtedness of the

Group for new equity in UDW (the "**New Parent Equity**"), cash payments of about $288

million (the "**Cash Consideration**") and new secured debt of $450 million (the "**New Secured**

**Debt**").  If the contemplated restructuring is achieved, the Group will be well placed to continue

to operate as the market recovers and to effectively compete as an industry leader.  *See*

Kandylidis Declaration ¶ 17; Appell Declaration ¶ 17.

23.     The RSA contemplates that the restructuring of the Group will be implemented

through four separate Cayman Schemes, one for each Debtor.  The Cayman Schemes are all

interrelated, but only the UDW scheme, the DOV scheme and the DFH scheme are inter-

---

[2]    Includes pending trades that have not yet closed.

conditional (*i.e.*, for any one of those schemes to become effective, all three must be sanctioned by the Cayman Court).  The terms of the contemplated Cayman Schemes are as follows:

a. <u>UDW Scheme</u>: The SUNs and the UDW Guarantees will be discharged in exchange for New Parent Equity.  This New Parent Equity will be valued at the asset value of UDW immediately prior to the restructuring of DRH, DFH and DOV (i.*e.*, while SSNs, the DOV loans and the DFH loans remain outstanding in the hands of the third-party creditors).   The New Parent Equity will be allocated among the holders of the UDW Guarantees and the SUNs pro rata on the basis of the notional amount of the claims of such holders.

b. <u>DRH Scheme</u>: The claims of the SSNs will be transferred to UDW in exchange for (i) New Parent Equity and (ii) Cash Consideration.  The Cash Consideration will be shared pro rata with the lenders under the Credit Agreements under the DFH and the DOV schemes from a pool of available cash.  The value of the New Parent Equity received in exchange for the transfer of the SSNs to UDW will equal the going concern value of DRH, less the Cash Consideration received by holders of the SSNs in the exchange.

c. <u>DFH and DOV Schemes</u>: In the DOV and DFH schemes, the lenders under the Credit Agreements will transfer their loans to UDW in exchange for (i) New Parent Equity, (ii) New Secured Debt and (iii) Cash Consideration.  The Cash Consideration will be shared pro rata among the lenders under the Credit Agreements and, if the DRH scheme is also sanctioned, the holders of the SSNs. The New Secured Debt will be shared pro rata among the lenders under the Credit Agreements.  The value of the New Parent Equity received in exchange for the

14

transfer of the loans under the DOV Credit Agreement to UDW will equal the

going concern value of DOV, less the Cash Consideration and New Secured Debt

received by the lenders under the DOV Credit Agreement in the exchange.  The

value of the New Parent Equity received in exchange for the transfer of the loans

under the DFH Credit Agreement to UDW will equal the going concern value of

DFH, less the Cash Consideration and New Secured Debt received by the lenders

under the DFH Credit Agreement.

*See* Kandylidis Declaration ¶¶ 18-21; Appell Declaration ¶¶ 18-21.

24.    In accordance with the requirements of the RSA, the Group entered into a global

settlement agreement (the "**GSA**") pursuant to which (i) it canceled approximately $369 million

of SUNs and approximately $340 million of SSNs held by certain subsidiaries of UDW, Alley

Finance Co., and Algarve Finance Limited, and (ii) all intragroup liabilities among the members

of the Group were released.  The effect of the GSA is that the scheme consideration to be

received by UDW, DOV and DRH scheme creditors will be of a greater value in any event than

if the GSA had not been entered into.  DFH creditors will receive slightly less, but, as of the date

hereof, 84.25% of the DFH lenders support the proposed RSA.  *See* Kandylidis Declaration ¶ 22;

Appell Declaration ¶ 22.

25.    As a consequence of the filing of winding up petitions and the commencement of

the Cayman Provisional Liquidation Proceedings, the Debtors have triggered defaults and cross-

defaults under their financial indebtedness and have exposed themselves to any number of

adverse actions in the United States.  If provisional relief in the form of a stay is not granted,

there is substantial risk that certain creditors may place the company in imminent peril in an

effort to jeopardize the restructuring.  The Debtors are already the target of aggressive litigation

tactics initiated by certain holders of the SSNs and by UDW's largest individual shareholder,
who through his company is also the largest holder of the SUNs and a holder of loans under the
Credit Agreements. These parties are positioning themselves to stymy the Debtors'
reorganization efforts in order to extract value to which they are not entitled to under any
reasonable restructuring scenario. *See* Kandylidis Declaration ¶ 35.

## ARGUMENT

### I.    THE REQUIREMENTS FOR RECOGNITION OF THE CAYMAN PROCEEDINGS AS FOREIGN MAIN PROCEEDINGS UNDER CHAPTER 15 HAVE BEEN MET

26.    As a threshold matter, the Court of Appeals for the Second Circuit, which has
jurisdiction over the New York bankruptcy courts, has held that foreign debtors seeking chapter
15 relief must satisfy the debtor eligibility requirements set forth in section 109(a) of the
Bankruptcy Code. *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737
F.3d 238, 247-51 (2d Cir. 2013). Each of the Debtors satisfies the requirements of section 109(a)
of the Bankruptcy Code.

27.    The remaining requirements for recognition of a foreign proceeding under chapter
15 are set forth in section 1517(a) of the Bankruptcy Code. Subject to section 1506, a foreign
proceeding must be recognized if the following requirements are met:

> (1)    such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
>
> (2)    the foreign representative applying for recognition is a person or body; and
>
> (3)    the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a); *see also In re Millard*, 501 B.R. 644, 651 (Bankr. S.D.N.Y. 2013) (section
1517 provides a "statutory mandate that recognition be granted upon compliance with the

requirements of section 1517(a)(1), (2) and (3)") (citing *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1021 (5th Cir. 2010)); *In re ABC Learning Centres Ltd.*, 728 F.3d 301, 306 (3d Cir. 2013) *cert. denied*, 134 S. Ct. 1283 (2014) (recognition mandatory when an insolvency proceeding meets the section 1517 criteria).

