**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| OCEAN RIG UDW INC., *et al.*,[1] | ) | Case No. 17-_____(  ) |
| | ) | |
| Debtors in Foreign Proceedings. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF ANTONIOS KANDYLIDIS
## PURSUANT TO 28 U.S.C. § 1746

I, Antonios Kandylidis, declare under penalty of perjury under the laws of the

United States of America that the following is true and correct:

1.      I am an individual over 21 years of age and am competent to testify and to

provide this declaration (the "**Declaration**") in support of (i) the Verified Petition for

Recognition of Foreign Proceeding under Chapter 15 (the "**Verified Petition**")[2] and the

memorandum in support thereof and for related relief (the "**Memorandum**"), which seek

entry of an order (a) recognizing (1) provisional liquidation proceedings with respect to the

Debtors under section 104 of Part V of the Cayman Islands Companies Law (2016 Revision),

and (2) subsequent applications for the sanctioning of schemes of arrangement in respect of

the Debtors under section 86 of Part IV of the Cayman Islands Companies Law (2016

---

[1] UDW (defined below), a foreign Debtor, is a Cayman Islands exempted company with registration number 310396. DRH (defined below), DFH (defined below), and DOV (defined below) are each foreign Debtors that are non-resident corporations registered in the RMI (defined below) with RMI registration numbers 32563, 61701, and 55652, and which are registered as foreign companies in the Cayman Islands with Cayman Islands registration numbers 316134, 316135, and 316137, respectively.  The Debtors have a registered address in the Cayman Islands of P.O. Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands, and business address c/o Ocean Rig Cayman Management Services, SEZC Limited, 3rd Fl. Flagship Building, Harbour Drive, Grand Cayman, Cayman Islands.

[2] Except as otherwise indicated, capitalized terms used herein carry the meanings ascribed to them in the Verified Petition.

Revision) as foreign main proceedings pursuant to sections 1515, 1517 and 1520 of title 11

of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "**Bankruptcy Code**"),[3] and (ii) the

Motion for Provisional Relief Pursuant to sections 1519, 1521(a)(7) and 362 of the

Bankruptcy Code, both of which were filed concurrently herewith and to which this Court is

respectfully referred.

2.      I make this Declaration on the basis of documentation in my possession or

supplied to me and on facts and matters that are known to me or of which I have been

informed by others.  Where I have been informed by others, the information is true to the

best of my knowledge and belief.

3.      I am the President and Chief Financial Officer of Ocean Rig UDW Inc.,

("**UDW**").  UDW is the holding company of the Ocean Rig Group (the "**Group**") and the

direct parent of the three other Debtors herein: Drillships Financing Holding Inc. ("**DFH**");

Drillships Ocean Ventures Inc. ("**DOV**"); and Drill Rigs Holdings Inc. ("**DRH**" and

collectively, the "**Subsidiary Debtors**").  I am also a Director and the President and

Treasurer of the Subsidiary Debtors.  Through these roles, I am intimately aware of and

closely involved in the operations and financial affairs of the Group generally, and UDW and

the Subsidiary Debtors specifically.  I have also been charged with primary responsibility for

negotiating the overall restructuring of the Debtors and the Group.

**A.  Constitutive, Organizational and Capital Structure[4]**

4.      UDW has been registered since April 2016 as an exempted company limited by

shares under s. 202 of the Companies Law of the Cayman Islands (registration number

---

[3] Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

[4] An organizational chart of the Group is attached hereto as Exhibit A.

310396).    Prior to that time, the company had been registered as a non-resident corporation in the Republic of the Marshall Islands (the "**RMI**").  The Subsidiary Debtors are all registered as non-resident corporations in the RMI (RMI registration numbers: DFH – 61701; DOV – 55652; DRH – 32563) and are registered as foreign companies under s. 186 of the Companies Law of the Cayman Islands (Cayman registration numbers DFH – 316135; DOV – 316137; DRH – 316134)  where, together with UDW, they maintain offices.  None of the Debtors has ever conducted operations or directed their affairs from the RMI.

