**Hearing Date and Time: April 3, 2017 at 10:00 a.m. (Eastern Time)**
**Deadline for Written Objections: March 31, 2017 at 12:00 p.m. (Eastern Time)**

Edward O. Sassower, P.C.
Brian E. Schartz
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Ad Hoc Group of Holders of 6.5% DRH Secured Notes*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| Ocean Rig UDW INC., *et al.*[1] | ) | Case No. 17-10736 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

[1]  Ocean Rig UDW Inc., a foreign Debtor, is a Cayman Islands exempted company with registration number 310396. Drill Rigs Holdings Inc., Drillship Financing Holding Inc., and Drillships Ocean Ventures Inc. (collectively, with Ocean Rig UDW Inc., the "<u>Debtors</u>") are each foreign Debtors that are non-resident corporations registered in the Republic of the Marshall Islands ("<u>RMI</u>") with RMI registration numbers 32563, 61701, and 55652, and which are registered as foreign companies in the Cayman Islands with Cayman Islands registration numbers 316134, 316135, and 316137, respectively. The Debtors have a registered address in the Cayman Islands of P.O. Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands, and business address c/o Ocean Rig Cayman Management Services, SEZC Limited, 3rd Fl. Flagship Building, Harbour Drive, Grand Cayman, Cayman Islands.

**PRELIMINARY OBJECTION OF THE AD HOC GROUP OF HOLDERS OF 6.5% DRH
SECURED NOTES TO (A) CHAPTER 15 DEBTORS' MOTION FOR (I) *EX PARTE*
EMERGENCY RELIEF AND (II) PROVISIONAL RELIEF PURSUANT TO 11 U.S.C.
§§ 1519, 1521(A)(7), AND 362 AND (B) APPLICATION BY JOINT PROVISIONAL
LIQUIDATORS SIMON APPELL AND ELEANOR FISHER FOR ORDER
(I) SCHEDULING HEARING ON VERIFIED PETITION OF OCEAN RIG UDW INC.,
ET AL. (IN PROVISIONAL LIQUIDATIONS) AND MOTION FOR RECOGNITION
AND RELATED RELIEF AND (II) SPECIFYING FORM AND MANNER OF SERVICE
OF NOTICE**

The ad hoc group (the "Secured Noteholder Group" or the "Group") of holders of 6.5% senior secured notes due 2017 (the "Secured Notes") issued by Drill Rigs Holdings, Inc. ("DRH") and guaranteed by Ocean Rig UDW Inc. ("UDW") and certain of DRH's direct and indirect subsidiaries, pursuant to that certain Indenture, dated as of September 20, 2012 (the "Indenture") hereby submits this preliminary objection to (a) the *Motion for (I) Ex Parte Emergency Relief and (II) Provisional Relief Pursuant to 11 U.S.C. §§ 1519, 1521(a)(7), and 362* [Docket No. 8] (the "Provisional Relief Motion") and (b) the *Application by Joint Provisional Liquidators Simon Appell and Eleanor Fisher for Order (I) Scheduling Hearing on Verified Petition of Ocean Rig UDW Inc., et al. (in Provisional Liquidations) and Motion for Recognition and Related Relief and (II) Specifying Form and Manner of Service of Notice* [Docket No. 9] (the "Recognition Hearing Application").   In support of this objection, the Secured Noteholder Group respectfully states as follows:

## Preliminary Statement[1]

1.    The members of the Secured Noteholder Group are tired of being surprised, ignored, and mischaracterized by the Debtors.   After nearly a year of sham, one-sided negotiations, the Debtors have built a false narrative of constructive engagement, while behind the scenes cutting the Secured Noteholder Group out of negotiations, shutting it off from other similarly-situated creditors, refusing to provide documents, and manipulating onerous and

---

[1]    Capitalized terms used but not immediately defined in this objection shall have the meanings ascribed to them elsewhere in this objection or in the Provisional Relief Motion or the Recognition Hearing Application.

off-market non-disclosure agreements in an effort to paint the Group in an unfavorable light.[2]  At

each turn, the Debtors have promised that "substantive discussions" and the "real deal" are just

around the corner, entreating the Group for patience and cooperation.  The Debtors have made

promise after promise of open engagement; but they have taken months and months to respond

to restructuring proposals and informational requests, if they respond at all.  Each time the

Secured Noteholder Group has extended an olive branch, it has been ignored and often learned of

another concerning maneuver taken by the Debtors with no warning, no consultation, and no

consideration for the Group's rights and claims.  Meanwhile, the Debtors have engaged in a

series of highly questionable transactions, highlighted by a $50 million stock buy-back for the

sole benefit of the Debtor's Chief Executive Officer's affiliate less than one year ago and within

nine days of the Debtors' parent company redomiciling to the Cayman Islands.  The culmination

of the Debtors' intentional game of cat-and-mouse is their Cayman Islands processes, which

include inter-related schemes of arrangement for each of the Debtors ("Cayman Schemes") and a

chapter 15 process designed to fast-track the Debtors' one-sided restructuring efforts.

2.    The Secured Noteholder Group is nonetheless not wholly opposed to the relief

requested in the Provisional Relief Motion; the Group does, however, desire to protect its

interests and those of other holders of the Secured Notes, which the Debtors have made patently

clear are of minimal to no concern in the proposed restructuring.  The Debtors have requested the

imposition of the automatic stay for an indefinite period of time, pending the Court's entry of an

order recognizing the Verified Petition.  Although the Debtors have filed the Recognition

Hearing Application, they have not requested a hearing date for recognition of the Verified

---

[2]    The Debtors have referred to members of the Group as vultures, disruptive, recalcitrant repeatedly throughout the hundreds
of pages of filings, but without any mention of actions that would substantiate such name calling.

Petition (the "Petition Hearing"), but since the RSA contains "as soon as practicable" milestones, the Debtors seem to be attempting to push their restructuring through at breakneck speed.