28.    As demonstrated below, the Debtors are eligible for chapter 15 relief because they have property located in the United States. Moreover, the Verified Petition and the Cayman Proceedings satisfy each of the foregoing requirements for recognition.

### A.    The Debtors Satisfy Section 109(a)

29.    Pursuant to section 109(a) of the Bankruptcy Code, "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor" under the Bankruptcy Code. 11 U.S.C. § 109(a). The question that most often arises in interpreting section 109(a) is what constitutes "property in the United States," particularly because section 109(a) does not address how much property must be present or when or how long property must have a situs in the United States.

30.    Numerous courts have indicated that the "property" requirement is easily satisfied. *See In re Octaviar Admin. Pty. Ltd.*, 511 B.R. 361, 369-74 (Bankr. S.D.N.Y. 2014) (finding that foreign debtor satisfied section 109(a) based on claims the foreign debtor had under U.S. law against U.S. defendants and retainer that foreign representative deposited in client trust account to secure representation by U.S. law firm); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 412-13 (Bankr. S.D.N.Y. 2014) (establishment of a bank account in New York prior to commencement of the chapter 15 proceeding was sufficient to satisfy section 109(a)); *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) (finding that debtors' maintenance of original business documents in the United States constituted "property in the

765997680

United States" under section 109).  In fact, this Court recently held that even New York choice

of law and forum selection clauses in a debtor's indenture constitute sufficient property to satisfy

section 109(a).  *See In re Berau Capital Resources Pte Ltd.*, 540 B.R. 80, 83 (Bankr. S.D.N.Y.

2015) ("The Court concludes that the presence of the New York choice of law and forum

selection clauses in the Berau indenture satisfies the section 109(a) 'property in the United

States' eligibility requirement.").

    31.    Furthermore, this Court has previously found that actively taking steps to meet the

property requirement of section 109(a) is not improper conduct and does not constitute bad faith.

In *Suntech*, the debtor had no property or business in the United States at the time its joint

provisional liquidators agreed to file a chapter 15 case there.  The joint provisional liquidators

subsequently established a bank account in New York, transferred $500,000 into that account

and filed the chapter 15 case the next day.  This Court found that these actions were proper,

stating:  "Interpreting the Bankruptcy Code to prevent an ineligible foreign debtor from

establishing eligibility to support needed chapter 15 relief [would] contravene the purposes of the

statute to provide legal certainty, maximize value, protect creditors and other parties in interests

[sic] and rescue financially troubled businesses."  *In re Suntech*, 520 B.R. at 413.

    32.    Here, it is clear that the Debtors lack a United States domicile or place of

business.  However, each Debtor clearly meets the burden of proving that it has property in the

United States and, more specifically, in New York.   First, each Debtor has paid an attorney

retainer fee of $250,000 to Orrick, Herrington & Sutcliffe, LLP, a New York law firm.  The

retainer fees are held in Orrick's client trust account at Citibank Private Bank in New York,

where they shall remain pending the final billing in these proceedings.  *See* Kandylidis

Declaration ¶ 32; Appell Declaration ¶ 32(f).  Second, share certificates of DRH, DFH and DOV,

18

which are pledged to secure the UDW Guarantees, are held by the respective collateral agents or

collateral trustee in the United States, as are the pledged shares of the subsidiaries of each of the

Subsidiary Debtors.  Furthermore, the SUN Indenture, the DRH Indenture and the Credit

Agreements are all expressly governed by New York law.  *See* SUN Indenture § 12.06, DRH

Indenture § 13.06, DFH Credit Agreement § 5.07, DOV Credit Agreement § 5.07; *see also*

Kandylidis Declaration ¶ 6.  Moreover, the Credit Agreements both include a forum selection

clause designating "the courts of the state of New York or of the United States for the Southern

District of New York, in each case which are located in the County of New York" as their

chosen fora.  *See* DFH Credit Agreement § 5.07, DOV Credit Agreement § 5.07.  Thus, the

Debtors should not be precluded from commencing and prosecuting their Chapter 15 Cases on

the basis of section 109.

> **B.     The Verified Petition Meets the Requirements of Section 1515**

33.     The Chapter 15 Cases were duly and properly commenced in accordance with

sections 1504, 1509 and 1515 of the Bankruptcy Code.  The JPLs filed the Verified Petition for

recognition of foreign proceedings pursuant to section 1515(a), which was accompanied by all

documents and information required by sections 1515(b) and (c) and the relevant Bankruptcy

Rules, including (a) a certified copy of the Cayman Order with respect to each Debtor; (b) a

statement identifying all foreign proceedings known to the JPLs with respect to the Debtors; (c)

corporate ownership statements containing the information described in Bankruptcy Rule

1007(a)(4); and (d) a list containing (i) the names and addresses of all persons or bodies

authorized to administer foreign proceedings of the Debtors, (ii) all parties to litigation pending

in the United States to which each Debtor is a party at the time of the filing of the petition, and

(iii) all entities against whom provisional relief is being sought under section 1519 of the

765997680

Bankruptcy Code.  The JPLs respectfully submit that they have satisfied the clear and objective standards for compliance with section 1515 of the Bankruptcy Code.

### C.    Each of the JPLs Qualifies as a "Foreign Representative"

34.    A chapter 15 case is commenced by the filing of a petition for recognition (and related documents) by the "foreign representative." *See* 11 U.S.C. 1504, 1509(a), 1515(a).  A bankruptcy court may presume that the person petitioning for chapter 15 recognition is a foreign representative if the decision or certificate from the foreign court so indicates.  11 U.S.C. § 1516(a).  The Bankruptcy Code defines "foreign representative" as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

35.    The Cayman Orders expressly appoint the JPLs as "the duly authorised foreign representative[s] of the [Debtors]" and authorize the JPLs "to seek relief under Chapter 15 of Title 11 of the United States Bankruptcy Code, and to take such steps arising in connection therewith that the JPLs may consider appropriate."  Cayman Orders ¶ 3.  The Cayman Orders further grant the JPLs the power to "seek recognition of their appointment in any jurisdiction the JPLs deem necessary."  *Id.* ¶ 5(e).  *See also* Reynolds Declaration ¶ 53.