5.    The Group is composed of four separate operating divisions.  Each of the Subsidiary Debtors is itself a holding company and the parent of one of three of these operating divisions.  The parent holding company of the fourth operating division, Drillship Alonissos Shareholders Inc. ("**DAS**") is not a debtor herein or a part of the restructuring.    Each of the operating divisions has secured its own financing.  The financing obtained by each of the Subsidiary Debtors has been guaranteed by UDW and UDW has pledged the shares of the applicable Subsidiary Debtor to secure its respective guaranty obligations (e.g., the shares of DRH have been pledged to secure the DRH facility).

6.    The following is a summary of the financing incurred by UDW and the Subsidiary Debtors:

a.    The DRH Facility:  DRH issued $800 million of 6.5% Senior Secured Notes due 2017 (the "**SSNs**"), pursuant to an indenture dated September 20, 2012 (as amended by a supplemental indenture dated January 23, 2013) (as amended, the "**DRH Indenture**"). U.S. Bank National Association is the Indenture Trustee under the DRH Indenture and Deutsche Bank Trust Company Americas is the collateral trustee.  The SSNs are guaranteed by UDW (the "**DRH Indenture Guaranty**") and certain of DRH's direct

3

and indirect subsidiaries (the "**DRH Subsidiary Guarantors**"). UDW has pledged the shares of DRH to secure the DRH Indenture Guaranty, and DRH and the DRH Subsidiary Guarantors have pledged their assets (including shares of their subsidiaries) to secure their obligations in respect of the DRH Indenture. All pledged shares are held by the collateral trustee in the United States. Approximately $460 million remains outstanding under the DRH Indenture.

b.    The DFH Facility:    DFH is a borrower under a $1.9 billion Credit Agreement dated July 12, 2013 (as amended and restated from time to time, including on February 7, 2014) between, amongst other, DFH and Drillships Projects Inc., as borrowers and Deutsche Bank AG New York Branch, as administrative and collateral agent (the "**DFH Credit Agreement**"). The DFH Credit Agreement has been guaranteed by UDW (the "**DFH Credit Agreement Guaranty**") and certain of DFH's direct and indirect subsidiaries (the "**DFH Subsidiary Guarantors**"). UDW has pledged the shares of DFH to secure the DFH Credit Agreement Guaranty, and DFH and the DFH Subsidiary Guarantors have pledged their assets (including shares of their subsidiaries) to secure their obligations in respect of the DFH Credit Agreement. All pledged shares are held by the collateral agent in the United States. Approximately $1.83 billion remains outstanding under the DFH Credit Agreement.

c.    The DOV Facility:    DOV is a borrower under a $1.3 billion Credit Agreement dated July 25, 2014 between, amongst others, DOV and Drillships Ventures Projects Inc., as borrowers, and Deutsche Bank AG New York Branch, as administrative and collateral agent (the "**DOV Credit Agreement**" and, together with the DFH Credit Agreement, the "**Credit Agreements**"). The DOV Credit Agreement has been guaranteed by UDW

4

(the "**DOV Credit Agreement Guaranty**") and certain of DOV's direct and indirect subsidiaries (the "**DOV Subsidiary Guarantors**").  UDW has pledged the shares of DOV to secure the DOV Credit Agreement Guaranty, and DOV and the DOV Subsidiary Guarantors have pledged their assets (including shares of their subsidiaries) to secure their obligations in respect of the DOV Credit Agreement.  All pledged shares are held by the collateral agent in the United States.  Approximately $1.27 billion remains outstanding under the DOV Credit Agreement.

d.  The UDW Facility:  UDW issued $500 million of 7.25% Senior Unsecured Notes due 2017 (the "**SUNs**"), pursuant to an indenture dated March 26, 2014 (the "**SUN Indenture**").  Deutsche Bank Trust Company Americas is the Indenture Trustee under the SUN Indenture.  The SUNs are not guaranteed by any member of the Group.  Approximately $131 million of unsecured notes remain outstanding under the SUN Indenture.  The amounts outstanding in respect of the SUN Indenture, the DRH Indenture and the Credit Agreements are collectively referred to as the "**Scheme Indebtedness**."

**B.  The Business of the Group**

7.     The Group operates as an international offshore oil drilling contractor, owner and operator of drilling rigs.  It provides drilling services for offshore oil and gas exploration, development and production, and specializes in the ultra-deepwater and harsh-environment segments of the offshore drilling industry.