3.     Given the nature of the Debtors' acknowledged[3] efforts to manufacture COMI in the Cayman Islands, it will come as no surprise that the Group currently intends to object to the relief sought at the Petition Hearing.  In light of the Group's concerns regarding the critical issue of whether this Court should recognize the Cayman Proceedings as foreign main or foreign nonmain proceedings, the Group respectfully submits that this Court should not grant further provisional relief without first ensuring that *all* creditors are given sufficient time to develop all facts regarding the Debtors' alleged COMI in the Cayman Islands as well as a fair opportunity to present any objections to recognition of the Cayman Proceedings.[4]

4.     Accordingly, the Secured Noteholder Group respectfully requests that the Court schedule the Petition Hearing on the later of ninety (90) days from the entry of the provisional order granting the relief requested by the Provisional Relief Motion (*i.e.*, early July 2017), or fourteen (14) days after the entry of any Cayman Islands court order sanctioning the Cayman Schemes.  The Group's proposed timeline for the Petition Hearing fits reasonably within the timeline the Debtors have set for their restructuring process, which, by the terms of the restructuring support agreement filed in connection with the Cayman Proceedings (the "RSA"),

---

[3]     *See Memorandum of Law in Support of Verified Petition of Ocean Rig UDW Inc., et. al (In Provisional Liquidations) and Motion of the Joint Provisional Liquidators for (A) Recognition of the Cayman Proceeding as Foreign Main Proceedings or, in the Alternative, as Foreign Nonmain Proceedings, and (B) Certain Related Relief* [Docket No. 3] (conceding that "the Debtors *purposefully* established the Cayman Islands as their COMI prior to the Petition Date") (emphasis added).

[4]     The Secured Noteholder Group is in the process of evaluating the general scope of provisional relief requested by the Debtors through the Provisional Relief Motion.  Among other things, including the issues raised in this objection, the Secured Noteholder Group has concerns that the scope of stay relief granted in the *Temporary Restraining Order and Order Shortening Notice of Motion Seeking Provisional Relief* [Docket No. 12] (the "Interim Provisional Relief Order") exceeds the bounds of the Bankruptcy Code, including sections 1519(a), 1521(a)(3), 1521(a)(4), and 1521(a)(7) of the Bankruptcy Code.  In particular, the Group is concerned that the stay the Debtors propose may improperly limit its right to litigate with the Debtors regarding the scope of the Debtors' property (*i.e.*, what is or is not actually the Debtors' property), the ability of any party to file an involuntary petition against the Debtors, and the scope of the stay as it may pertain to non-Debtor entities other than the JPLs.  *See, e.g., In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 104 (Bankr. S.D.N.Y. 2012) (provisional relief order reserved creditor's right to dispute debtor's ownership in assets subject to the order); 11 U.S.C. § 1520(c) (noting that the effect of the automatic stay on a foreign proceeding does not affect the right of an entity to file a petition under title 11 or file claims or take other actions in such a case).

contemplates completion of the Cayman Schemes by October 31, 2017. This proposed timeline is also consistent with other chapter 15 cases in this Circuit.[5] Likewise, the Group's request would pose no harm to the Debtors while the stay remains in place.

5.    If the Court decides not to set the date of the Petition Hearing at this time, the Group respectfully requests that the Court only extend the stay until the date of the hearing to schedule the Petition Hearing (*i.e.*, the hearing on the Recognition Hearing Application). In addition, the Secured Noteholder Group requests that the Debtors be directed to cooperate with it and other parties to constructively develop an agreed order regarding a discovery, deposition, and briefing schedule in advance of the Petition Hearing within seven (7) days of the entry of any further order granting a provisional stay. If the parties cannot reach an agreement within seven (7) days, the Group would request that the Court set a separate scheduling hearing on discovery, deposition, and briefing matters regarding the Petition Hearing.

6.    The Secured Noteholder Group's requested approach is specifically contemplated by chapter 15 of the Bankruptcy Code, which is designed to balance the interests of foreign debtors and their creditors who will affected by chapter 15 recognition. Providing creditors with adequate notice and opportunity to prepare for and participate in U.S. hearings is consistent with this goal. This is especially true where the Debtors will enjoy stay protections in the interim. From the volumes of documents filed with this Court and the Cayman Court, the Debtors have clearly had ample time to prepare for these proceedings. The Debtors have not, however, given the Secured Noteholder Group any meaningful opportunity or notice to participate in the

---

[5]    *See, e.g., Cozumel Caribe*, 482 B.R. at 104 (91 days between petition date and recognition hearing); *In re Creative Fin. Ltd.*, 543 B.R. 498 (Bankr. S.D.N.Y. 2016) (171 days between petition date and recognition hearing); *In re Gold & Honey, Ltd.*, 410 B.R. 357 (Bankr. E.D.N.Y. 2009) (182 days between petition date and recognition hearing).

4

negotiations or otherwise prepare for these proceedings.[6] The Debtors have simply stonewalled and rejected the Group's *multiple* entreaties to be informed of contemplated restructuring actions. Most strikingly, and as discussed below, the Debtors have actively tried to suppress the Group's voice by trying to trick its members into agreeing to a non-disclosure agreement that would have *entirely* prevented them from participating in this and other proceedings outside the Cayman Islands, while simultaneously commencing the Cayman Proceedings.

7.       The Secured Noteholder Group's tailored relief to the provisional order is especially appropriate because there are significant material disputes that will arise in these chapter 15 cases and the Cayman Proceedings. As a threshold matter, based purely on public information, and without the benefit of discovery, the Debtors do not appear to satisfy the recognition requirements set forth in section 1517 of the Bankruptcy Code. Until very recently, the Debtors had *no* connection to the Cayman Islands and evidenced no intention to avail themselves of that forum. They have manufactured various connections to the Cayman Islands within a short span of time to support their Cayman Proceedings.[7]

8.       Additionally, the members of the Secured Noteholder Group collectively hold over 25 percent of the Secured Notes and, therefore, collectively hold a blocking position for at least any potential Cayman Scheme regarding the Debtor entity DRH. To the Group's knowledge, no holder of Secured Notes has signed up to the RSA—an unsurprising result given the Debtors' near-complete exclusion of holders of the Secured Notes from negotiations and the deal's proposed lopsided treatment of the Secured Notes.[8] The Group also has substantial concerns regarding the validity of the Cayman Schemes (not limited only to the Debtor entity

---

[6]     To be clear, the Secured Noteholder Group's current view of the Cayman Schemes is based on incomplete information. At this time, the Group and its advisors are continuing to review the materials and filings and will be requesting additional information from the Debtors and their advisors to better understand the proposed restructuring.

[7]     *See* fn. 6, *supra*.

[8]     Attached hereto as **Exhibit A** is a summary of the claims held by the RSA parties.

DRH), as well as the proposed classification scheme, notice, and underlying fairness of the process. Based on the scant information provided, the Secured Noteholder Group contends that the likelihood of success of a Cayman Scheme at both DRH and UDW is actually quite low. If the UDW scheme failed, then all four of the Cayman Schemes would fail automatically because all of the Cayman Schemes are conditional on the approval by stakeholders and Cayman Court approval of the UDW scheme.

9. There is no good reason to rush to a Petition Hearing when these significant concerns exist, the Debtors have already repeatedly excluded key stakeholders from negotiations and notice, and the Debtors' own timetable does not require it. Rather, the Secured Noteholder Group respectfully requests that the Court provide the parties with a full and fair opportunity to pressure test these proceedings. The tailored provisional relief and proposed scheduling that the Secured Noteholder Group requests in this Objection would balance these concerns and adequately protect the Debtors in the meantime.