36.    In light of the statutory presumption, the Bankruptcy Code's definition of "foreign representative" and the express provisions of the Cayman Orders, the JPLs are each proper "foreign representatives" of the Debtors within the meaning of section 101(24) of the Bankruptcy Code.  *See also* Appell Declaration ¶¶ 23-26; Reynolds Declaration ¶¶ 52-53.

### D.    The Cayman Proceedings Are "Foreign Proceedings"

37.    The Cayman Proceedings are "foreign proceedings" as required for recognition

under section 1517(a) of the Bankruptcy Code. *See* 11 U.S.C. 1517(a)(1). The Bankruptcy Code

defines a "foreign proceeding" as

> a collective judicial or administrative proceeding in a foreign
> country, including an interim proceeding, under a law relating to
> insolvency or adjustment of debt in which proceeding the assets and
> affairs of the debtor are subject to control or supervision by a foreign
> court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

38.     As set forth in further detail in the Reynolds Declaration, the Cayman Provisional

Liquidation Proceedings and the contemplated Cayman Schemes are "collective judicial

proceedings" commenced under Parts V and IV, respectively, of the Companies Law, which—as

the statute applicable to corporate insolvencies (in the case of the provisional liquidations) or the

adjustment of debt (in the case of the contemplated schemes)—is a "law relating to insolvency or

adjustment of debt." *See* Reynolds Declaration ¶ 51.  Under the Companies Law, a Cayman

Court may (i) give regard to the wishes of creditors for all matters related to the winding up of an

insolvent company, (ii) make all debts payable on a contingency basis and all present or future,

certain or contingent claims against the company admissible in the proceeding, (iii) appoint a

liquidator who is required to convene meetings of the creditors, and (iv) apply the property of the

debtor in satisfaction of its liabilities *pari passu* and distribute such property to creditors

according to their rights and interests.  *See* Companies Law §§ 105, 115, 139(1), 140(1).  In

addition, through the Cayman Proceedings, the JPLs, as "[o]fficers of the [Cayman] Court," are

subject to the control of the Cayman Court, and the JPLs or any creditor may apply to the

Cayman Court for an order for the continuation of the winding up under the supervision of the

Cayman Court.  *See* Companies Law §§ 108(2), 104(4), 131-133; *see also* Reynolds Declaration

¶¶ 31, 34.  The debtors' assets and affairs are also subjection to the control or supervision of the

21

Cayman Court in both provisional liquidation proceedings and schemes of arrangement. *See id.*

¶ 51. Finally, the purpose of the Cayman Provisional Liquidation Proceedings is reorganization

or, should the reorganization fail, liquidation; the purpose of the contemplated Cayman Schemes

is reorganization by way of an adjustment of debt. *See generally* Cayman Orders; Reynolds

Declaration ¶ 51.

39.    The conclusion that the Cayman Proceedings are foreign proceedings within the

meaning of section 101(23) is further supported by precedent.  On multiple occasions, this Court

and others have previously held that insolvency proceedings (including provisional liquidations)

and schemes of arrangement under Cayman Islands law qualify as foreign proceedings under

chapter 15 of the Bankruptcy Code.  *See, e.g.*, *In re Suntech Power Holdings Co.*, 520 B.R. 399

(Bankr. S.D.N.Y. 2014) (provisional liquidation); *In re Platinum Partners Value Arbitrage Fund

et al.*, No. 16-12925 (SCC) [ECF No. 27] (Bankr. S.D.N.Y. Nov. 23, 2016) (official liquidation);

*In re Ardent Harmony Fund, Inc.*, No. 16-12282 (MG) [ECF No. 17] (Bankr. S.D.N.Y. Sept. 1,

2016) (official liquidation); *In re Caledonian Bank Ltd.*, No. 15-10324 (MG) [ECF No. 39]

(Bankr. S.D.N.Y. Mar. 17, 2015) (official liquidation); *In re LDK Solar Co.*, No. 14-12387

(PJW) [ECF Nos. 43, 44] (Bankr. D. Del. Nov. 21, 2014) (provisional liquidation and scheme of

arrangement).

**E.    The Cayman Proceedings Are "Foreign Main Proceedings"**

40.    The Cayman Proceedings are "foreign main proceedings" within the meaning of

section 1502(4) of the Bankruptcy Code because each Debtor's center of main interests

("**COMI**") is the Cayman Islands.

**1.    Each Debtor's COMI Is the Cayman Islands**

41.    The Bankruptcy Code defines a "foreign main proceeding" as "a foreign

proceeding pending in the country where the debtor has the center of its main interests." *See* 11

U.S.C. § 1502(4).  A foreign proceeding "shall be recognized" as a foreign main proceeding if it

is pending where the debtor has its COMI.  *See* 11 U.S.C. § 1517(b)(1).  The Bankruptcy Code

does not define "center of main interests," but, pursuant to section 1516(c) of the Bankruptcy

Code, it is presumed that a debtor's COMI is the location of its registered office "absent

evidence to the contrary."  *See* 11 U.S.C. § 1516(c); *see also In re Millennium Glob. Emerging*

*Credit Master Fund Ltd.*, 458 B.R. 63, 76 (Bankr. S.D.N.Y. 2011) *aff'd*, 474 B.R. 88 (S.D.N.Y.