8.     Through various subsidiaries, the Group operates 11 ultra-deepwater offshore drilling units:

766598691

a.  <u>The DRH Division</u>.  Through its DRH division, the Group owns two fifth generation harsh weather ultra-deepwater semisubmersible offshore drilling units, the *Leiv Eiriksson* and the *Eirik Raude*.

b.  <u>The DFH Division</u>:  Through its DFH division, the Group owns four sixth generation advanced capability ultra-deepwater drilling units, the *Ocean Rig Corcovado*, the *Ocean Rig Olympia*, the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos*, delivered in January 2011, March 2011, July 2011 and September 2011, respectively.  These four ships are capable of drilling in water depths of up to 10,000 feet.

c.  <u>The DOV Division</u>:  Through its DOV division, the Group owns three seventh generation drilling units, the *Ocean Rig Mylos*, the *Ocean Rig Skyros*, and the *Ocean Rig Athena*.  These units were delivered in August 2013, December 2013, and March 2014, respectively. These seventh generation drilling units are capable of drilling in water depths of up to 12,000 feet.

d.  <u>The DAS Unit</u>:  Through DAS, the Group owns another seventh generation ultra-deepwater drilling unit, the *Ocean Rig Apollo*, delivered March 2015, which is also capable of drilling to water depths of up to 12,000 feet.

e.  <u>The Agon Shipping Inc. Unit</u>:  Through a separate subsidiary of UDW, Agon Shipping Inc., the Group owns another sixth generation ultra-deepwater drilling unit, the *Ocean Rig Paros*, which it acquired on April 28, 2016 through an auction.  The *Ocean Rig Paros* is capable of drilling in water depths of up to 10,000 feet.

9.      In addition to its owned units, the Group has contracted for the construction of an additional three seventh generation drilling units (the *Ocean Rig Santorini*, the *Ocean Rig Crete* and the *Ocean Rig Amorgos*) with a major shipyard in Korea.  The delivery dates for

6

these vessels had previously been scheduled for 2017, 2018, and 2019, respectively, but the delivery dates of two (the *Ocean Rig Santorini* and the *Ocean Rig Crete*) have been postponed, and construction on the third (the *Ocean Rig Amorgos*) has been suspended. The guarantees that were originally provided by UDW in respect of these drilling rigs have also been released.

10.    The Group employs the drilling units to drill wells for customers primarily on a "day rate" basis for periods of between two months and six years. Payments are set at a fixed amount for each day that the unit is operating under a contract at full efficiency. A higher "day rate" is charged on days when actual drilling operations are being undertaken and lower rates are charged during periods of mobilization, or when drilling operations are interrupted or restricted by equipment breakdowns, adverse environmental conditions or other conditions beyond the company's control. Contracts are generally obtained through a competitive bidding process with other contractors. The Group's customers are typically major oil companies, integrated oil and gas companies, state-owned national oil companies and independent oil and gas companies.

11.    We believe that our sixth and seventh generation drilling units are among the most sophisticated and technologically advanced drilling units in the world. Among other technological enhancements, most of our drilling units are equipped with dual derrick technology, which involves two drilling systems that permit two drilling-related operations to take place simultaneously. We estimate this technology saves between 15% and 40% in drilling time, depending on the well parameters. Our sixth generation drilling units are capable of drilling up to 40,000 feet deep at water depths of up to 10,000 feet and our seventh

766598691

generation drilling units have the capacity to drill up to 40,000 feet deep at water depths of up to 12,000 feet.

12.     Currently, the Group's revenues are dependent on five units; the *Leiv Eiriksson*, which is operating offshore Norway; the *Ocean Rig Corcovado* and the *Ocean Rig Mykonos*, which are operating offshore Brazil; and the *Ocean Rig Poseidon* and the *Ocean Rig Skyros*, which are operating offshore Angola.  The other six units, the *Eirik Raude*, the *Ocean Rig Olympia*, the *Ocean Rig Mylos*, the *Ocean Rig Athena*, the *Ocean Rig Paros* and *the Ocean Rig Apollo* are currently uncontracted and have been laid-up.  Laid-up rigs must be deactivated and either "cold stacked" or "warm stacked" in order to preserve the units pending reactivation.  "Cold stacked" rigs require a longer period of time and greater cost to reactivate than "warm stacked" rigs.  Rig deactivation costs are approximately $5 million per unit.  The daily costs for "warm stacked" rigs are approximately $40,000 per day.  The daily costs for "cold stacked" rigs are approximately $5,000 per day.