<u>**Background**</u>

10. The Debtors' filings tell a story of a streamlined and largely consensual restructuring plan, with a few dissenting trouble-makers attempting to muck up the works. There is, however, another, very important side to the story.

### A.    The Debtors' Management, Debt, and Assets.

11. The Debtors are controlled and managed by Mr. George Economou, a Greek shipping magnate. Mr. Economou is the Debtors' Chief Executive Officer, significant shareholder, and the Chairman of the Board of UDW. Mr. Economou also controls several related companies that do significant—and highly lucrative for them—business with the Debtors. Mr. Economou's affiliates have received nearly $170 million in *de facto* dividends from the Debtors in recent years. For example, Debtor UDW made a substantial *de facto* dividend to

Dryships, an entity owned and managed by Mr. Economou, through a $120 million loan on November 18, 2014,[9] which was then *de facto* forgiven by exchanging the loan for UDW shares owned by Dryships.[10] Dryships' assets are managed by a number of entities controlled and managed Mr. Economou, including TMS Offshore Services Ltd. ("TMS"), which also manages and operates the drillships owned by the Debtors under incredibly expensive management agreements with no industry comparison.

12.     On September 20, 2012, the Debtors, through UDW's wholly-owned subsidiary DRH, issued the Secured Notes, secured by two fifth-generation harsh environment semisubmersible offshore drilling units, the *Leiv Eiriksson* and the *Eirik Raude*. At the time of the issuance and continuing to today, DRH and its guarantor subsidiaries are Marshall Islands corporations. Debtor UDW, which fully guarantees the obligations under the Secured Notes, also originally was a Marshall Islands entity. The Indenture, the Secured Notes, and the applicable guarantee and collateral agreements are governed by New York law.[11] Since the Secured Notes were issued, certain of the Debtors have repurchased approximately $340 million of the Secured Notes.[12] Other than the Secured Notes, the Debtors have approximately $3.7 billion of secured debt borrowed by Debtors DFH and DOV and guaranteed by UDW. At the time of issuance, DFH, DOV, and UDW were domiciled in the Marshall Islands.[13]

13.     As of the Petition Date, the Debtors and the vast majority of their assets are based world-wide. The Debtors' drillships are located in various locations outside of the Cayman Islands, including Greece, Norway, and other regions. In fact, ***none*** of their drillships are located

---

[9]     *See* Dryships Inc., Annual Report (Form 20-F) (Dec. 31, 2016).

[10]    In June 4, 2015, UDW exchanged $40 million for 2.4 million shares of UDW, and then on August 13, 2015, further exchanged $80 million for another 17.8 million shares. *See* Ocean Rig UDW Inc., Annual Report (Form 20-F) (Dec. 31, 2016).

[11]    *See* Secured Notes Indenture § 13.06, attached as Exhibit D to *Kandylidis Supplemental Declaration* [Docket No. 18].

[12]    *See* Ocean Rig UDW Inc., Annual Report (Form 20-F) (Dec. 31, 2016).

[13]    *See Verified Petition*, ¶¶ 11–13.

in the Cayman Islands, nor does it appear that they ever have been located in, or done business in, the Cayman Islands.  The *Eirik Raude* appears to be cold-stacked in Greece, based on a publicly-available location beacon, and the *Leiv Eiriksson* is under contract operating off the coast of Norway.[14]  The Debtors apparently have certain U.S. based assets, as disclosed in the declarations filed with their chapter 15 petitions, including legal retainers and stock certificates of, among other entities, the DRH subsidiaries.

### B.    The Debtors' Value-Depleting Transactions.

14.    Following the collapse of the global oil and gas market in mid-2014, the Debtors engaged in a series of dubious and value-draining transactions.  These actions have depleted the Debtors' assets in general and UDW in particular, with no other explanation than to benefit insiders like Mr. Economou and his affiliates' other business interests to the detriment of the Debtors' creditors.  The Debtors have only recently (February 2017) appointed independent directors and apparently lacked such oversights in recent years.  From the Secured Noteholder Group's review of publicly-available information, this pattern of questionable dealings and transactions began as early as fall 2014 and continued through the eve of these restructurings with an announcement of an opaque intercompany settlement on March 17, 2017.

15.    Between October 2014 and June 2015, UDW paid dividends of more than $75 million to shareholders,[15] at a time when the Debtors acknowledged that the market was "soft," and the Debtors would likely need to cold stack ships, which requires ample liquidity.[16]

---

[14]    *See    Vessel    details    for:    EIRIK    RAUDE    (Platform)*    MarineTraffic.com, *http://www.marinetraffic.com/en/ais/details/ships/shipid:368831/mmsi:308463000/imo:8765266/vessel:EIRIK_RAUDE* (last    visited    Mar    29,    2017);    *Vessel    details    for:    EIRIK    RAUDE    (Platform)*    MarineTraffic.com, http://www.marinetraffic.com/en/ais/details/ships/shipid:297847/mmsi:253403000/imo:9429584/vessel:LEIV_EIRIKSSON (last visited Mar 29, 2017).

[15]    *See* Ocean Rig UDW Inc., Annual Report (Form 20-F) (Dec. 31, 2016) Page F-7.

[16]    UDW Press Release, *Ocean Rig UDW Inc. Reports Financial and Operating Results for the Third Quarter 2014* (Nov. 5, 2014), available at http://cdn.capitallink.com/files/docs/companies/ocean_rig/press/2014/oceanrig110514.pdf; UDW Press Release, *Ocean Rig UDW Inc. Reports Financial and Operating Results for the Fourth Quarter 2014* (Feb. 25, 2015), available at http://cdn.capitallink.com/files/docs/companies/ocean_rig/press/2015/oceanrig022515.pdf.

In a fit of optimism, the Debtors announced on December 8, 2015 in their third-quarter earnings results: "We still believe in the long-term market recovery and in the solid fundamentals of our industry and Ocean Rig. We believe our $3.8 billion of contracted backlog and approximately $650 million of free cash today provides us with a comfortable cushion to weather this market and pursue distressed asset opportunities as they arise."[17]  Within three months, on February 1, 2016, the Debtors announced they had received a notice of breach of material obligations under the drilling contract for the *Eirik Raude*.  Just two weeks later, the Debtors announced that two of their other drilling contracts had been terminated.[18]  In early 2016, the Debtors reported operational and market challenges, UDW's stock dipped below $1 per share in March 2016, and the Debtors retained restructuring advisors.