2012) (finding in the context of section 1516 that "[t]he party seeking to rebut a statutory

presumption must present enough evidence to withstand a motion for summary judgment"); *In re*

*ABC Learning Centres Ltd.*, 445 B.R. 318, 333 (Bankr. D. Del. 2010) *aff'd*, 728 F.3d 301 (3d

Cir. 2013) (holding that debtor's registered jurisdiction was its COMI where debtor established

the section 1516 presumption no objection was raised or evidence presented rebutting the section

1516 presumption).  However, the legislative history indicates that this presumption was

"designed to make recognition as simple and expedient as possible" in cases where COMI is not

controversial.  H. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 112-13 (2005).  Accordingly,

"[t]his presumption is *not a preferred alternative where there is a separation between a*

*corporation's jurisdiction of incorporation and its real seat.*"  *In re Bear Stearns High-Grade*

*Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 128 (Bankr. S.D.N.Y. 2007)

(emphasis in original).

     42.    Courts have identified several additional factors which may be considered in a

COMI analysis, including:

> the location of the debtor's headquarters; the location of those who
> actually manage the debtor (which, conceivably could be the
> headquarters of a holding company); the location of the debtor's
> primary assets; the location of the majority of the debtor's creditors

23

or of a majority of the creditors who would be affected by the case;
and/or the jurisdiction whose law would apply to most disputes.

*In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006); *In re Bear Stearns*, 374

B.R. at 128. While each of these factors may serve as a "helpful guide" in determining a debtor's

COMI, these factors are not exclusive, and none of the factors are required nor dispositive. *See*

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137-38 (2d Cir.

2013) (explaining that "consideration of these specific factors is neither required nor dispositive"

and warning against mechanical application).

43.    Moreover, the Second Circuit and other courts often examine whether a chapter

15 debtor's COMI would have been ascertainable to interested third parties, finding "the relevant

principle is that the COMI lies where the debtor conducts its regular business, so that the place is

ascertainable by third parties . . . . Among other factors that may be considered are the location

of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes." *In*

*re Fairfield Sentry*, 714 F.3d at 130.    As the Second Circuit explained, by examining factors "in

the public domain," courts are readily able to determine whether a debtor's COMI is in fact

"regular and ascertainable and not easily subject to tactical removal." *Id.* at 136-37.  *See also In*

*re British Am. Ins. Co.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's

COMI should be readily ascertainable by third parties."); *In re Betcorp Ltd.*, 400 B.R. 266, 289

(Bankr. D. Nev. 2009) (looking to ascertainability of COMI by creditors).

44.    In assessing these factors, a chapter 15 debtor's COMI is determined as of the

filing date of the chapter 15 petition, without regard to the debtor's historic operational activity.

*See In re Fairfield Sentry*, 714 F.3d at 137 ("[A] debtor's COMI should be determined based on

its activities at or around the time the chapter 15 petition is filed, as the statutory text suggests.").

However, as discussed in greater detail below, to the extent that a debtor's COMI has shifted

prior to filing its chapter 15 petition, courts may engage in a more holistic analysis to ensure that the debtor has not manipulated COMI in bad faith.

45.     The JPLs submit that, as of the Petition Date, each Debtor's "center of main interests" within the meaning of chapter 15 of the Bankruptcy Code is in the Cayman Islands and that COMI was not manipulated prior to the filing in bad faith.  Thus, the Cayman Proceedings are foreign main proceedings based on consideration of the following factors:

**a.      Place of Incorporation and Current Presence**

46.     As previously noted, UDW is a Cayman Islands registered corporation.  UDW migrated from the RMI, where it had been a non-resident domestic corporation, on April 14, 2016.  The Subsidiary Debtors are each wholly owned direct subsidiaries of UDW.  They are RMI non-resident domestic corporations and registered as foreign companies in the Cayman Islands on October 18, 2016.  Each of the Debtors is a holding company whose primary assets are the equity interests in their respective subsidiaries.  Each Debtor maintains its head office in the Cayman Islands in office space provided by an affiliate, Ocean Rig SEZ Co. (defined below). *See* Kandylidis Declaration ¶ 23.

47.     Although UDW was previously a tax resident of Cyprus, it ceased being a tax resident there effective December 31, 2016 and no longer maintains any presence in Cyprus.  UDW also maintains a "law 89 establishment" in Greece.  Law 89 permits foreign commercial and industrial companies to maintain an establishment in Greece exclusively for the provision of limited types of serviced for head offices or affiliates outside of Greece.  Foreign companies with law 89 license in Greece are required to spend U.S. $50,000 per year in Greece.  UDW established its "law 89 establishment" with the intention of providing ship-brokerage services to affiliates, but the brokerage services were never provided as intended.  As a result, UDW is in

765997680

the process of getting its law 89 establishment license terminated.  Affiliates of the Debtors also maintain offices in Norway, Angola, Brazil and Jersey.  *See* Kandylidis Declaration ¶ 24.

48.    None of the Debtors has ever conducted operations or directed their affairs from the RMI, has ever maintained administrative, management or executive offices in the RMI, has ever had any directors who were residents or citizens of the RMI, or has ever held a meeting of its directors or shareholders in the RMI.  Public notice of the opening of UDW's head office in the Cayman Islands was provided by SEC Form 6-K on September 27, 2016 and the Debtors gave notice of their registration in the Caymans by subsequent press release.  *See* Kandylidis Declaration ¶ 25.

### b.    Location of Board of Directors and Officers

49.    The board of directors of UDW is comprised of six directors, one of whom, Michael Pearson, has his primary residence in the Cayman Islands.  The other five directors of UDW are resident in Monaco and Greece.  The board of directors of DRH is comprised of four directors, two of whom, Michael Pearson and Casey McDonald, have their primary residences in the Cayman Islands, and two of whom have residences in the Cayman Islands.  The boards of directors of DFH and DOV are each composed of three directors, one of whom, Michael Pearson, has his primary residence in the Cayman Islands, and two of whom have residences in the Cayman Islands.  *See* Kandylidis Declaration ¶ 26; Appell Declaration ¶ 32(a).