**C.  The Group's Financial Situation, Creditor Negotiations and the RSA**

13.     The oil and gas drilling industry is currently in a down-cycle.  Crude oil prices have fallen during the past several years.  The price of crude oil has fallen from over $100 per barrel in March 2014, to approximately $52 per barrel in March 2017, and UDW's share price has fallen from a high of $19.87 on June 20, 2014, to $0.73 as of March 24, 2017.  The significant decrease in oil prices is expected to continue to reduce customer demand in the industry during 2017.  In fact, a number of our customers have revised their budgets to decrease projected expenditures for offshore drilling on multiple occasions.  Declines in capital spending levels, coupled with an oversupply of newbuilding, have and are likely to continue to put significant pressure on "day rates" and utilization.  The Group has come

under severe financial pressure as a result of these factors.   The Group does not expect that its inactive rigs will begin work under new contracts until 1 January 2020 at the earliest. According to an energy industry expert report commissioned by the Group, deepwater rig demand is currently at a utilization rate of only approximately 45% of available rigs and is not expected to begin to improve until 2019.  Even by the first quarter of 2020, utilization rates are expected to remain below 60% of rig availability.

14.     As a result of the foregoing, the Group will continue to face significant challenges in the near and mid-term.  Of the Group's five operational units, two are under contracts that will expire during the second half of 2017, and two are under contracts that will expire during the first half of 2018.  Only one unit, the *Ocean Rig Skyros*, is under a long term contract (expiring September 30, 2021).

15.      Prior to commencing the Cayman Provisional Liquidation Proceedings, the Debtors were facing significant challenges with respect to their Scheme Indebtedness.  DRH and UDW both have obligations to make sizeable payments on April 3, 2017.  DRH has an interest payment of $14.9 million due in respect of the SSNs.  DRH had to consider that if it made this payment its projected cash balances would be depleted to $4 million by the end of June 2017.  UDW has an interest payment of $4.7 million due in respect of the SUNs.   UDW does not have sufficient cash to make this payment without borrowing funds that it will be unable to repay.  Both entities are insolvent.  The failure to pay these obligations beyond thirty days after the scheduled payment dates would trigger cross-defaults under the Credit Agreements.

16.     The Debtors also had to consider that, even if they made the April 3, 2017 payments, the Group would face another critical inflection point at the October 1, 2017

766598691

maturity of the $460 million SSNs. Neither DRH nor UDW, as guarantor, will have

sufficient cash or financeable assets to pay the SSNs at maturity. Failure to repay the SSNs

would trigger cross-defaults under the Credit Agreements and the SUN Indenture. Such

cross-defaults could cause an acceleration of approximately $3.7 billion in debt, the loss of

critical customer contracts, and the destruction of a substantial portion of the value of the

Group. Further, beyond the SSN maturity date, the Debtors are projected to breach the

leverage covenant in the Credit Agreements by December 31, 2017.

17.    Anticipating that it would be caught between Scylla and Charybdis, the Group

retained legal and financial advisors in early 2016 to consider various restructuring

alternatives. The Group ultimately decided to engage primarily with an ad hoc group of

lenders under the DFH Credit Agreement and the DOV Credit Agreement (the "**Ad Hoc**

**Group**"), as the units owned by those divisions are among the most technologically

advanced and valuable in the fleet, and because the members of the Ad Hoc Group were

willing to engage constructively with the Group on a restructuring founded on realistic

valuations of the Group's assets, the benefits of a significant deleveraging and the prognosis

for the industry. These negotiations have culminated in a restructuring agreement (the

"**RSA**") that is supported by approximately 73%[5] of the aggregate amount of Scheme

Indebtedness at UDW. If schemes of arrangement are ultimately sanctioned by the Grand

Court of the Cayman Islands (the "**Cayman Court**") the Group will achieve its much needed

deleveraging. The schemes contemplate the exchange of more than $3.7 billion of existing

financial indebtedness of the Group for new equity in UDW (the "**New Equity**"), cash

payments of about $288 million (the "**Cash Consideration**") and new secured debt of $450

---

[5] Includes pending trades that have not yet closed.

million (the "**New Secured Debt**").  If the contemplated restructuring is achieved, the Group will be well placed to continue to operate as the market recovers and to effectively compete as an industry leader.