16.    Despite their drastically changed financial circumstances during the first quarter of 2016, the Debtors continued their spate of value-draining transactions throughout the spring of 2016, at a time when they openly assumed that the market would not recover for two to three years.[19]  Specifically, on March 1, 2016, the Debtors entered into an off-market management agreement with TMS (the "TMS Management Agreement"), which provided TMS with an extremely lucrative, above-market $150 million termination fee.[20]  None of the Debtors' public offshore drilling peers has a similar management agreement, much less than one with a $150 million termination fee.    The TMS Management Agreement further provided Mr. Economou and his affiliates with a ten year contractual commitment for management

---

[17]    UDW Q3 2015 Earnings Call, December 8, 2015, *Ocean Rig UDW Inc. Reports Financial and Operating Results for the Third Quarter 2015* (Dec. 7, 2015), available at http://cdn.capitallink.com/files/docs/companies/ocean_rig/press/2015/oceanrig120715.pdf.

[18]    UDW Press Release, *Ocean Rig UDW Inc. Announces Notice of Breach of Material Obligations on the Eirik Raude* (Feb. 1, 2016), available at http://cdn.capitallink.com/files/docs/companies/ocean_rig/press/2016/oceanrig010216.pdf; UDW Press Release, *Ocean Rig UDW Inc. Announces Cancellation of Two Drilling Contracts* (Feb. 15, 2016), available at http://cdn.capitallink.com/files/docs/companies/ocean_rig/press/2016/oceanrig150216.pdf.

[19]    UDW Q4 2015 Earnings Call, March 9, 2016, *UDW Inc. Reports Financial and Operating Results for the Fourth Quarter 2015* (Mar. 8, 2016), available at http://cdn.capitallink.com/files/docs/companies/ocean_rig/press/2016/oceanrig030816.pdf.

[20]    *See* Ocean Rig UDW Inc., Annual Report (Form 20-F) (Dec. 31, 2016); *See* Ocean Rig UDW Inc., Quarterly Report (Form 6-K) (Jun. 15, 2016).

services and a laundry list of other financing and commission fees.[21] UDW management has long enjoyed rich, off-market total compensation, to the detriment of its creditors, based on customary management compensation and proceeds from their affiliates' management agreements. Specifically, between fiscal year 2013 and fiscal year 2016, UDW paid over $155 million to George Economou and Anthony Kandylidis and their affiliated entities on account of these related-party agreements, in addition to $27.1 million of management compensation received, and dividends received from the Company during this time period.[22]

17. Also in March 2016, the Debtors capitalized an unrestricted subsidiary, Ocean Rig Investments, Inc. ("ORI") with $180 million of cash. The Debtors have not, despite multiple requests from the Secured Noteholder Group, explained how they financed this capitalization (in other words whether some or all the $180 million came from DRH), or the purpose of such capitalization. It appears now from publicly-available information that the Debtors moved money into an unrestricted subsidiary under the debt documents for the primary purpose of removing cash from the reach of their creditors, including the holders of the Secured Notes. Of primary concern is how the Debtors subsequently used ORI once it had been capitalized: on April 5, 2016, the Debtors used ORI to purchase approximately $49.9 million worth of UDW shares that were held by Dryships (again, which is controlled by Mr. Economou).[23] ORI brought these shares at an approximate 17 percent premium to the previous day's closing trading price;

---

[21]  *See* Ocean Rig UDW Inc., Annual Report (Form 20-F) (Dec. 31, 2016).

[22]  *See* Ocean Rig UDW Inc., Annual Report (Form 20-F) (Dec. 31, 2013–Dec. 31, 2016). Entities controlled or beneficially owned by George Economou, namely Cardiff Drilling Inc., Vivid Finance Limited, Azara Services S.A, and TMS Offshore Services Ltd. received $58.9 million, $31.2 million, $16.5 million, and $38 million, respectively, between fiscal year 2013 and fiscal year 2016, and Basset Holdings, Inc., an entity beneficially owned by Anthony Kandylidis received $12.8 million between fiscal year 2013 and fiscal year 2015. *Id.*

[23]  *Id.* Although the Debtors claim to have received some sort of fairness opinion for the Dryships repurchase, the share repurchase of approximately $49.9 million was apparently structured to avoid the requirement under the Secured Notes indenture for a fairness opinion for affiliate transactions with consideration of $50 million or more. *See* Secured Notes Indenture § 4.11(a)(2).

these same shares will receive **no distribution** in the Debtors' proposed schemes.[24] Dryships then used the proceeds to pay down $45 million of a loan it owed to Sinfos Shareholders Inc., another entity owned and controlled by Mr. Economou.  At that time, it is highly questionable whether the Debtors were solvent and why the Debtors and their boards concluded that transferring substantial sums of cash was legal and in the best interests of the business.

18.    The pattern of questionable transactions continued in 2016.  In early April 2016, the Debtors announced that they had repurchased, but did not retire, approximately $370 million of their 7.25% Unsecured Notes and $340 million of the Secured Notes.[25]  For months, the Debtors did not disclose why they continued to carry the repurchased 7.25% Unsecured Notes and Secured Notes on their balance sheets, how they funded such purchases, and which entity (within the corporate structure or elsewhere) held those securities.

19.    On April 15, 2016, the Debtors purchased, and immediately stacked, the drilling unit *Cerrado* for $65 million in cash, notwithstanding current market conditions and their repeated proclamations that the market would likely not recover for years.[26]  Consistent with their other actions over the past eighteen months, the Debtors made little effort to explain to their stakeholders how they funded this purchase and what benefit it provided.  The *Cerrado*, now named the *Ocean Rig Paros*, remains uncontracted and is laid-up in Greece.[27]

20.    The Debtors stripped hundreds of millions of dollars in cash and assets away from creditors through, among other transactions, the ORI capitalization and UDW stock repurchase from Dryships, the UDW dividends to its shareholders, the Dryships loan that was subsequently *de facto* forgiven by exchanging the loan for UDW shares, and excessively rich payments to

---

[24]    *See* Dryships Inc., Annual Report (Form 20-F) (Dec. 31, 2016).
[25]    *Id.*
[26]    *Id.*
[27]    *Id.*

affiliated entities under management agreements.  The Debtors have made no attempt to explain or justify any of these actions even though they were likely insolvent or left insolvent by these transactions.  The Group's members were neither consulted nor informed before any of these actions, and have been rebuffed by the Debtors in their requests for basic information and explanation of the transactions.[28]  With the restructuring contemplated by the Cayman Proceedings and these chapter 15 cases underway, the Debtors are now eager to sweep those transactions under the proverbial rug.