50.    UDW board meetings have been held exclusively in the Cayman Islands since a regular meeting held in the Cayman Islands on November 17, 2016.  Meetings of the UDW board were also held in the Cayman Islands on February 3, 2017, February 21, 2017 and March 23, 2017.  Meetings of a special committee of the UDW board were held in the Cayman Islands on March 7, 2017 and March 16, 2017.  Board meetings of the Subsidiary Debtors have been

26

765997680

held exclusively in the Cayman Islands since meetings held in the Cayman Islands on February 3, 2017.  Meetings of the boards of the Subsidiary Debtors were also held in the Cayman Islands on February 21, 2017 and March 23, 2017, and meetings of special committees of each of the Subsidiary Debtors were held in the Cayman Islands on March 7, 2017 and March 16, 2017.   As noted, no directors have ever been located in the RMI and no directors' meetings have ever taken place there.  *See* Kandylidis Declaration ¶ 27; Appell Declaration ¶ 32(a).

### c.        Location of Officers

51.        The President and Chief Financial Officer, the Company Secretary, and the Vice President of Business Development of UDW have places of residence in the Cayman Islands and work in the Cayman Islands in office space provided by Ocean Rig SEZ Co. pursuant to the terms of their Zone Employment Certificates.  All of the officers of the Subsidiary Debtors have places of residence in the Cayman Islands and work in the Cayman Islands in office space provided by Ocean Rig SEZ Co. pursuant to the terms of their Zone Employment Certificates. Each of these officers use mobile phones with Cayman Islands phone numbers.  *See* Kandylidis Declaration ¶ 28; Appell Declaration ¶ 32(b).

### d.        Location of Operations

52.        The Debtors' subsidiaries do business throughout the world, principally on the high seas.  Head office and administrative service functions for the Debtors, formerly performed by an affiliate located in Cyprus, are now performed by an affiliate, Ocean Rig Cayman Management Services SEZC Limited ("**Ocean Rig SEZ Co.**") in the Cayman Islands.  Ocean Rig SEZ Co. is licensed to operate and is located in the Maritime Park in the Special Economic Zone at Cayman Enterprise City in the Cayman Islands, where it provides office space and administrative support services to the Debtors.  One of the employees of Ocean Rig SEZ Co. has

27

her primary residence in the Cayman Islands. All of the other employees of Ocean Rig SEZ Co. have residences in the Cayman Islands. The Services Agreement between Ocean Rig SEZ Co. and the Debtors is governed by Cayman Islands law. *See* Kandylidis Declaration ¶ 30; Appell Declaration ¶ 32(d).

### e.    **Location of Assets**

53.    Each of the Debtors is a holding company. The share certificates of DRH, DFH and DOV are pledged to secure the UDW Guarantees and are held by the respective collateral trustees in the United States, as are the shares of the subsidiary guarantors under the Subsidiary Debtors' credit facilities. The share certificates of other subsidiaries are unpledged and represent valuable interests in these subsidiaries' cash and rigs. These certificates are held in the Cayman Islands. *See* Kandylidis Declaration ¶ 31; Appell Declaration ¶ 32(e).

### f.    **Location of Bank Accounts**

54.    Each of the Debtors has a bank account in the Cayman Islands. The paying agents for the Debtors' financial indebtedness have been instructed to address all invoices for payment due to the office of Ocean Rig SEZ Co. in the Cayman Islands. Payments to professionals have been made from the Cayman accounts, including a retainer of $250,000 paid by each of the Debtors (total $1 million) to the Debtors' U.S. restructuring counsel, Orrick, Herrington & Sutcliffe LLP. These retainers are being held in counsel's client trust account at Citibank Private Bank in New York, where they shall remain pending the final billing in these proceedings. *See* Kandylidis Declaration ¶ 32; Appell Declaration ¶ 32(f).

### g.    **Books and Records**

55.    The minute book of UDW has been maintained in the Cayman Islands since November 2016. The minute books of each of the Subsidiary Debtors has been maintained in

the Cayman Islands since January 2016.  *See* Kandylidis Declaration ¶ 33; Appell Declaration ¶ 32(g).

### h.      **Restructuring Activities**

56.      Face-to-face creditor meetings were held in the Cayman Islands on November 21 through 23, 2016 and February 7 through 9, 2017.  Numerous conference calls with creditors have been hosted by the Debtors from the Cayman Islands.  The Debtors have also met frequently in the Cayman Islands with their legal and financial advisers.  *See* Kandylidis Declaration ¶ 34; Appell Declaration ¶ 32(h).

### i.      **Notice of Relocation to Third Parties**

57.      *Paying Agents.*  The paying agent under the SUNs issued by UDW was notified on November 1, 2016 to address all future invoices for payment to the registered office of Ocean Rig SEZ Co. in the Cayman Islands.  The paying agent under the SSNs issued by DRH was notified on November 2, 2016 to address all future invoices for payment to the registered office of Ocean Rig SEZ Co. in the Cayman Islands.  The paying agent under the DFH Credit Agreement was notified on January 23, 2017 to address all future invoices for payment to the registered office of Ocean Rig SEZ Co. in the Cayman Islands.  The paying agent under the DOV Credit Agreement was notified on January 23, 2017 to address all future invoices for payment to the registered office of Ocean Rig SEZ Co. in the Cayman Islands.  *See* Kandylidis Declaration ¶ 29(a); *see generally* Appell Declaration ¶ 32(c).