18.      The RSA contemplates that the restructuring of the Group will be implemented through four separate schemes of arrangement in the Cayman Islands, one for each of UDW, DFH, DOV and DRH.  The schemes are all inter-related, but only the UDW scheme, the DOV scheme and the DFH scheme are inter-conditional, meaning that for any one of those schemes to become effective, all three must be sanctioned by the Cayman Court.

19.      In the UDW scheme, the SUNs and the UDW Guarantees will be discharged in exchange for New Equity.  This New Equity will be valued at the asset value of UDW immediately prior to the restructuring of DRH, DFH and DOV (i.e. while SSNs, the DOV loans and the DFH loans remain outstanding in the hands of the third-party creditors).   The New Equity will be allocated among the holders of the UDW Guarantees and the SUNs pro rata on the basis of the notional amount of the claims of such holders.

20.      If the DRH scheme is sanctioned, the claims of the SSNs will be transferred to UDW in exchange for (i) New Equity and (ii) Cash Consideration.  The Cash Consideration will be shared pro rata with the lenders under the Credit Agreements under the DFH and DOV schemes from a pool of available cash.  Upon implementation of the DRH scheme, UDW will become the sole holder of the SSNs currently held by the third-party creditors of DRH.  DRH will remain obligated on the SSNs and the DRH Subsidiary Guarantees will remain in place (although the maturity date may be extended, covenants and other terms of the facility may be relaxed and the issuer may be provided with the option to satisfy its repayment obligation at maturity through the issuance of additional equity if it then meets

certain financial metrics).  The value of the New Equity received in exchange for the transfer of the SSNs to UDW will equal the going concern value of DRH, less the Cash Consideration received by holders of the SSNs in the exchange.

21.     In the DOV and DFH schemes, the lenders under the Credit Agreements will transfer their loans to UDW in exchange for (i) New Equity, (ii) New Secured Debt and (iii) Cash Consideration.  The Cash Consideration will be shared pro rata among the lenders under the Credit Agreements, and, if the DRH scheme is also sanctioned, the holders of the SSNs.  The New Secured Debt will be shared pro rata among the lenders under the Credit Agreements.  Upon the implementation of the DFH and DOV schemes, UDW will become the sole lender under the DOV Credit Agreement and DFH Credit Agreement.  DOV and DFH will remain obligated under these facilities and the DOV Subsidiary Guarantees and the DFH Subsidiary Guarantees will remain in place (although the maturity dates may be extended, covenants and other terms of the facilities may be relaxed and the issuers may be provided with the option to satisfy their repayment obligations at maturity through the issuance of additional equity if they then meet certain financial metrics).  The value of the New Equity received in exchange for the transfer of the loans under the DOV Credit Agreement to UDW will equal the going concern value of DOV, less the Cash Consideration and New Secured Debt received by the lenders under the DOV Credit Agreement in the exchange.  The value of the New Equity received in exchange for the transfer of the loans under the DFH Credit Agreement to UDW will equal the going concern value of DFH, less the Cash Consideration and New Secured Debt received by the lenders under the DFH Credit Agreement.

766598691

22.     In accordance with the requirements of the RSA, the Group entered into a global settlement agreement (the "**GSA**") pursuant to which (i) it canceled approximately $369 million of SUNs and approximately $340 million of SSNs held by certain subsidiaries of UDW, Alley Finance Co., and Algarve Finance Limited, and (ii) all intragroup liabilities among the members of the Group were released.  The effect of the GSA is that the scheme consideration to be received by UDW, DOV and DRH scheme creditors will be of a greater value in any event than if the GSA had not been entered into.  DFH creditors will receive slightly less, but as of the date of this declaration 84.25% of the DFH lenders support the proposed RSA.