### C.    The Debtors' Run to the Cayman Islands and Declining Conditions.

21.    On April 14, 2016, a mere nine days after the Debtors' repurchase of Dryships stock, UDW redomiciled from the Marshall Islands to the Cayman Islands.[29]  According to UDW's Form 20-F filing dated December 31, 2016, UDW and its subsidiaries' business, assets, liabilities, subsidiaries, principal locations, and directors and officers were the same before and after the redomicilation.  In other words, the ***only*** change was that UDW was registered in the Cayman Islands instead of in the Marshall Islands.  All of UDW's subsidiaries, including DRH, continue to be domiciled in the Marshall Islands.[30]  The Debtors also continued to operate out of their Greece and Cyprus offices even after the redomiciliation to the Cayman Islands.[31]  The implication of UDW's sudden and artificial move is clear:  the Debtors and their affiliates were fleeing from the scene of crime.

22.    On August 11, 2016, the Debtors announced that they had engaged restructuring advisors and that:

---

[28]    *See* Letter of Patrick J. Nash, Jr., P.C., dated August 16, 2016, attached hereto as **Exhibit B**.

[29]    *See* Ocean Rig UDW Inc., Annual Report (Form 20-F) (Dec. 31, 2016) at 27.

[30]    The issue of domiciliation, along with myriad other issues, is still yet murky to the Group.  Despite repeatedly requesting basic diligence regarding the Debtors and their subsidiaries, the Debtors have refused to do so.

[31]    *See* **Exhibit C**, attached hereto, presenting a cache of the Debtors' website in April and October 2016, showing their offices in Greece.

> While we have not made any specific decisions, it is evident to the Company and a number of its creditors that its debt obligations will need to be amended or exchanged for new debt and/or equity securities, and some debt holders may have little or no recovery on their investment. We continue to explore and consider alternatives, which may include a possible reorganization under US bankruptcy laws or another jurisdiction, so that we can ride out this very difficult cycle with feasible prospects for strong, long-term success.[32]

In the four month span between the Debtors' $49.9 million buy-back of Dryships shares and this dire announcement, Brent crude oil prices *increased* from $37.87 to $46.94 per barrel.[33]

23.    On February 6, 2017—just *eight weeks ago*—the Debtors announced that UDW, DFHI, DOV, and DRH had relocated their principal executive offices and principal place of business to the Cayman Islands, and appointed two Cayman-Islands-based independent directors.[34]  Mr. Michael Pearson was appointed as a director of each of the Debtors on February 3, 2017, and DRH's independent director, Mr. Casey McDonald, was appointed on February 13, 2017.[35]  It is still unclear whether and to what extent the Debtors' management and operations have actually moved to the Cayman Islands; as of March 27, 2017, to the Group's knowledge, the Debtors' officers remain primarily based outside of the Cayman Islands.[36]  Even at the meetings authorizing the appointment of joint provisional liquidators held on March 23, 2017 (which all appear to have occurred at 11:30 A.M. notwithstanding that the Board of

---

[32]    UDW Press Release, *Ocean Rig UDW Inc. Reports Financial and Operating Results for the Second Quarter 2016* (Aug. 11, 2016), available at http://cdn.capitallink.com/files/docs/companies/ocean_rig/press/2016/oceanrig081116.pdf.

[33]    ICE Brent Future Europe Commodities, *Generic 1st CO Future*, https://www.theice.com/products/219/Brent-Crude-Futures.

[34]    UDW Press Release, Ocean Rig UDW Inc. Announces the Day of its 2017 Annual General Meeting of Shareholders, the Relocation of its Principal Executive Offices, Appointment of New Officers and Directors and the Amendment of the Existing Agreement with TMS Offshore (Feb. 6, 2017), available at http://cdn.capitallink.com/files/docs/companies/ocean_rig/press/2017/oceanrig020617.pdf.

[35]    *See* Second Affidavit of Antonios Kandylidis, *In the Matter of Section 104 of the Companies Law and in the Matters of Ocean Rig UDW Inc., Drill Rigs Holdings Inc., Drillships Financing Holding Inc., and Drillships Ocean Ventures Inc.* ¶86.5, sworn on March 24, 2017 filed with the Grand Court of the Cayman Islands, Cause Nos FSD 56-59 (2017), attached hereto as **Exhibit D**.  Until that time, the other two members of the Board of Directors of DRH were Anthony Kandylidis and Iraklis Sbarounis.  Both Anthony Kandylidis and Iraklis Sbarounis are directors of DFH and DOV and are officers of UDW.

[36]    *See Ocean Rig*, Ocean-rig.com (Mar. 30, 2017), available at http://www.ocean-rig.com/.

Directors for each entity purported to separately authorize the respective entity's Scheme), almost every director of each Debtor entity appeared at the meeting by telephone.[37]

24.     Around the time the Debtors had "completed" their "move" to the Cayman Islands, they disclosed the truly dire straits of their financial situation—in mid-February 2017— the Debtors released their 2016 earnings results, through which they revealed that they their assets were impaired by almost $3.75 billion, and that significant losses were expected for shareholders and other financial stakeholders.[38]  In light of those losses and ongoing restructuring, the Group fears that the Debtors may have pursued other undiscovered transactions to the company's detriment.  Even with the commencement of the Cayman Proceedings and these chapter 15 cases, much remains unclear and the Group is committed to uncovering the truth of these transactions for the benefit of all creditors.

### D.     The Secured Noteholder Group's Repeated Good-Faith Efforts to Engage in Restructuring Negotiations and the Debtors' Stone-Walling.

25.     Over the past year, the members of the Secured Noteholder Group have consistently attempted to engage the Debtors in constructive discussions to help them through this challenging economic period.  Certain holders of the Secured Notes formed the Group in the spring of 2016, and engaged Kirkland & Ellis, LLP ("K&E"), as legal counsel, and Perella Wienberg Partners ("Perella"), as financial advisors, in early 2016 to represent their interests and to facilitate discussions with the Debtors and their advisors.  In late spring, its members met to discuss the Debtors' general business plan, ongoing challenges, and potential restructuring and other alternatives.  K&E and Perella also began informal discussions with the Debtors and their advisors throughout the spring and summer of 2016.

---

[37]   *See* First Affidavits of Antonios Kandylidis sworn on March 24, 2017 filed with the Grand Court of the Cayman Islands, Cause Nos FSD 56-59 (2017), attached hereto as **Exhibit E**.

[38]   *See* UDW Press Release *Ocean Rig UDW Inc. Reports Financial and Operating Results for the Fourth Quarter 2016* (Feb. 22, 2017), available at http://cdn.capitallink.com/files/docs/companies/ocean_rig/press/oceanrig022217.pdf.