58.      *Indenture Trustees, Administrative and Collateral Agents*.  The Indenture Trustee under the SUN Indenture was notified on February 6, 2017 to direct all notices for UDW to the registered office of the Ocean Rig SEZ Co. in the Cayman Islands.  The Indenture Trustee and the Collateral Agent, Registrar and Paying Agent under the DRH Indenture were notified on

765997680

February 6, 2017 to direct all notices for UDW and DRH to the registered office of the Ocean

Rig SEZ Co. in the Cayman Islands.  The Administrative Agent and the Collateral Agent under

the DFH Credit Agreement was notified on February 6, 2017 to direct all notices for UDW and

DFH to the registered office of the Ocean Rig SEZ Co. in the Cayman Islands.  The

Administrative Agent and the Collateral Agent under the DOV Credit Agreement was notified

on February 6, 2017 to direct all notices for UDW and DOV to the registered office of the Ocean

Rig SEZ Co. in the Cayman Islands.  *See* Kandylidis Declaration ¶ 29(b); *see generally* Appell

Declaration ¶ 32(c).

59.    *Investment Service Providers*.  Investment service providers, including Moody's

Investors Service, Inveshare, Broadridge and Standard & Poor Global Ratings, were notified of

UDW's change of address in November 2016 and have remitted invoices, as directed, to the

company in the Cayman Islands.  *See* Kandylidis Declaration ¶ 29(c); *see generally* Appell

Declaration ¶ 32(c).

60.    *Public Notice and General Recognition of Relocation*.  On September 27, 2016,

UDW filed a Form 6-K report with the SEC updating the address of its principal executive

offices to its registered office in the Cayman Islands.  On February 6, 2017, each of the Debtors

issued a press release advising that it had relocated its principal place of business to the Cayman

Islands and that the address for all postal communications to the companies should be directed to

the Ocean Rig SEZ Co. in the Cayman Islands.  Also on February 6, 2017, UDW announced that

its 2017 Annual General Meeting will be held on April 24, 2017 at the company's business

office in the Cayman Islands.  The contact details for the Debtors on the Group's website list the

Debtors' Cayman Islands address.  Media reports have been published acknowledging the

relocation of UDW's principal executive offices to the Cayman Islands.  The Company has been

765997680

served in an English legal proceeding in the Cayman Islands. A group of hostile distressed debt traders who hold SSNs retained counsel in the Cayman Islands in late February or early March, and by letter dated March 3, 2017 sought information regarding the Debtors restructuring plans in the Cayman Islands. Counsel to the Ad Hoc Group retained counsel in the Cayman Islands in the spring of 2016. *See* Kandylidis Declaration ¶ 29(d); *see generally* Appell Declaration ¶ 32(c).

### 2. Each Debtor Established its COMI in the Cayman Islands Prior to the Petition Date

61. As described above, the Debtors are holding companies of the Group and conduct their business throughout the world, principally on the high seas. *See* Kandylidis Declaration ¶ 30. Accordingly, the nature of the Group's business and the mobility of their assets complicate the COMI analysis.

62. However, the Debtors have been engaging in various activities for almost a year – beginning with the incorporation of UDW in April 2016 – in the Cayman Islands. Among other things, the Debtors have (i) hosted meetings with creditors and advisors in relation to the proposed restructuring in the Cayman Islands, (ii) provided specific notice of relocation to paying agents, parties to the SUN Indenture, DRH Indenture, DFH Credit Agreement and DOV Credit Agreement, and investment service providers, and, perhaps most importantly, (iii) provided public notice and general recognition of relocation through UDW's Form 6-K report with the SEC, press releases and media reports. *See generally* Kandylidis Declaration ¶¶ 23-34. Additionally, the Debtors' boards of directors and officers have been actively managing the Debtors from the Cayman Islands by, among other things, convening regular and special meetings in the Cayman Islands over the last few months. *See id.* ¶¶ 24-26. They will continue to fulfill such roles throughout the course of the Cayman Proceedings, as the Cayman Orders

31

765997680

specifically grant them the authority "to continue to exercise all powers of management conferred on them by the [Debtors] and conduct the ordinary, day-to-day, business operations of the [Debtors]." Cayman Orders ¶ 6.  These are the same kinds of activities that this Court has previously found to effectively establish a debtor's COMI.  *See In re Suntech*, 520 B.R. at 418 ("Centered in the Cayman Islands, the JPLs took the necessary steps to centralize the administration of the Foreign Proceeding there.  They published notices of the Foreign Proceeding directing interested parties to contact [management] in the Cayman Islands.  They changed the Debtor's address on SEC filings and informed the Debtor's lenders to send future notices to their offices in the Cayman Islands.  They conducted Board meetings and creditor meetings, largely through telephonic participation, from the Cayman Islands and appointed a Cayman Island[s] director.").  Thus, the Debtors' COMI was clearly the Cayman Islands before and on the Petition Date.  *See also* Appell Declaration ¶ 31.

63.    Moreover, it does not matter that the Subsidiary Debtors are registered as non-resident corporations in the RMI.  While section 1516(c) creates a presumption that a debtor's COMI is the situs of its registered office, such presumption is clearly rebuttable and should only be invoked "[i]n the absence of evidence to the contrary."  11 U.S.C. § 1516(c); *see also In re Fairfield Sentry Ltd.*, 440 B.R. 60, 64 (Bankr. S.D.N.Y. 2010) ("[A]s the Objectors have advanced evidence in support of their position that New York is the proper COMI, the Court cannot rely solely upon this presumption, but rather must consider all of the relevant evidence."); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 335 (S.D.N.Y. 2008) ("However, section 1516(c) creates no more than a rebuttable evidentiary presumption, which may be rebutted notwithstanding a lack of party opposition. … Such a rebuttable presumption at no time relieves a petitioner of its burden of proof/risk of non-

765997680

persuasion."); *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 48-49 (Bankr. S.D.N.Y.