**D.  The Debtors' Move to and Current Connections with the Cayman Islands**

23.     As previously noted, UDW is a Cayman Islands registered corporation.  UDW migrated from the RMI, where it had been a non-resident domestic corporation, on April 14, 2016.  The Subsidiary Debtors are each wholly owned direct subsidiaries of UDW.  They are RMI non-resident domestic corporations and registered as foreign companies in the Cayman Islands on October 18, 2016.  Each of the Debtors is a holding company whose primary assets are the equity interests in their respective subsidiaries.  Each Debtor maintains its head office in the Cayman Islands in office space provided by an affiliate, Ocean Rig SEZ Co. (defined below).

24.     UDW was previously a tax resident of Cyprus, but it ceased being a tax resident there effective December 31, 2016.  UDW no longer maintains any presence in Cyprus.  UDW also maintains a "law 89 establishment" in Greece.  Law 89 permits foreign commercial and industrial companies to maintain an establishment in Greece exclusively for the provision of limited types of services for head offices or affiliates outside of Greece.

766598691

Foreign companies with a law 89 license in Greece are required to spend U.S. $50,000 per year in Greece. UDW established its "law 89 establishment" with the intention of providing ship-brokerage services to affiliates, but the brokerage services were never provided as intended. As a result, the company is in the process of getting its law 89 establishment license terminated. Affiliates of the Debtors also maintain offices in Norway, Angola, Brazil and Jersey.

25.     None of the Debtors has ever conducted operations or directed their affairs from the RMI, has ever maintained administrative, management or executive offices in the RMI, has ever had any directors who were residents or citizens of the RMI, or has ever held a meeting of its directors or shareholders in the RMI. Public notice of the opening of UDW's head office in the Cayman Islands was provided by SEC Form 6-K on September 27, 2016 and the Debtors gave notice of their registration in the Caymans by subsequent press release.

26.     <u>Directors and Board Meetings</u>. The board of directors of UDW is comprised of six directors, one of whom, Michael Pearson, has his primary residence in the Cayman Islands. The other five directors of UDW are resident in Monaco and Greece. The board of directors of DRH is comprised of four directors, two of whom, Michael Pearson and Casey McDonald, have their primary residences in the Cayman Islands, and two of whom have residences in the Cayman Islands. The boards of directors of DFH and DOV are each composed of three directors, one of whom, Michael Pearson, has his primary residence in the Cayman Islands, and two of whom have residences in the Cayman Islands.

27.     UDW board meetings have been held exclusively in the Cayman Islands since a regular meeting held in the Cayman Islands on November 17, 2016. Meetings of the UDW board were also held in the Cayman Islands on February 3, 2017, February 21, 2017 and

March 23, 2017.  Meetings of a special committee of the UDW board were held in the
Cayman Islands on March 7, 2017 and March 16, 2017.  Board meetings of the Subsidiary
Debtors have been held exclusively in the Cayman Islands since meetings held in the
Cayman Islands on February 3, 2017.  Meetings of the boards of the Subsidiary Debtors were
also held in the Cayman Islands on February 21, 2017 and March 23, 2017, and meetings of
special committees of each of the Subsidiary Debtors were held in the Cayman Islands on
March 7, 2017 and March 16, 2017.   As noted, no directors have ever been located in the
Marshall Islands and no directors' meetings have ever taken place there.

28.    <u>Company Officers</u>.  The President and Chief Financial Officer, the Company
Secretary, and the Vice President of Business Development of UDW have places of
residence in the Cayman Islands and work in the Cayman Islands in office space provided by
Ocean Rig SEZ Co. pursuant to the terms of their Zone Employment Certificates.  All of the
officers of the Subsidiary Debtors have places of residence in the Cayman Islands and work
in the Cayman Islands in office space provided by Ocean Rig SEZ Co. pursuant to the terms
of their Zone Employment Certificates.  Each of these officers use mobile phones with
Cayman Islands phone numbers.