26.    On or about July 5, 2016, the Secured Noteholder Group submitted its first restructuring proposal, which would have provided the Debtors with additional liquidity through a new-money loan and a maturity extension beyond 2017 for the Secured Notes.  The Secured Noteholder Group did not receive a substantive response from the Debtors—despite multiple attempts to engage with both the Debtors' management team and their advisors—until mid-September 2016.  The Debtors refused to provide basic diligence and sign standard non-disclosure agreements with the K&E and Perella, instead insisting on off-market provisions designed to prevent discussions with other creditors. [39]  In hindsight, these Debtors required limitations in a standard advisor-only non-disclosure agreement would prove consistent with the Debtors' overall approach to the Secured Noteholder Group:  to systematically separate and disenfranchise the holders of Secured Notes to advance discussions with other favored creditors.

27.    In August 2016, the Debtors proposed another meeting among the respective professionals, which the Secured Noteholder Group expected to focus on the terms of its proposal.  The meeting was, however, another preliminary meeting during which the Debtors once again laid out their business plan and market constraints.  The Group's professionals also submitted numerous requests for key diligence regarding critical aspects of the Debtors' business and financial history, including historical financial details beyond the information in the public filings, financial projections, assets, liabilities, intercompany activities and balances, financial statements for DRH and information with respect to the disputed transactions.  The Debtors declined to provide information on intercompany activities and balances, historical financial

---

[39]    *See* Letter of Patrick J. Nash, Jr., P.C., dated August 16, 2016, attached hereto as **Exhibit B** ("The Company's insistence that the Group's advisors not speak with other constituents, even on matters unrelated to confidential information, is unrealistic and unreasonable, and precludes the [Group's] advisors from effectively representing the Group.  We're nevertheless willing to explore ways to resolve this issue on reasonable and mutually satisfactory terms").

detail beyond what is in the public filings, and DRH financial statements, all which is necessary diligence information to better understand the value of the Debtors and DRH. [40]

28.     After over two months, on or about September 19, 2016, the Debtors submitted a counter-proposal to the Secured Noteholder Group, which essentially offered the holders of the Secured Notes with minimal cash consideration in exchange for releasing the UDW guarantee. The counter-proposal's primary objective was to silo DRH and the holders of the Secured Notes by severing the UDW guarantee on the Secured Notes.

29.     In another attempt to advance discussions, the Secured Noteholder Group submitted a revised proposal, without the benefit of the outstanding diligence information that had been requested, on or about October 13, 2016.  The Debtors again refused to engage with the Group, giving no substantive feedback to the proposal and continuing to elude providing essential information on intercompany activities and balances, historical financial detail beyond what is in the public filings, and DRH financial statements.  On October 21, 2016, K&E delivered a letter to the Debtors' counsel to urge discussions and request that the Debtors inform the Group of any court proceedings, including a potential restructuring in the Cayman Islands, and allow counsel to the Group the opportunity to participate in such proceedings. [41]  The Debtors did not respond to the letter, and clearly did not heed the request when they filed for a provisional liquidation in the Cayman Islands without so much as a whisper to the Group. Despite the Debtors' duty of full and frank disclosure in the Cayman Islands, the volumes of paper submitted in the Cayman Proceedings in advance of the *ex parte* hearing appointing the JPLs and subsequently in this Court all appear to have omitted the October 21st letter.

---

[40]   *See* Letter of Patrick J. Nash, Jr., P.C., dated August 16, 2016, attached hereto as **Exhibit B**.
[41]   *See* Letter of Brian Schartz, dated October 21, 2016, attached hereto as **Exhibit B**.

30.     Three months passed before, at the end of January 2017, the Debtors finally responded to the Secured Noteholder Group's proposal.  Instead of sending a constructive counter-proposal, the Debtors simply requested a meeting with the advisors to the Secured Noteholder Group to discuss the potential terms of an in-court proposal to be made by the Debtors.  The Group and its advisors suggested various alternatives during the meeting; most of which were dismissed outright by the Debtors and their advisors.  The Debtors' management, however, promised to provide a counter-proposal within the next day, emphasizing need to move quickly, with or without the Group's support.

31.     Despite these pronouncements, the Debtors did not send a counterproposal the next day, the next week, or even next month.  In fact, to date, the Debtors have not sent a detailed counterproposal to the Secured Noteholder Group, ignoring multiple requests from the Group's advisors.  On February 20, 2017, the Debtors instead sent a high-level summary of their business plan and operating assumptions, and communicated only a framework of their restructuring plan over the telephone rather than an actual counter proposal.  During these conversations, the Debtors noted that the rig values assumed for DRH collateral were based on estimated "broker values;" while the rig values for all other rigs were based on going-concern value.  Additionally, certain members of the Group understand, based upon information and belief, that the Debtors had received valuation guidance from other rig brokers for DRH collateral at higher values than the value used in the Cayman Schemes; however, the Debtors evidently have decided not to rely on those higher values.

32.     On February 22, 2017, the Debtors met briefly with advisors to the Secured Noteholder Group.  The Debtors and their advisors again declined to provide a written proposal or any other detail regarding the contemplated restructuring, and the meeting only entailed

preliminary discussions without principals.  Shortly after the meeting, the Secured Noteholder Group and its advisors once again informed the Debtors that the Group members would be willing to enter into market-based non-disclosure agreements (collectively, the "NDA") to engage in substantive principal-led restructuring discussions.  On March 3, 2017, K&E and Campbells, the Group's Cayman counsel, sent the Debtors a draft NDA and a letter expressing their frustrations with the lack of engagement, requesting long-outstanding diligence, and reiterating the desire to substantively discuss restructuring alternatives.[42]

33.    The Debtors refused to discuss the draft NDA—despite their many assertions that time was of the essence—for over a week, choosing instead to respond to the letter from Campbells.  Nearly a week and half after receiving the initial draft NDA, the Debtors sent the Secured Noteholder Group's advisors its own draft NDA.  That draft included a provision that would have prohibited the Secured Noteholder Group from taking any action other than in the Debtors' primary restructuring proceeding while the NDA remained in effect.  Incredibly, this "standstill" provision included a trigger provision that would have extended the gag effect ***throughout the period of any potential restructuring proceeding*** if the Debtors started a restructuring proceeding with the NDA in effect.  The Group's advisors, understandably, asked the Debtors to remove the provision and agree to customary terms.

34.    The last NDA draft that the Debtors provided to the Secured Noteholder Group's advisors doubled down on the standstill demand and made the restriction even more onerous by extending its initial term.  The Group again rejected the term because it would severely impair its ability to participate in the restructuring process and would potentially allow the Debtors to spring an in-court proceeding with no notice and lock the Group into waiving its due process rights (which is, in fact, exactly what happened).  The Debtors' advisors admitted that this

---

[42] *See* Letter of Campbells, dated March 3, 2017, attached hereto as **Exhibit B**.

standstill provision was off market and that they could not point to a single instance where any creditor (of the Debtors or otherwise) had agreed to such a substantive waiver in an NDA.  The Debtors instead wrongly accused the Group of making overt threats of litigation; these claims are patently false and the Debtors and their actions alone have driven parties toward litigation.