2008) (declining to presume that the debtor's COMI is where its registered office is located

because there is enough "evidence to the contrary" to rebut section 1516(c)).  Moreover, the

Subsidiary Debtors are *also* registered as foreign companies under the Companies Law in the

Cayman Islands where, together with UDW, they maintain offices.  *See* Kandylidis Declaration ¶

4.  Thus, section 1516(c) does not indicate that the Subsidiary Debtors' COMI are the RMI.

  64. It is likewise of no consequence that UDW is classified as an "exempted" under

the Companies Law, even though "exempted" company status appears to limit that company's

activities in the Cayman Islands.  Section 163 of the Companies Law provides: "Any proposed

company applying for registration under this Law, *the objects of which are to be carried out*

*mainly outside the Islands*, may apply to be registered as an exempted company."  Companies

Law § 163 (emphasis added); *see also id.* § 174 (prohibiting exempted companies from trading

in the Cayman Islands except in furtherance of its business outside the Cayman Islands).

However, the vast majority of Cayman companies are incorporated as exempted companies

under the Companies Law.  *See* Reynolds Declaration ¶ 16.  While exempted companies are

prohibited from *trading* in the Cayman Islands, except in furtherance of their business outside

the Cayman Islands, they may still be *managed* from there:

> "Section 174 clarifies that it is not to be construed so as to prevent the exempted
> company from effecting and concluding contracts in the Cayman Islands and exercising
> in the Cayman Islands all of its powers necessary for the carrying on of its business
> outside the Cayman Islands.  An exempted company can therefore, for example, maintain
> premises and employ staff and appoint directors and other agents who are resident in the
> Cayman Islands, in furtherance of the company's business outside the Cayman Islands."

Reynolds Declaration ¶ 18.  *Cf. In re Bear Stearns*, 389 B.R. at 338 (mentioning the

debtors' status as exempted companies in discussing the debtors' lack of activities in the Cayman

Islands); *In re Basis Yield*, 381 B.R. at 49 (finding that the debtor was not entitled to the

presumption under section 1516(c) because "there is at least a *question* in the Court's mind as to whether this exempted company … would have its COMI in the Cayman Islands") (emphasis in original).  In light of the fact that the business of the Group is generally conducted on the high seas, it is clear that, in this case, the Group's business would be conducted outside of any jurisdiction in which it was managed.  Accordingly, the Cayman Islands is the site of the Debtors' "main interests" because it is the site where their business is run.

65.    Finally, there is no evidence suggesting any other potential location for the Debtors' COMI.  First, the RMI are not the COMI for the Debtors – even the Subsidiary Debtors – because none of the Debtors has ever conducted operations or directed their affairs from the RMI, has ever maintained administrative, management or executive offices in the RMI, has ever had any directors who were residents or citizens of the RMI, or has ever held a meeting of its directors or shareholders in the RMI.  *See* Kandylidis Declaration ¶¶ 4, 25.  Second, although UDW was previously a tax resident of Cyprus, it has not been a tax resident there since December 2016 and it no longer maintains any presence there.  *See id.* ¶ 24.  Third, while UDW maintains a law 89 establishment in Greece pursuant to which it may conduct ship brokerage services to other members of the Group, it is not conducting such services and is currently in the process of terminating its law 89 license.  *See id.* ¶ 24.  Given the lack of suitable alternatives, the mobile nature of the Debtors' business and the vast majority of COMI factors pointing to the Cayman Islands, the Court should find that the Debtors indisputably established their COMI in the Cayman Islands before the Petition Date and that it remains there today.  *See In re Millennium Glob.*, 458 B.R. at 79 ("In addition to the fact that Bermuda was the only COMI reasonably ascertainable by third parties, *there is insufficient evidence in this case that establishes the COMI in a location other than Bermuda. … On this record, the proof does not*

*establish an alternative COMI.* Since every entity has a center of main interests … the fact that the evidence does not disclose a COMI other than Bermuda operates in favor of granting recognition of the Bermuda proceedings as foreign main proceedings.") (emphasis added).

### 3.    The Debtors Have Not Manipulated COMI in Bad Faith

66.    As indicated above, "[i]n any proceeding for foreign recognition, of great concern to the Court is the potential for mischief and COMI manipulation. … Thus, even courts that have recently relegated the COMI focus to the time of the petition for recognition … would likely support a totality of the circumstances approach where appropriate." *In re Fairfield Sentry*, 440 B.R. at 65-66. Although the Debtors purposefully established the Cayman Islands as their COMI prior to the Petition Date, such actions were not taken in bad faith, and the Court should not deny recognition on this ground.

67.    In discussing potential "bad faith" reasons for shifting COMI, courts have specifically named "insider exploitation, untoward manipulation, [and] overt thwarting of third party expectations" as examples. *Id.* There is no evidence in the record pointing to any of these motivations and, on the contrary, the Debtors took great care to notify third parties as to their new location in the months preceding the Chapter 15 Cases.

68.    More importantly, the Debtors had a legitimate, good faith purpose for taking steps to establish their COMI in the Cayman Islands, a jurisdiction that maintains a sophisticated judiciary and a fair and well developed insolvency regime.

69.    Although UDW was a non-resident corporation incorporated in the RMI until April 2016, and DRH, DFH and DOV are still non-resident corporations in the RMI, the RMI has not adopted the Bankruptcy Code, has no bankruptcy or insolvency statute currently in force and has no statutory, regulatory or administrative provisions regarding corporate restructuring.

765997680

*See* Reeder Declaration ¶¶ 8-9.  The only provisions under RMI law that address financially

distressed corporations – the Business Corporations Act and the Uniform Foreign Money-

Judgments Recognition Act – contemplate dissolution and, therefore, any insolvency process in

the RMI would invariably result in a value destroying liquidation process.  *See id.* ¶ 10.

Accordingly, the Debtors' establishment of COMI in the Cayman Islands was motivated by the

intent to maximize value for their creditors and preserve their assets.  Thus, the Court should not

find that COMI was manipulated in bad faith.