29.    <u>Notice of Relocation to Cayman Islands</u>.

a.    *Paying Agents*.  The paying agent under the SUNs issued by UDW was notified on
November 1, 2016 to address all future invoices for payment to the registered office
of Ocean Rig SEZ Co. in the Cayman Islands.  The paying agent under the SSNs
issued by DRH was notified on November 2, 2016 to address all future invoices for
payment to the registered office of Ocean Rig SEZ Co. in the Cayman Islands.  The
paying agent under the DFH Credit Agreement was notified on January 23, 2017 to

address all future invoices for payment to the registered office of Ocean Rig SEZ Co. in the Cayman Islands. The paying agent under the DOV Credit Agreement was notified on January 23, 2017 to address all future invoices for payment to the registered office of Ocean Rig SEZ Co. in the Cayman Islands.

b. *Indenture Trustees, Administrative and Collateral Agents*. The Indenture Trustee under the SUN Indenture was notified on February 6, 2017 to direct all notices for UDW to the registered office of the Ocean Rig SEZ Co. in the Cayman Islands. The Indenture Trustee and the Collateral Agent, Registrar and Paying Agent under the DRH Indenture were notified on February 6, 2017 to direct all notices for UDW and DRH to the registered office of the Ocean Rig SEZ Co. in the Cayman Islands. The Administrative Agent and the Collateral Agent under the DFH Credit Agreement was notified on February 6, 2017 to direct all notices for UDW and DFH to the registered office of the Ocean Rig SEZ Co. in the Cayman Islands. The Administrative Agent and the Collateral Agent under the DOV Credit Agreement was notified on February 6, 2017 to direct all notices for UDW and DOV to the registered office of the Ocean Rig SEZ Co. in the Cayman Islands.

c. *Investment Service Providers*. Investment service providers, including Moody's Investors Service, Inveshare, Broadridge and Standard & Poor Global Ratings, were notified of UDW's change of address in November 2016 and have remitted invoices, as directed, to the company in the Cayman Islands.

d. *Public Notice and General Recognition of Relocation*. On September 27, 2016, UDW filed a Form 6-K report with the SEC updating the address of its principal executive offices to its registered office in the Cayman Islands. On February 6, 2017,

16

each of the Debtors issued a press release advising that it had relocated its principal

place of business to the Cayman Islands and that the address for all postal

communications to the companies should be directed to the Ocean Rig SEZ Co. in the

Cayman Islands.  Also on February 6, 2017, UDW announced that its 2017 Annual

General Meeting will be held on April 24, 2017 at the company's business office in

the Cayman Islands.  The contact details for the Debtors on the Group's website list

the Debtors' Cayman Islands address.  Media reports have been published

acknowledging the relocation of UDW's principal executive offices to the Cayman

Islands.  The Company has been served in an English legal proceeding in the Cayman

Islands.  A group of hostile distressed debt traders who hold SSNs retained counsel in

the Cayman Islands in late February or early March, and by letter dated March 3,

2017 sought information regarding the Debtors' restructuring plans in the Cayman

Islands.  Counsel to the Ad Hoc Group retained counsel in the Cayman Islands in the

spring of 2016.

30.    <u>Location of Operations</u>.  The Debtors' subsidiaries do business throughout the

world, principally on the high seas.  Head office and administrative service functions for the

Debtors, formerly performed by an affiliate located in Cyprus, are now performed by an

affiliate, Ocean Rig Cayman Management Services SEZC Limited ("**Ocean Rig SEZ Co.**")

in the Cayman Islands.  Ocean Rig SEZ Co. is licensed to operate and is located in the

Maritime Park in the Special Economic Zone at Cayman Enterprise City in the Cayman

Islands, where it provides office space and administrative support services to the Debtors.

One of the employees of Ocean Rig SEZ Co. has her primary residence in the Cayman

Islands.  All of the other employees of Ocean Rig SEZ Co. have residences in the Cayman

17

Islands. The Services Agreement between Ocean Rig SEZ Co. and the Debtors is governed by Cayman Islands law.

31.    <u>Location of Assets</u>. Each of the Debtors is a holding company. The share certificates of DRH, DFH and DOV are pledged to secure the UDW Guarantees and are held by the respective collateral agents and collateral trustee in the United States. The share certificates of the subsidiary guarantors under the DRH Indenture, the DFH Credit Agreement and the DOV Credit Agreement are also held by the respective collateral agents and collateral trustee. The share certificates of other subsidiaries are unpledged and represent valuable interests in these subsidiaries' cash and rigs. These certificates are held in the Cayman Islands.