35.     The sequencing of the Debtors' actions over the past week cannot be overstated because it is a microcosm of the Debtors' entire approach to the Secured Noteholder Group throughout the restructuring process: ***the Debtors were pushing the Secured Noteholder Group to agree to an NDA that would waive the members of the Group's rights to participate in restructuring proceedings in other jurisdictions, <u>a day after the Debtors had already secretly filed winding up petitions in the Cayman Islands</u>***.  Had the Group members agreed to the Debtors' terms on Saturday, they would have realized on the subsequent Monday afternoon that they had been hoodwinked when the Debtors filed for chapter 15 relief, finally giving notice to the Group of the Debtors' actions in the Cayman Islands.  This deception is striking and gives the Secured Noteholder Group great pause when evaluating any path forward set by the Debtors.

**E.     The Debtors' Proposed Restructuring Scheme.**

36.     As a result of the Debtors' own actions, the Secured Noteholder Group members are not parties to the RSA, do not support the restructuring contemplated by the RSA, and have serious concerns that the Cayman Proceedings will be substantially unfair vis-à-vis the Secured Noteholder Group and other stakeholders.

37.     The face of the Debtors' restructuring proposal evidences as much, and it has no support from the holders of Secured Notes at this time.  From what the Secured Noteholder Group has seen so far, the restructuring plan proposed to be implemented through the Cayman Proceedings and subsequently recognized in these chapter 15 cases would give the Term Loans highly favorable recoveries, which the Secured Noteholder Group believes could be well in

19

excess of 100 percent depending on the actual equity value of reorganized Debtors, in exchange for granting nearly $400 million of value to Mr. Economou and Mr. Kandylidis in the form of equity and a lucrative TMS management contract unparalleled in the offshore industry. The contemplated agreement with TMS is so off-market it can be characterized as nothing less than a gift. All in, Mr. Economou and other insider members of management the affiliated entity stand to receive 9.5 percent of the reorganized equity, with value likely to be in excess of $200 million depending on the actual equity value of the reorganized Debtors, and additional management fees worth an additional $200 million on a present value basis. In stark contrast, the Secured Noteholder Group and the holders of the UDW 7.25% Unsecured Notes stand to see their claims substantially undervalued or diluted—and, in the case of the Secured Noteholder Group, receive a paltry recovery (approximately $105 million in value for a recovery of approximately 20 percent depending on the actual equity value of the reorganized Debtors) on account of their undervalued collateral. Put simply, among other issues, the distributions to management under the restructuring would dwarf the recoveries of holders of approximately $460 million in Secured Notes and nearly $131 million in 7.25% Unsecured Notes **combined**.[43]

38.     The Debtors' disenfranchisement of the holders of Secured Notes carries over to the structure of their Cayman Schemes, which make the DOV, DFH, and UDW Schemes interrelated and inter-conditional. The DRH Scheme, however, is to be "interrelated" vis-à-vis sharing in the same recovery pool (on the basis of highly suspect valuations), but not inter-conditional. In other words, the DRH Scheme is conditional on the success of the UDW Scheme, but the other Schemes are not conditional on the success of the DRH Scheme. The obvious inference from this structure is that the Debtors have attempted to silo the DRH scheme

---

[43]     By effectively reinstating the management agreements, the Debtors ensure that insiders receive a windfall, even though claims under the pre-existing management agreements would otherwise receive pennies on the dollar.

participants (*i.e.*, the members of the Group who hold a blocking position within the DRH Scheme) from the restructuring process as a whole.

39. The Cayman Schemes also seek to combine holders of various claims against UDW into one class—including the guarantee claim by UDW of the Secured Notes—diluting the value of those claims not held by the Term Loan Lenders, and contemplate releasing valuable intercompany claims (notwithstanding that the Debtors are, and have been, insolvent for a significant period of time and such claims could provide significant value to the DRH Debtors). Finally, to add insult to injury, the Debtors' cash management procedures would require DRH— and effectively the holders of the Secured Notes—to bear nearly ***20 percent*** of the Debtors' administrative expenses; a patently unfair requirement, given that the Debtors have dramatically under-valued the collateral securing the Secured Notes to amount ***to less than 5 percent*** of the total value of the Debtors.[44]  It is also inequitable for the DRH creditors to bear those costs when the DRH Scheme is already doomed to fail.  The Debtors' proposed Cayman Schemes therefore evidence a profoundly troubling attempt to isolate certain disfavored creditors and ignore their legitimate and valuable rights and interests in the Debtors.

## Preliminary Objection

40. As part of their chapter 15 proceedings, the Debtors have requested and received the protection of the automatic stay pursuant to section 362 of the Bankruptcy Code on an emergency basis.  The Debtors now seek entry of an order that would impose the automatic stay on creditors, including New York-based holders of debt governed by New York State law, until the Court has made a final determination regarding the recognition of the Cayman Proceedings.

---

[44]    *See Declaration of Simon Appell Pursuant to 28 U.S.C. § 1746 and Statements and Lists Required by Bankruptcy Rule 1007(a)(4)* [Docket No. 4].

41.     The Debtors' request, however, provides no protection to creditors as required by section 1519 of the Bankruptcy Code. *See* 11 U.S.C. §§ 1519(a); 1522 (authorizing the court to grant provisional relief, where urgently needed, to protect the interests of creditors, and only where the interests of creditors are "sufficiently protected").[45]

42.     To be clear, the Secured Noteholder Group does not wholly oppose the entry of an automatic stay in its entirety.  Consistent with their approach to date, the Group aims to be a productive participant in the Debtors' restructuring, while protecting valid legal rights, and recognizes the importance of the automatic stay to maintain value for all parties.  To that end, the Secured Noteholder Group requests that the Court tailor the relief requested by the Debtors to ensure that it and other creditors are afforded the opportunity to participate in these chapter 15 cases, without being steamrolled by the Debtors and the Term Loan Lenders.  Specifically, the Secured Noteholder Group respectfully requests that the Court either schedule the Petition Hearing for an appropriate time to allow the Group sufficient time to engage in discovery regarding whether the Debtors qualify for relief under chapter 15 of the Bankruptcy Code, or limit the duration of the automatic stay to such time as the Court sets a hearing to consider scheduling the Petition Hearing.  As a show of good faith, the Group has proposed a timeline for the Petition Hearing that fits squarely within the Debtors' proposed restructuring timeline, which contemplates a potential end-date of October 31, 2017.[46]  In addition, the Secured Noteholder Group requests that the Court direct the Debtors to cooperate with the parties in setting

---

[45]   *See also In re Tri-Cont'l Exch. Ltd.*, 349 B.R. 627, 636 (Bankr. E.D. Cal. 2006) ("To be sure, chapter 15 provides ample authority for this court to impose restrictions so as to protect United States creditors to a greater extent than otherwise provided in chapter 15 and in other applicable provisions of the Bankruptcy Code . . . Standards that inform the analysis of § 1522 protective measures in connection with discretionary relief emphasize the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, without ***unduly favoring*** one group of creditors over another.") (emphasis added).  "The idea underlying [§ 1522] is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief." *Guide to Enactment of the UNCITRAL Model Law On Cross–Border Insolvency*, U.N. Gen. Ass., UNCITRAL 30th Sess., U.N. Doc. A/CN.9/442 (1997) ¶ 161.