> **F.    In the Alternative, the Cayman Proceedings Are "Foreign Nonmain Proceedings" Because the Debtors Have Establishments There**

70.    As stated above, the Cayman Proceedings have met the requirements of "foreign

main proceedings" pursuant to section 1502 of the Bankruptcy Code in light of each Debtor's

activities in the Cayman Islands.  Nevertheless, should the Court for some reason conclude that

the Cayman Proceedings should not be recognized as foreign main proceedings, the JPLs submit

that, in the alternative, the Cayman Proceedings should be recognized as a foreign nonmain

proceedings under sections 1516(b)(2) and 1502(5) of the Bankruptcy Code.

71.    A foreign nonmain proceeding is defined as a "foreign proceeding, other than a

foreign main proceeding, pending in a country where the debtor has an establishment."  11

U.S.C. § 1502(5).  An "establishment" is "any place of operations where the debtor carries out a

nontransitory economic activity."  11 U.S.C. § 1502(2).  The Bankruptcy Code does not define

"nontransitory economic activity," but courts have interpreted the terms "operations" and

"economic activity" as used in section 1502(2) to require a "showing of a local effect on the

marketplace, more than mere incorporation and record-keeping and more than just the

maintenance of property."  *In re Creative Fin. Ltd.*, 543 B.R. 498, 521 (Bankr. S.D.N.Y. 2016).

Moreover, the "establishment" requirement may be satisfied by the local conduct of business.

36

*See id.* at 520 ("'Establishment' has been described as a 'local place of business.'"); *In re Fairfield Sentry Ltd.*, No. 10 Civ. 7311, 2011 WL 4357421, at *10 n.8 (S.D.N.Y. Sept. 16, 2011) ("This Court agrees with the Bankruptcy Court that if main recognition were not granted, non-main recognition of Sentry's BVI Proceeding would be appropriate because Sentry has an establishment in the BVI for the conduct of nontransitory economic activity, *i.e.* a local place of business.").

72.    Even if the Court declines to find that the Cayman Islands is the *center* of each Debtor's main interests, it would be hard pressed to deny that each Debtor has an establishment there.  As described above, board meetings of all Debtors—including both regular meetings and special meetings—have exclusively been held in the Cayman Islands for at least the last several months.  *See* Kandylidis Declaration ¶ 27.  This factor should be given considerable weight as the Debtors are holding companies for the Group.  Multiple officers of each Debtor have places of residence in the Cayman Islands and work in office space in the Cayman Islands pursuant to the terms of their work permits.  *See* Kandylidis Declaration ¶ 28.   The Cayman Islands is also where each Debtor conducts its principal business operations, given that Ocean Rig SEZ Co. performs head office and administrative functions for the Debtors and Ocean Rig SEZ Co. is licensed to operate in and is located in the Cayman Islands.  *See* Kandylidis Declaration ¶ 30.  Likewise, restructuring activities concerning the Debtors have occurred in the Cayman Islands, including creditor meetings and meetings between the Debtors' principals and their legal and financial advisors.  *See* Kandylidis Declaration ¶ 34.

73.    Given the considerable business activities conducted by the Debtors in the Cayman Islands, the JPLs submit that the Caymans Proceedings are pending where the Debtors have an "establishment," and, therefore, that the Cayman Proceedings constitute "foreign

nonmain proceedings" within the meaning of section 1502 of the Bankruptcy Code. *See also*

Appell Declaration ¶ 34.

### G.   Recognition of the Cayman Proceedings Would Not Be Manifestly Contrary to United States Policy

74.   Recognition of a foreign proceeding is "subject to section 1506," which provides

that a bankruptcy court may decline to grant relief requested if the action would be "manifestly

contrary to the public policy of the United States." 11 U.S.C. §§ 1506, 1517(a). Courts have

construed this public policy exception narrowly. *See Armada (Singapore) Pte Ltd. v. Shah (In re

Ashapura Minechem Ltd.)*, 480 B.R. 129, 139 (S.D.N.Y. 2012) (stating that courts have

"uniformly" read the public policy exception "narrowly and applied it sparingly").

75.   Granting recognition of the Cayman Proceedings would advance the public policy

objectives of sections 1501(a) and 1508 of the Bankruptcy Code, among others, thereby making

the public policy exception under section 1506 wholly inapplicable. Specifically, granting

recognition of the Cayman Proceedings would promote the fair and efficient administration of

cross-border insolvency proceedings designed to protect the interests of all creditors and other

interested parties, while at the same time preventing dissident creditors from commencing or

continuing litigation in the United States that could potentially thwart the Debtors' restructuring

plans and disadvantage the overwhelming majority of creditors. Granting recognition to the

Cayman Proceedings as foreign proceedings is critical to furthering the objectives of chapter 15,

promoting greater cooperation between the United States and Cayman Courts, and

accomplishing the Debtors' restructuring through the Cayman Proceedings. Moreover,

recognition of the Cayman Proceedings as foreign proceedings under chapter 15 would further

protect the interests of creditors in the Cayman Proceedings because, absent recognition, the

uniform and orderly administration of the Debtors' assets would be jeopardized. *See Kandylidis*

38

Declaration ¶¶ 35-38.

## **CONCLUSION**

76.     For the foregoing reasons, the Petitioners respectfully request that this Court enter

an order substantially in the form attached to the Verified Petition as <u>Exhibit A</u>, granting the

relief requested therein and such other and further relief as may be just and proper.

39

Dated:  New York, New York
        March 27, 2017

ORRICK, HERRINGTON & SUTCLIFFE LLP


By: /s/ Evan C. Hollander
    Evan C. Hollander

    51 West 52nd Street
    New York, New York 10019
    Telephone:  (212) 506-5000
    Facsimile:  (212) 506-5151
    Evan C. Hollander
    Raniero D'Aversa, Jr.
    Monica A. Perrigino

    *Counsel for the Petitioners, Simon Appell and
    Eleanor Fisher, in their capacities as Joint
    Provisional Liquidators and Proposed Foreign
    Representatives*

40

765997680