32.    <u>Location of Bank Accounts</u>. Each of the Debtors has a bank account in the Cayman Islands. The paying agents for the Debtors' financial indebtedness have been instructed to address all invoices for payment due to the office of Ocean Rig SEZ Co. in the Cayman Islands. Payments to professionals have been made from the Cayman accounts, namely a retainer of $250,000 paid by each of the Debtors (total $1 million) to the Debtors' U.S. restructuring counsel, Orrick, Herrington & Sutcliffe LLP. These retainers are being held in counsel's client trust account at Citibank Private Bank in New York, where they shall remain pending the final billing in these proceedings.

33.    <u>Books and records</u>. The minute book of UDW has been maintained in the Cayman Islands since November 2016. The minute books of each of the Subsidiary Debtors has been maintained in the Cayman Islands since January 2017.

34.    <u>Restructuring Activities</u>. Face-to-face creditor meetings were held in the Cayman Islands on November 21 through 23, 2016 and February 7 through 9, 2017. Numerous

conference calls with creditors have been hosted by the Debtors from the Cayman Islands.
The Debtors' have also met frequently in the Cayman Islands with their legal and financial
advisers.

**E. Imminent Risk of Disruption to the Restructuring Process**

35.    As a consequence of the filing of winding up petitions and the commencement of
the provisional liquidation proceedings in the Cayman Islands, the Debtors have triggered
defaults and cross-defaults under their financial indebtedness and have exposed themselves
to any number of adverse actions in the United States.  If provisional relief in the form of a
stay is not granted, there is substantial risk that certain creditors may place the company in
imminent peril in an effort to jeopardize the restructuring.  The Debtors are already the target
of aggressive litigation tactics initiated by certain holders of the SSNs, by UDW's largest
individual shareholder (who through his company is also the largest holder of the SUNs and
a holder of loans under the Credit Agreements).  These parties are positioning themselves to
stymy the Debtors' reorganization efforts in order to extract value to which they are not
entitled to under any reasonable restructuring scenario.

36.    These disruptive holders of SSNs are speculative, distressed-debt traders who
bought their bonds on the secondary market during 2016 to take advantage of the steep
decline in oil prices and the corresponding impairment of the business of the Group and the
market value of its most vulnerable debt instruments.  These vulture investors acquired their
holdings without regard to the underlying value of the bonds.  Instead, they placed a wager
that the Group would pay off these obligations at maturity and hope for a subsequent
recovery, rather than address financial challenges head-on.  These were bad bets.  The

disgruntled holder of SUNs is a par holder who is seeking to use his large stake in the SUNs to extract a premium to its legal entitlement.

37.    I have met on numerous occasions with the legal and financial representatives of a group three holders of SSNs, and with a large holder of the SUNs (this entity is also a holder of loans under the Credit Agreements, and the principal of this entity is also UDW's largest shareholder) during the course of the past year, and have provided non-public financial information subject to non-disclosure agreements to the professionals representing the SSNs. I have provided sufficient information to the representatives of the SSNs to enable them to develop an informed view regarding the intrinsic value of the SSNs.  I have expended significant Group resources (and resources of the legal and financial advisors to the Group) meeting with the SSN representatives, preparing restructuring proposals supported by the Group's business plan, and in explaining the underlying financial metrics and assumptions supporting the plan.  While I have repeatedly invited the representatives of the SSNs to test the financial metrics underlying our business plan, they have been unwilling to do so and have been directed by their clients to discuss only a transaction at a premium to the individual purchase prices paid by their clients.  Similarly, this large holder of SUNs has consistently demanded recoveries that cannot be justified by any reasonable valuation.  The legal advisors to both the SSN holders and the large SUN holder have taken steps to position themselves to disrupt any restructuring process that may be undertaken by the Group.

38.    Notwithstanding these actions, the Debtors have remained willing to engage these holders and to provide additional financial information to them on the condition that they agree not to take hostile action against the Debtors outside of the Cayman Proceedings. Tellingly, these recalcitrant creditors have rejected all such proposals out of hand.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated:  March 27, 2017
        Grand Cayman, Cayman Islands

Antonios Kandylidis

766598691