[46]   *See Second* Affidavit of Antonios Kandylidis, *Restructuring Support Agreement*, sworn on March 24, 2017, filed with the Grand Court of the Cayman Islands, Cause Nos FSD at 1057 (2017), attached hereto as **Exhibit F**.

manageable goals around discovery and depositions that will need to be taken in advance of the

Petition Hearing within seven (7) days of the entry of such provisional order.

43.    It is clearly in the Debtors' insiders' and the Term Loan lenders' interest to move

the chapter 15 and Cayman Proceedings as quickly as possible.  If they are successful, they will

have run away with the Debtors' assets at the expense of all holders of the Secured Notes.  They

have attempted to paint the members of the Group as obstreperous, while it is, in fact, the

Debtors who have been completely unwilling to engage with "unfavored" creditors, drained

value through insider transactions, and insisted on a litigious path.  The Debtors pretend that the

Group has threatened and coerced, when all it has done is to *attempt* to get a seat at the table.

44.    Any request by the Debtors in these chapter 15 cases must be viewed in light of

the Debtors' actions to date.  This Court should not allow the Debtors to use the protections of a

U.S. court while seeking to rid themselves of the concomitant benefits available to creditors.  *See*

11 U.S.C. § 1522.[47]  Such relief is particularly important where the Debtors may not meet the

standards for recognition of their proceeding, as it is well established that recognition should not

be "rubber stamped" by the courts.[48]  Put simply, the Secured Noteholder Group needs sufficient

time requested to develop and present to the Court an accurate picture of whether the Debtors

qualify for recognition under section 1517 of the Bankruptcy Code.

45.    There are also significant issues that remain to be litigated in the Cayman

Proceedings that may slow down the Debtors' proposed schedule, further supporting the need for

a measured pace in these chapter 15 proceedings.  Most importantly, the Secured Noteholder

Group holds a blocking position of the Secured Notes for the DRH Scheme, and currently has no

---

[47]    *See also In re Int'l Banking Corp.* B.S.C., 439 B.R. 614, 627 (Bankr. S.D.N.Y. 2010) ("Chapter 15 grants secured creditors . . . the same protections that they would enjoy in a plenary bankruptcy case.").

[48]    *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007), *aff'd,* 389 B.R. 325 (S.D.N.Y. 2008); *In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 40 (Bankr. S.D.N.Y. 2008).

intention of voting to accept the Cayman Scheme embodied and proposed in the Debtors' RSA. Without the Group's support, the DRH Scheme cannot achieve approval of 75 percent of the class, and therefore cannot be approved by the Cayman Court.[49]  Moreover, the Secured Noteholder Group also has, among others, significant class composition arguments with relation to the classification of claims for the UDW Scheme, as well as fairness arguments to be asserted at any potential Sanction Hearing in respect of the UDW Scheme.[50]  To the extent that the UDW Scheme is not approved, all of the other Cayman Schemes will automatically fail.

46.    Additionally, enhanced protection for creditors is particularly important where there is a risk of inadequate procedural safeguards in the foreign proceeding. *See In re Elcoteq, Inc.*, 521 BR 189, 197 (Bankr. ND Tex. 2014) (lack of notice and the opportunity to be heard prevented grant of comity to Mexican Labor Board determination); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (noting the importance of procedures ensuring "fundamental standards of fairness" in granting recognition to Canadian proceeding). In such situations, U.S. courts are entitled to, and should, tailor any relief granted to the debtor in the chapter 15 proceeding only if the interests of the creditors are "sufficiently protected." 11 U.S.C. § 1522.  On March 29, 2017, Campbells delivered a letter to the Debtors' Cayman counsel and the Grand Cayman court, requesting notice of and an opportunity to participate at the next Cayman hearing.  As of the filing of this Objection, the Secured Noteholder Group has not received a response and remains very concerned that the Debtors will continue their pattern of excluding the Group from the process.

47.    The Debtors have, as of yet, not given the Secured Noteholder Group the opportunity to participate in the Cayman Proceedings.  This is notwithstanding the fact that the

---

[49]    *See* Declaration of Rachael Reynolds [Docket No. 6].
[50]    *Id.*

Secured Noteholder Group explicitly requested to be given "three weeks' notice in writing of any winding up petition that is to be presented."[51]

## Conclusion

48.     The relief that the Secured Noteholder Group requests will appropriately balance the Debtors' desire to "protect the *status quo*"[52] while ensuring the interests of ***all*** creditors are protected.  While the stay is in effect, there is no need to rush to a hearing on the Verified Petition.  The Cayman Proceedings can continue in due course, and the Debtors will have the time they need to engage constructively with *all* parties in interest.  In the meantime, the Group and other parties should have the time to develop the information required to adequately respond to the application for recognition—and, for the first time in the Debtors' restructuring efforts, have a fair opportunity to participate in the process.

## Reservation of Rights

49.     Each member of the Secured Noteholder Group reserves its right to supplement or add to the legal and factual arguments raised in this Preliminary Objection and to raise further and other objections or responses to the Motions prior to or at any hearing on the Motions, including, without limitation, objections to the scope of provisional relief granted in the Interim Provisional Relief Order and based on section 1520(c) of the Bankruptcy Code.  All rights and remedies are hereby expressly reserved.

---

[51]    See Letter of Campbells, dated March 29, 2017, attached hereto as **Exhibit B**.

[52]    *See* Provisional Relief Motion ¶ 25.

WHEREFORE, the Secured Noteholder Group respectfully objects to the Provisional Relief Motion and the Recognition Hearing Application and request that the Court deny such motions on the bases set forth herein.

Dated:  March 31, 2017

*/s/ Edward O. Sassower, P.C.*

Edward O. Sassower, P.C.
Brian E. Schartz
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen, P.C.
Patrick J. Nash, Jr., P.C. (*pro hac vice pending*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Ad Hoc Group of Holders of 6.5% DRH Secured Notes*