VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
Telephone: (212) 307-5500
Jeffrey S. Sabin
Kostas D. Katsiris
*Counsel for Highland Capital Management LP*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                          :

In re                               :        Chapter 15

                               :

OCEAN RIG UDW, INC., et al.    :        Case No. 17- 10736 (MG)

                               :

        Debtors in a Foreign Proceeding.  :       Jointly Administered

                               :

---------------------------------------------------------x

## NOTICE OF APPEAL OR, IN THE ALTERNATIVE, <br> MOTION FOR LEAVE TO APPEAL

Highland Capital Management LP, on behalf of certain of its or its affiliates' funds and

managed accounts (collectively, "Highland"), by and through undersigned counsel, pursuant to

28 U.S.C. § 158(a)(1) and Rule 8003 of the Federal Rules of Bankruptcy Procedure, hereby

appeals to the United States District Court for the Southern District of New York from the

Bankruptcy Court's ruling (the "Order") made and so-ordered on the record during the April 20,

2017 hearing, and entered on the docket of the above-captioned Chapter 15 proceeding on April

27, 2017 [Dkt. No. 55], denying that portion of Highland's Limited Objection [Dkt. Nos. 25 &

46] requesting that the Court modify the Provisional Relief Order [Dkt. No. 41] to permit

Highland and other creditors to file an involuntary petition for relief against the Debtors (or any

one of them).   A true and correct copy of the so-ordered transcript reflecting the Order is

attached hereto as **Exhibit A**.

The names of all parties to the Order appealed from and the names, addresses and telephone numbers of their respective counsel are as follows:

## I.   APPELLANT AND COUNSEL

**A.**   Appellant:

Highland Capital Management LP, on behalf of Highland Floating Rate Opportunities Fund, Highland Global Allocation Fund, Highland Opportunistic Credit Fund, Highland Loan Master Fund, L.P., and NexPoint Credit Strategies Fund, as holders of (i) the majority in aggregate principal amount of the outstanding 7.25% Senior Notes due 2019 governed by an indenture, dated as of March 26, 2014, by and between Deutsche Bank Trust Company Americas as Trustee and Ocean Rig UDW, Inc. ("Ocean Rig") (ii) Term Loans made pursuant to that certain Credit Agreement, dated as of July 12, 2013, as amended and restated by and among Drillships Financing Holding Inc. ("DFH") and Drillships Projects Inc. ("DPI"), as borrowers, Ocean Rig, as a guarantor, Deutsche Bank AG New York Branch, as administrative and collateral agent, and the lenders party thereto (the "DFH Credit Agreement"), and (iii) shares of common stock of Ocean Rig.

**B.**   Counsel to the Appellant:

VENABLE LLP
Rockefeller Center
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
Telephone: (212) 307-5500
Attn:   Jeffrey S. Sabin
        Kostas D. Katsiris

II.     **APPELLEES AND COUNSEL**

A.      Appellees:

Simon Appell and Eleanor Fisher, in their capacities as the Joint Provisional

Liquidators and proposed foreign representatives of the Debtors.

B.      Counsel:

ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
Telephone: (212) 506-5000
Attn:   Evan C. Hollander
        Raniero D'Aversa, Jr.
        William S. Haft
        David Litterine-Kaufman
        Monica A. Perrigino
*Counsel to the Joint Provisional Liquidators*

**MOTION FOR LEAVE TO APPEAL, FILED SUBJECT TO, AND IN THE
<u>ALTERNATIVE TO, NOTICE OF APPEAL</u>**

In the alternative, Highland ("Appellant") incorporates its Notice of Appeal and files this

Motion for Leave to Appeal (the "Motion") pursuant to 28 U.S.C. §§ 158(a)(1) and 158(a)(3),

and Federal Rule of Bankruptcy Procedure 8003 and 8004, seeking leave to appeal from the

Order.  Appellant submits the attached Memorandum of Law in support of this Motion.

Dated: May 11, 2017
     New York, New York           Respectfully submitted,
                                      VENABLE LLP

                                By:    /s/ Jeffrey S. Sabin_____
                                      Jeffrey S. Sabin
                                      Kostas D. Katsiris
                                      1270 Avenue of the Americas, 24th Floor
                                      New York, New York 10020
                                      Telephone: (212) 307-5500

                                      *Counsel for Highland Capital
                                      Management LP*

# EXHIBIT A

```
 1                 UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF NEW YORK
 2     ------------------------------
       In re:                              Case No. 17-10736-mg
 3                                         New York, New York
             OCEAN RIG UDW INC.,           April 20, 2017
 4                            Debtor.      3:05 p.m. - 4:25 p.m.
       ------------------------------
 5                        - TRANSCRIPT -

 6     17-10736-MG SIMON APPELL AND ELEANOR FISHER, CHAPTER 15
              HEARING REGARDING WHETHER CREDITORS MAY FILE
 7             INVOLUNTARY CHAPTER 11 AGAINST NON-DEBTOR
             CHAPTER 15 AFFILIATES (DOC. NOS. 46, 47, 48)
 8                 BEFORE THE HONORABLE MARTIN GLENN
                    UNITED STATES BANKRUPTCY JUDGE
 9
       A P P E A R A N C E S :
10
       For the Debtor             EVAN C. HOLLANDER, ESQ.
11     Ocean Rig UDW Inc., et al.: Orrick, Herrington & Sutcliffe LLP
                                   51 West 52nd Street
12                                 New York, New York 10019
                                   (212) 506-5145; (212) 506 5151 fax
13                                 echollander@orrick.com

14     For Foreign Representatives RANIERO D'AVERSA, ESQ.
       Simon Appell and           DAVID LITTERINE-KAUFMAN, ESQ.
15     Eleanor Fisher:            Orrick, Herrington & Sutcliffe LLP
                                   51 West 52nd Street
16                                 New York, New York 10019
                                   (212) 506-5000; (212) 506 5151 fax
17
       For Highland Capital        KOSTAS D. KATSIRIS, ESQ.
18     Management:                 JOHN POGLITSCH, ESQ. (via phone)
                                   JEFFREY S. SABIN, ESQ.
19                                 Venable LLP
                                   Rockefeller Center
20                                 1270 Avenue of Americas, 24th Fl.
                                   New York, New York 10020
21                                 (212) 307-5500; (212) 307-5598 fax

22     For the Ad Hoc Group of     ALEX CROSS, ESQ. (via phone)
       Holders of 6.5% DRH Secured PATRICK J. NASH, JR., ESQ.
23     Notes; Ad Hoc Group of 6.5% BRIAN SCHARTZ, ESQ. (via phone)
       Senior Secured Noteholders: Kirkland & Ellis LLP
24                                 300 North LaSalle Street
                                   Chicago, Illinois 60654
25                                 (312) 862-2000; (312) 862-2200 fax
```

A P P E A R A N C E S :

| | |
|---|---|
| *For Ad Hoc Group of Term Loan Lenders:* | JAMES C. BEHRENS, ESQ. (via phone)<br>ALEXANDER B. LEES, ESQ.<br>DANIEL M. PERRY, ESQ.<br>GERARD UZZI, ESQ.<br>Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, New York 10005-1413<br>(212) 530-5000; (212) 530-5219 fax |
| *For the U.S. Bank, as Indenture Trustee for the 6.5% Senior Secured Noteholders:* | BENJAMIN FEDER, ESQ.<br>Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, New York 10178<br>(212) 808-7974; (212) 808-7897 fax<br>bfeder@kelleydrye.com |
| *Via Phone - Live:* | MARK A. GOODMAN<br>Campbells<br>(345) 949-2648 Ext 210 |
| *Via Phone – Listen Only:* | TERESA LI<br>Reorg Research, Inc.<br>(212) 588-8890 |
| *Via Phone – Listen Only: (creditor)* | KENNETH J. SHAFFER<br>Quinn Emanuel Urquhart & Sullivan LLP<br>(213) 443-3667 |
| *Transcribers:* | AA EXPRESS TRANSCRIPTS<br>195 Willoughby Ave, Suite 1514,<br>Brooklyn, New York 11205<br>(888) 456-9716; (888) 677-6131 fax<br>aaexpress@court-transcripts.net |

*(Proceedings recorded by electronic sound recording)*

- P R O C E E D I N G -                                        3

1          THE COURT:  Chapter 15 case, involving Ocean Rig UDW,

2    Inc., 17-10736.

3          All right.  I have these pleadings that have been

4    filed in connection with whether creditors can file an

5    involuntary proceeding or proceedings.  And so, let me hear from

6    the creditors first.  Well, first, give me an update on where

7    things stand.

8          MR. HOLLANDER:  Well, Your Honor, we're --

9          THE COURT:  You have to make your appearance.

10         MR. HOLLANDER:  Evan Hollander, a counsel for the

11   Petitioners here in this case.

12         We are progressing on getting signups to the RSA.

13         THE COURT:  What does that mean?

14         MR. HOLLANDER:  The restructuring support agreement.

15         THE COURT:  No, I know what the -- what's the status

16   of it?

17         MR. HOLLANDER:  The status is, we have approximately

18   85 percent at the UDW level.  We also have, Your Honor, some

19   significant support down at the DRH level.  That's Drill Rigs

20   Holdings.  That's the level where the 6.5 Secured Noteholders

21   are.

22         THE COURT:  Since the last time you were here, have

23   there been hearings in the Cayman?

24         MR. HOLLANDER:  There's been no hearings in the Cayman

25   since we were last here.  However, the JPLs have reached out to

- P R O C E E D I N G -                                          4

 1   both Highland Capital, as well as the Senior Secured

 2   Noteholders.  Simon Appell was here today in New York with his

 3   associate, Chris Duffy.  They met with the Senior Secured

 4   Noteholders this morning.  I don't know whether they have

 5   scheduled a meeting with Highland while they're here.

 6              THE COURT:  Are there any hearings scheduled?

 7              MR. HOLLANDER:  I don't believe there's current

 8   hearings scheduled in the Caymans, Your Honor.

 9              THE COURT:  Who is the judge who's presiding over the

10   matter in the Cayman?

11              MR. HOLLANDER:  I believe Judge McMillan.

12              THE COURT:  All right.  Anything else you want to tell

13   me about the status before we --

14              MR. HOLLANDER:  That's it, Your Honor.

15              THE COURT:  Okay.  All right.  Let me hear from

16   creditors.

17              MR. SABIN:  Good afternoon, Your Honor, Jeffrey Sabin

18   from Venable, LLP, on behalf of Highland Capital Management, as

19   manager for various funds that own notes unsecured, issued by

20   Ocean Rig, UDW.

21              Your Honor, thank you very much for the opportunity to

22   further brief an issue Highland first raised in its objection to

23   the motion of the provisional joint liquidators, and first

24   discussed at the April 3 hearing.  And that is whether this

25   Court has discretion in our view under Section 1519 or 1522 and

- P R O C E E D I N G -                                                5

1    Bankruptcy Rule 7065 to prohibit and/or temporarily restrain

2    Highland and/or other unsecured creditors at UDW from

3    immediately filing an involuntary petition, i.e. before there

4    would be a recognition order if there is one in this case.

5             THE COURT:  May I ask you this?

6             MR. SABIN:  Sure.

7             THE COURT:  Because on April 7 I entered an order

8    granting provisional relief, and Paragraph 1-A on pages 4 and 5

9    say "Section 362 of the Bankruptcy Code applies with respect to

10   the Debtors and the property of the Debtors that is within the

11   territorial jurisdiction of the United States.  For the

12   avoidance of doubt, the stay will operate to stay and restrain

13   all holders of scheme indebtedness or any holder's affiliates

14   from (a) commencing or continuing any actions against the

15   debtors or their property within the territorial jurisdiction of

16   the United States.  Further defined in 11 U.S.C. 1052(8)."

17            So, do you agree that that order that I entered,

18   correctly or incorrectly, prohibits creditors from filing an

19   involuntary case against the Debtor in New York currently?

20            MR. SABIN:  Yes, that's how we read it.

21            THE COURT:  Okay.

22            MR. SABIN:  Except that that same order preserved our

23   rights to make these arguments today.

24            THE COURT:  I know.  I know.  But essentially, I

25   granted the foreign representatives the relief that they

- P R O C E E D I N G -          6

1  requested.  And it seems to me that there are really two issues

2  now.  The relief that I granted, did I not have the power to do

3  it?  And if I had the power to do it, has Highland demonstrated

4  cause to lift the stay?  Would you agree those are the two

5  issues?

6           MR. SABIN:  Yes.  I would state it a little

7  differently, but I would agree.

8           THE COURT:  Okay.  So -- well, go ahead with your

9  argument.  I'll let you argue --

10           MR. SABIN:  Surely.

11           THE COURT:  And then we'll come back.

12           MR. SABIN:  No, no, no.  I'm happy to answer any

13  questions as we go along, because that may be the easiest way to

14  dialogue it, and --

15           THE COURT:  Well, all right.  Then let me ask this.

16           MR. SABIN:  Surely.

17           THE COURT:  With respect to the first proposition, do

18  you agree that I had authority under 1519 to grant the relief

19  that I did grant?

20           MR. SABIN:  Respectfully, I do not.

21           THE COURT:  I don't think it's an easy issue.  Let me

22  put it that way.  Are there any cases that say I don't?

23           MR. SABIN:  No.  In fact, my next statement was to be,

24  I believe this is an issue that has not been addressed by any

25  court anywhere.

- P R O C E E D I N G -                                      7

1       THE COURT:  Well, let me test that.

2       MR. SABIN:  Okay.

3       THE COURT:  Because when I read Judge Hale's decision

4   in *Vitro* in 2011, and he goes through an analysis, and so, this

5   is at 455 B.R. 579, in the second column, top of the second

6   column, "However, as stated previously, the relief enumerated in

7   Section 1519 is not all-inclusive.  *See* 11 U.S.C. § 1519(a)

8   ("including"); *see also In re Ran*, which is a Fifth Circuit

9   decision, (1519(a)(1)-(3) represents a "non-exhaustive list of

10  relief available to a foreign proceeding's representative in a

11  Chapter 15 case").  *Ran* is an appeal from a denial of

12  recognition, and the circuit affirms the denial of recognition,

13  but in the course of it, has this language about the non-

14  exhaustive list.  And so, it seems to me that *Vitro* may be

15  closest that I see.  I read *Ran*, I read *Pro-Fit Int'l Ltd.*, and

16  so my question is, aren't those three cases -- you say it's a

17  question of first impression; I read those cases as saying it's

18  not a question of first impression.  That those cases have said

19  that 1519(a) -- and I'll leave some words out -- where relief is

20  urgently needed to protect the assets of the Debtor or the

21  interests of creditors, grant relief of a provisional nature

22  including.  And then (1), (2) and (3).  (1), (2) and (3) don't

23  cover staying somebody from filing an involuntary.  I would say

24  that.  But I think *Ran*, *Vitro* and *Pro-Fit* would seem to say yes,

25  but the authority is broader than just 1519(a)(1), (2) and (3),

- P R O C E E D I N G -                                            8

1    including is used, applying the 362 stay.  Do you agree?

2         MR. SABIN:  I wouldn't go that far.  I do not read

3    those cases that far, and perhaps I should go on for a few

4    minutes --

5         THE COURT:  Sure.  Go ahead.

6         MR. SABIN:  -- so that I can supplement what you have

7    read, because I know you've read our papers, and I know you've

8    read our opposition papers.  So, I start out with the bottom

9    line that I respectfully differ in those readings, and I believe

10   that there has been no case that has on-point addressed the

11   issue, limited to the rights of unsecured creditors --

12        THE COURT:  You hit the issue now and nobody is --

13        MR. SABIN:  No, I understand.  But it's the exercise

14   of a statutory right, i.e. filing of an involuntary, and whether

15   this Court, in essence, has discretion to abrogate that

16   statutory right in this context.  And so, let's talk about rules

17   of construction first, and then I'll talk about statute.

18        Rules of construction, two-fold.  First, in *pari*

19   *materia*.  Supreme Court in 1972 in a case called *Erlenbaugh v.*

20   *United States* put it simply, statutes that pertain to the same

21   subject should be construed as if they were one law.  And indeed

22   at least one case has looked at Chapter 15 issues in that

23   context and said, you're right.  And that's *Qimonda*.  And the

24   Second Circuit has gone one step further in connection with a

25   Statutory Rule of Construction called the Whole Act Rule of

- P R O C E E D I N G -                                          9

1    Construction.  And the Second Circuit three times, first in

2    2004, then in 2008, and then in 2011; *Rabin v. Wilson-Coker*,

3    *United States v. Kaiser*, and in *United States v. Kozeny*,

4    basically, saying the following:

5           That the Whole Act Rule of Statutory Construction to

6    read a section of a statute is not to be read in isolation from

7    the context of the whole act.  You'd look at the entire

8    provisions.  And in fact, when we do that here, unlike any of

9    the three cases you mentioned, I'm going to tell you now what we

10   think are the relevant statutes under these principles of

11   statutory construction that are relevant to our argument.

12   Whether I convince you, is another story, Your Honor.  But let

13   me for the record, name the statutes.

14          103, 301, a right the Debtor has to file a voluntary.

15   303, the issue today.  362, if I file an involuntary and you

16   give me that right, automatic stay.  541, if we file an

17   involuntary, an estate is created, including the possibility

18   that the draft complaint that we had appended becomes an asset

19   of the estate available for all.  1501(3), 1501(4), dealing with

20   policy that underlies Chapter 15.  1520(a) and (c), 1529(2)(a)

21   and (4), a critical statute inside the rules of construction, as

22   I will articulate in a minute, because I think it gives meaning

23   to the position we're articulating on Section 1520(c), which is

24   the right today to file the involuntary before recognition.

25          1525, 1526, 1527, which otherwise say, if you adopt

- P R O C E E D I N G -                                   10

1    our reading, and if we were to file an involuntary against UDW.

2    1529(4) says okay, the Court here, as opposed to Cayman, has

3    various technical rights to do with cooperation between the two

4    proceedings.  1528, which talks in the opposite, terms of

5    limitation of what may happen afterwards versus before.  1519

6    and 1522, the various sections that govern your discretion

7    and/or the word inclusive.  1511, which makes clear that a

8    provisional joint liquidator does not have a right to go file an

9    involuntary or a voluntary until there is recognition.  And

10   last, but not least, 305, which when combined with Section 103

11   in terms of applicability, only arises if, and when, and after

12   an involuntary petition is filed.  So --

13               THE COURT:  Let me ask you this.  Let me interrupt

14   you.

15               MR. SABIN:  Surely.

16               THE COURT:  Let me ask you about 1520(c).

17               MR. SABIN:  Okay.

18               THE COURT:  And obviously, that's effective

19   recognition as a foreign main proceeding.  And I take it you

20   would agree upon recognition as a foreign main proceeding, the

21   foreign representative could file a Chapter 11?

22               MR. SABIN:  That's correct.  That's 1511.  Uh-huh.

23               THE COURT:  Sure.  Are there any other cases or

24   legislative history or a guide to enactment -- I don't know why,

25   but I didn't look to see whether the same words were in the

- P R O C E E D I N G -                                  11

1   model law.  Because 1520(c) says Subsection-A does not affect

2   the right of a foreign representative or an entity to file a

3   petition commencing a case under this title.  Is there a gloss

4   on the reference "or an entity"?

5               MR. SABIN:  There is not.  And I would suggest to you

6   that what we need to do to read whatever confusion or ambiguity

7   there is temporal-wise as to whenever an entity can file an

8   involuntary, pre- or post-recognition, let's turn to Section

9   1529(2)(a).  And when we do so, we find an interesting lead-in

10  in Section 2.  "If a case in the United States under this title

11  commences after recognition, or after the date of filing of the

12  petition for recognition."  Suggesting to me, as I've been

13  arguing to you, that when you read these two together, the only

14  entity before recognition that can file an involuntary or a

15  voluntary, because both 1520(c) and this section deal with

16  either, are either the Debtor, which has the statutory right

17  under 301, or unsecured creditors that have a statutory right

18  under 303.  And in fact, I would go further in connection with

19  the statutory rules of construction that that interpretation is

20  important because there are different consequences if there's a

21  filing pre-recognition or post-recognition.

22              THE COURT:  Are there any cases where after

23  recognition, creditors have filed an involuntary?

24              MR. SABIN:  There probably are.

25              THE COURT:  You don't cite any cases?

- P R O C E E D I N G -                                    12

1          MR. SABIN:  No, I don't.  I don't.  Because --

2          THE COURT:  Have you looked to see whether -- and I

3    don't know of any.

4          MR. SABIN:  I don't know off the top of my head.  I

5    think there are, but ours is --

6          THE COURT:  You know, I think they're not.  I don't

7    know, my answer is probably as good as yours.

8          MR. SABIN:  In any event --

9          THE COURT:  If you're going to tell me that there are,

10   fine them.

11         MR. SABIN:  In any event, I can't find it.  And my

12   argument to you is that, I want to go a step further to respond

13   to your 1520(c) and 1529.

14         THE COURT:  So, when I started working on this and I

15   asked myself if Highland could file an involuntary after

16   recognition, why shouldn't they be able to file it now?

17         MR. SABIN:  That was my first argument on April 3 when

18   we filed those papers.

19         THE COURT:  And the more I focused on this, it's not

20   clear to me that even after recognition, Highland could file an

21   involuntary.  And that's why I'm focusing on the language of

22   1520(c) to see whether there's any authority.  I don't know

23   whether these words track in the model law or whether there's

24   anything in the legislative guide to enactment.

25         MR. SABIN:  Couldn't find anything, Your Honor.

```
                        - P R O C E E D I N G -                    13
```

 1          THE COURT:  What does it mean "an entity"?  It's an

 2  odd choice of words.  It isn't any party in interest, it isn't

 3  creditor.  Entity, which is not one on one, doesn't define

 4  entity.

 5          MR. SABINE:  I understand.

 6          THE COURT:  So, the more I thought about it --

 7          MR. SABINE:  I wish I could give you guidance, Your

 8  Honor.

 9          THE COURT:  You know, the more I thought about it,

10  well maybe -- because I originally thought, oh, okay, 1520(c),

11  Highland could file an involuntary if there's recognition.

12  Well, if they could do that, what in the statute should it be

13  interpreted as saying that they can't do it before?  And then

14  when I started thinking about it, I thought, well, maybe the

15  statute means they can't even after.  And then I said, well,

16  even if theoretically they could, could I enjoin them from doing

17  so?  And would it run afoul if recognition as a main proceeding

18  occurs or 362 does apply?  And 362(a)(1) would say you can't

19  file in just the way the order I've entered now.

20          MR. SABIN:  I would disagree, and that's where I was

21  going in terms of the next relevant statute that comes into play

22  at least from my thinking and perhaps for yours, and that's

23  1528.  And that is, if it were filed after recognition, as

24  opposed to before, then it's limited to assets within the United

25  States, and the stay is limited to assets in the United States.

```
                        - P R O C E E D I N G -                    14
```

1          THE COURT:  Sure, but 1528 doesn't say who filed.  It

2     says "After recognition of a foreign main proceeding, a case

3     under another chapter of this title may be commenced …."

4          MR. SABIN:  Understood.  But I'll take plain English

5     for purposes of the definition of the term "entity" since I

6     can't find anything in the legislative history one way or

7     another.

8          THE COURT:  Okay.

9          MR. SABIN:  And an entity in this case, it seems to

10    me, has got to include both the Debtor and people who are given

11    rights under --

12         THE COURT:  I have no idea whether it does or not.

13         MR. SABIN:  Neither do I, but --

14         THE COURT:  It's not a defined term in the Code.  Is

15    it?

16         MR. SABIN:  No.

17         THE COURT:  Go ahead.

18         MR. SABIN:  So, if you were to adopt my theory, 303

19    itself is a statutory privilege inside the entity of what we're

20    dealing with by way of statutory construction.  And if it were

21    to apply pre-recognition, then we have a stay, we have 541

22    property --

23         THE COURT:  Well, you see, that's what really bothers

24    me, Mr. Sabin.

25         MR. SABIN:  Okay.

- P R O C E E D I N G -                    15

1          THE COURT:  Because what you're trying to do is

2    totally screw up the proceeding in the Cayman, and I don't know

3    if the Cayman confirms the scheme of arrangement, and the issue

4    comes here as to whether the Court should recognize and enforce

5    it or not.  I don't know.  I have no idea.  But it's clear as

6    day to me that what you're trying to do, you, representing

7    unsecured creditors, you're trying to stop the Cayman proceeding

8    dead in its tracks by saying we filed a Chapter 11 involuntary

9    case, the automatic stay applies worldwide, and too bad, Cayman

10   judge, you're stuck.  That's what you're trying to do.  And that

11   bothers me.

12         MR. SABIN:  Well, I will tell you that is not the

13   motive --

14         THE COURT:  But that could be if I let you file.

15         MR. SABIN:  No, I don't think it would be.

16         THE COURT:  Why not?

17         MR. SABIN:  Because 1525, 1526 and 1527 appertain in

18   that scenario.  And there are cases, and in fact, we cite two of

19   them in our brief.  There are cases where there are indeed, at

20   the same time, concurrent proceedings pursuant to a full case,

21   and pursuant to whether it's a Cayman, or a Swiss case, or

22   anything else.  And we cite both of those in our brief.  And in

23   fact --

24         THE COURT:  Is any one of those cases an involuntary?

25         MR. SABIN:  Yes, one of those was an involuntary.

- P R O C E E D I N G -                                    16

1          THE COURT:  Which case?

2          MR. SABIN:  That's the *Tradex Swiss* case.  So, it has

3    happened, and if you take us on our papers, what is it we're

4    worried about?  There are no hard assets in the United States.

5    It's not as if we're going to go after bank accounts or anything

6    else.  This --

7          THE COURT:  No.  That's what convinces me that all

8    you're trying to do is stop --

9          MR. SABIN:  No.

10         THE COURT:  -- the scheme of arrangement dead in its

11   tracks before the court.  Actually, one of the questions I was

12   going to raise is 1525, 1526; let's arrange direct communication

13   between the courts now, and let me coordinate with the judge in

14   the Cayman.  Nobody here has been able to tell me about that

15   proceeding.  There's no hearing scheduled.

16         MR. SABIN:  There's no scheme filed yet.

17         THE COURT:  Well.  So, I want to have a direct

18   communication with the judge in the Cayman if he's willing, so

19   that he understands that I understand that I'm certainly not an

20   expert on Cayman proceedings, and certainly not with respect to

21   a scheme of arrangement.  I'm not averse to having court-to-

22   court communication with the Cayman judge before I decide the

23   issue of whether or not to permit an involuntary to be filed.

24   Because it does seem to me, and I'll give you a chance to argue

25   further; that the cases that I've referenced already, let's say

- P R O C E E D I N G -                                17

1   1519(a) says including, would permit me to extend, 362, and I've

2   already done so, and that's the authority for doing it.

3            I think there's also an issue whether 1519(a)(3),

4   which permits me any relief referred to in Paragraphs 3, 4 or 7

5   of 1521(a); 1521(a)(7) granting any additional relief that may

6   be available to a trustee.  Obviously, except for avoidance

7   actions.  Would additional relief available to a trustee include

8   a 105 injunction, actions against even third parties?  There's a

9   lot of non-debtors here.  You know *Vitro* refused to extend the

10  stay to non-debtors.  I'm not too keen about it, and that issue

11  is not before me, but it seems to me, why isn't what they

12  received authorized under 1521(a)(7)?

13           MR. SABIN:  I go back to my argument as to, what is

14  it, who is it, that is within the term "entity"?  And if you're

15  going to exclude --

16           THE COURT:  That's the issue getting recognized.

17           MR. SABIN:  That's correct.

18           THE COURT:  It's not the issue for today.

19           MR. SABIN:  No, I think it's an issue for today under

20  this.  You've got two different statutes read together which

21  contemplate that there's a filing pre-recognition.  And there's

22  only one way to get there.  Do you otherwise say an entity does

23  not include unsecured creditors, and therefore it's only the

24  Debtor?  No need to do that.  That isn't what it says.  In fact,

25  the legislative history simply uses the term "entity" itself.

- P R O C E E D I N G -                                      18

1    So --

2            THE COURT:  I didn't look to see.  I didn't have time

3    to look.  Is this coming from the model law?

4            MR. SABIN:  It doesn't say, but the concept is from

5    the model law.  So, from my perspective, if it's so clear that

6    we are only seeking to torpedo the proceeding, which in a

7    minute, I will try to explain how that's far from reality, and

8    it's far from the truth; then, clearly, if my argument is right,

9    and we were to file the involuntary, there'd be a motion in 24

10   hours under 305.  We'd have our rights to figure out exactly

11   whether or not a standard under 305(a), interests of creditors

12   and the debtors.  You'd have every right, under 1525, 1526,

13   1527, to talk to the Cayman judge as to what's going on.

14           And let me get to the heart of the matter.  And the

15   heart of the matter from our perspective is two things.  In part

16   is what was bothering creditors in *Vitro*, nine consenting

17   creditors releasing insiders, and in part it's about what is

18   really going on, and when will it go on in the Caymans that

19   otherwise --

20           THE COURT:  Of course the bottom line in *Vitro* is the

21   Court refused to recognize and enforce a Mexican plan.

22           MR. SABIN:  That's right.

23           THE COURT:  And that could well be what happened here.

24   I don't know.

25           MR. SABIN:  It could.

- P R O C E E D I N G -                    19

1          THE COURT:  Or not.

2          MR. SABIN:  But we were upfront.  We put on the table

3   what we thought was a colorable claim.  We did so within our

4   rights.  And as we read the RSA, and as we read the applicable

5   law, what we are fearful of, is that that claim never sees the

6   light of day.  Whether it's investigation, whether it's

7   consideration, or anything else.  And that's a potential claim.

8   If it were colorable and/or brought, doesn't detract from this

9   estate; it potentially enhances this estate.  And that is the

10  essence of our argument both as a pragmatic way of explaining to

11  you what we're about, and as a way of saying even if you had

12  discretion, please understand from the affidavit, which is

13  simply a statement of law in the Caymans, that that draft

14  complaint under New York law cannot be brought today by the

15  provisional liquidators.  Even though there may be an analogue

16  called "Fraudulent Disposition" in the Caymans, the provisional

17  liquidators don't have the right to do that.  Clearly the

18  creditors, nobody right now --

19          THE COURT:  Who would have the right?  And when?

20          MR. SABIN:  On an appointment of a full-blown

21  liquidator, which would never happen.  If a scheme gets

22  sanctioned, no one would.  In fact, as we read the RSA, and

23  these are all in the record; as we read the RSA, and as we read

24  the affidavit from Mr. Kandylidis, the scheme contemplates or

25  will contemplate when it's filed, the discharge of the notes,

- P R O C E E D I N G -                                           20

1   taking away standing under New York's Debtor and Creditor Law.

2   So, that's at the heart.

3          The second thing that's at the heart is what troubled

4   you at the beginning of this session.  You asked, where are we?

5   Now, on April 3 you said, has anyone talked to you?  And even

6   today you've heard, no one's talked to us.  One day after --

7          THE COURT:  I thought Mr. Hollander told me that they

8   talked to you.

9          MR. HOLLANDER:  They offered to talk to them.

10          THE COURT:  Did they offer to talk to you?

11          MR. SABIN:  I guess Mr. Hollander should have been on

12   the phone calls, because I can represent to this Court that we

13   asked for a meeting, we sent a letter asking for documents, we

14   got a letter back, we've had respectful phone calls, and it's

15   basically, when we file, and announce the scheme, and file our

16   first buddle of documents, then we'll sit and chat with you.

17          THE COURT:  When is that going to happen?

18          MR. SABIN:  I don't know.

19          THE COURT:  Can you tell me that, Mr. Hollander?

20          MR. HOLLANDER:  The JPLs were in New York today.  They

21   met with the Senior Secured Noteholders.

22          THE COURT:  Can you tell me when they're going to file

23   a proposed scheme?

24          MR. HOLLANDER:  Well, let me tell you a little bit

25   more about the bosses.

- P R O C E E D I N G -                    21

1          THE COURT:  No, could you answer that question first

2     for now?

3          MR. HOLLANDER:  Yes, I can.  The scheme documents are

4     still being prepared.  We have agreed, and Mr. Sabin knows this,

5     both with Mr. Sabin's client and with the senior secured

6     noteholders that both of those groups will have a full four

7     weeks with the X-Plan before any other creditors see it.  So,

8     there is a process underway; there are negotiations to work out

9     schedules.  I should have mentioned that earlier.  And there's

10    also an agreement that they're going to have the X-Plan a full

11    four weeks before --

12         THE COURT:  Working out schedules for what?  I'm

13    sorry.

14         MR. HOLLANDER:  For the hearings in the Cayman case.

15    Also, yes.  The JPL asked for a meeting; these guys asked for a

16    bunch of documents; the JPL said we don't really think it's

17    appropriate to be giving you documents at the moment.  We're

18    going to work around the X-Plan to make sure it has all the

19    necessary information to allow --

20         THE COURT:  You know, sometimes you can't have a

21    meaningful negotiation unless there's a level playing field well

22    spect to the information.

23         MR. HOLLANDER:  Perhaps.  But --

24         THE COURT:  Don't tell me perhaps, I have a very

25    strong view about that.

- P R O C E E D I N G -                                          22

1            MR. HOLLANDER:  Well, they have had some information,

2    Your Honor.  So --

3            THE COURT:  What information have the JPL's provided

4    to Mr. Sabin's clients?  Have they provided any of the

5    information that they've requested?

6            MR. HOLLANDER:  The JPLs have not provided that

7    information.

8            THE COURT:  Why is that?

9            MR. HOLLANDER:  The Debtor has provided information

10   prior to the filing.

11           THE COURT:  Why?

12           MR. HOLLANDER:  Because the JPLs believe that the

13   appropriate thing to do is not to respond to one off-creditor

14   request for different information, and we're focusing on putting

15   all the required information into the X-Plan.  And we're giving

16   it to them four weeks before any other creditors are seeing it,

17   and they can certainly make comments at that time.  But I think

18   we first need to put together the X-Plan, which is essentially

19   the --

20           THE COURT:  Have you committed to providing them with

21   information -- when you provide them with the plan, has there

22   been any discussion about the JPLs responding to reasonable

23   information requests regarding the foreign debtor's Debtor and

24   lots of non-debtors, obviously?  It's one thing if you hand them

25   a plan, but they ask for information, and you say no.

- P R O C E E D I N G -                                          23

1          MR. HOLLANDER:  Well, first of all, it's not the plan;

2     it's basically, a disclosure statement.  And until they get the

3     disclosure statement, I don't know what type of requests they

4     would have.  But I'm sure if they have reasonable requests, that

5     they would get it.

6          THE COURT:  All right.  Go ahead, Mr. Sabin.

7          MR. SABIN:  Is now the time to tell you what we

8     requested?  We requested particular documents; didn't get them.

9     We also requested the following, and we asked the question and

10    we got an answer.  Is there a data room?  Yes.  Have other

11    creditors had access to it even before the commencement of the

12    Cayman proceeding?  Yes.  Can we get access now?  No.  That's

13    not fair.  It's not right; it's not fair.

14         THE COURT:  Why haven't your clients asked for a

15    hearing before Judge McMillan where the proceeding has been

16    pending?  And say to Judge McMillan, they told us they have a

17    data room; they've given some creditors access to it; they

18    refused to give us any access to it; will you please direct them

19    to provide our creditors with access?  If there needs to be an

20    NDA or I don't know what the Cayman procedure is with respect to

21    it, but why haven't -- let me ask you this, so we're clear.  Has

22    Highland, through its counsel in the Cayman, requested a hearing

23    before Judge McMillan seeking access to information that the

24    Debtors provided to other creditors?

25         MR. SABIN:  We have not only because the procedures

```
                        - P R O C E E D I N G -                    24
```

1    are very difficult to get any access in the Caymans.

2              THE COURT:  Well, I don't know that.

3              MR. SABIN:  Well, we have counsel, so we can only

4    reply upon --

5              THE COURT:  It's clearer to me than ever that there

6    needs to be court-to-court communication, so that if the judge

7    is willing to discuss it with me, because courts don't have to

8    agree to have court-to-court communication; then I could get a

9    better sense of what's going on here.  Because it sure looks to

10   me that maybe for a very good reason, because you feel you're

11   being stonewalled in the Cayman, you've opted for a strategy to

12   try and blow everything up by coming here; filing an

13   involuntary; I don't know.

14             I said before at the last hearing, my existing

15   provisional remedy doesn't prevent you from filing involuntaries

16   against anybody other than the Debtor.  I suggested that

17   everybody ought to hold their fire before you run off and start

18   nuclear war.

19             MR. SABIN:  And in fact, consistent with what I'm

20   trying to indicate are our good-faith motives, and

21   notwithstanding the fact that we have that right today, we

22   haven't an exercised it yet.  So, we --

23             THE COURT:  Be careful what you ask for because you

24   may wind up with --

25             MR. SABIN:  Oh, we understand that.  And it may very

- P R O C E E D I N G -                     25

1   well be that we're going to have to exercise that to get anyone

2   to give us any information, get anyone to talk to us, etcetera.

3         THE COURT:  I'm still miffed that if what you want is

4   information and there's the proceeding in the Cayman, that your

5   counsel in the Cayman hasn't requested a hearing before Judge

6   McMillan, and raised the question with him.  They've given

7   access to other creditors to the data room.  They've told us

8   that there is a data room.  They've told us that they did give

9   access to some creditors.  Which creditors did they give access

10  to?  Secured creditors?

11        MR. SABIN:  I don't know.  I am assuming it's many of

12  the people who signed the RSA.

13        THE COURT:  Mr. Hollander, can you tell which

14  creditors got access to -- is there a data room, Mr. Hollander?

15        MR. HOLLANDER:  There is a data room, Your Honor.

16        THE COURT:  And can you tell us which creditors have

17  had access to it?

18        MR. HOLLANDER:  I think there's actually separate data

19  rooms for different clients, but predominantly, it's been

20  counsel and their financial advisors for the term lenders.  I

21  think perhaps maybe the initial ad hoc group of term lenders

22  have had some access to the data room.  No other of the parties

23  to the RSA, the term lender parties to the RSA, have had access

24  to the data room.

25        THE COURT:  Have they signed NDAs?  Those who have had

- P R O C E E D I N G -                                    26

1    access, have --

2            MR. HOLLANDER:  And in fact the company blew out, made

3    public all of the material information that was in the data room

4    on the 27th for the purpose of allowing people to trade.  So, all

5    of the material information that was in the data room was blown

6    out, was public, so there shouldn't really be anything that's --

7    yeah, there's nothing in the data room material.

8            THE COURT:  So, why don't you give Mr. Sabin's

9    client's access to the data room?  If you say there's nothing

10   material that hasn't been blown out, get some credibility with

11   the Defendant-Creditors, and give them access to it.  Did the

12   ones who had access sign NDAs?

13           MR. HOLLANDER:  Yes.

14           MR. SABIN:  And so did we.

15           THE COURT:  Mr. Sabin, is your client prepared to sign

16   an NDA?

17           MR. SABIN:  Yes.  And we signed an NDA.  And why when

18   we've signed an NDA, and we asked for access, and didn't get it?

19           THE COURT:  Why won't you give them access?

20           MR. HOLLANDER:  Well, Your Honor, again, we think that

21   everything that's material has been blown out.

22           THE COURT:  That doesn't answer my question.

23           MR. HOLLANDER:  Well, because what I think we're going

24   to do, is we're going to pull on a string here; pull on a string

25   there; and if their goals are really --

- P R O C E E D I N G -                                    27

1           THE COURT:  I'm asking a very clear question.

2           MR. HOLLANDER:  Absolutely.

3           THE COURT:  Will you give Highland access to the data

4   room, subject to an NDA?

5           MR. HOLLANDER:  We don't think they have good

6   intentions, but we will go back and consider it.

7           THE COURT:  Go ahead, Mr. Sabin, what else do you want

8   to tell me?

9           MR. SABIN:  I think I rest my case, and reserve some

10  time to respond.  Thank you, Your Honor.

11          THE COURT:  Sure.

12          MR. HOLLANDER:  The information they're requesting is

13  not in the data room.  They're requesting additional information

14  not in the data room.

15          THE COURT:  All right.  Why don't you -- now, it's

16  your turn.

17          MR. SCHARTZ:  Thank you, Your Honor.

18          THE COURT:  Yes.

19          MR. SCHARTZ:  Your Honor, it's Brian Schartz, from

20  Kirkland & Ellis, on behalf of the DRH Holders.  Do you mind if

21  I speak up on the creditors' side?

22          THE COURT:  Go ahead, speak on the creditors' side

23  before Mr. Hollander does.  I apologize, I have the list that

24  you're on the phone.

25          MR. SCHARTZ:  Thank you for letting me appear by

- P R O C E E D I N G -                              28

1    phone.  I ended up stuck in London, or I would have been there

2    in person.

3              So, we represent holders of about 26 percent of 6.5

4    notes, what Mr. Hollander has been referring to as the Senior

5    Secured Notes.  To be clear, just to clarify a point that he

6    made at the beginning of the hearing; while they may have some

7    holders out there in these notes that support the scheme, it's

8    not our holders.  And our holders have a blocking position in

9    the scheme, and that's where we sit.

10             On the information point, we feel very similar to Mr.

11   Sabin and Highland's position.  It's now been 16 days from the

12   last hearing, and at that hearing Your Honor noted several

13   times, the parties should work to see if they can consensually

14   resolve their differences.  We agree with that admonition.  We'd

15   like to have that opportunity, but it hasn't happened.  There

16   have been phone calls, there have been some emails, but really,

17   it's all perfunctory, and it's just this approach that, this is

18   our deal and the creditors will have to take it or leave it.

19   Well, we really don't have any intention of taking this deal

20   that leaves our creditors with cents on the dollar, undervalues

21   their rigs, and gives insiders and management a package of

22   hundreds of millions of dollars.

23             You probably will hear, yes, we did have a financial

24   advisor from Perella Weinberg, who works with us, with the group

25   meet with the JPL today.  We were very fortunate to have that

- P R O C E E D I N G - 29

1  meeting.  But it was really us sharing our view of the world,

2  not them giving us information.  And what we've heard is really

3  the same answer that you just got, which is, we're not going to

4  give the information because we think they don't need it.  Well,

5  we think we do need it.  We think it's really, really important.

6  And we've learned some things in the market that are ally

7  disconcerting, that really aren't out there in the public, but

8  we've heard that the company has retained a broker to sell the

9  two rigs that are collateral for our notes.  We've heard that

10  hat is a two-week marketing process, and may have other terms

11  that are designed to chill the market, so that they can then

12  take that, we presume, and go to the Cayman court, or go to the

13  bankruptcy court, and say yes, we're right, they are not worth

14  anything because we ran this two-week process.

15        All that stuff gives us a lot of pause.  And it's all

16  wrapped into the release that Highland is seeking.  And at the

17  end of the day, our group is trying to find the best way to

18  maximize value.

19        THE COURT:  Mr. Schartz?

20        MR. SCHARTZ:  We would consider --

21        THE COURT:  Mr. Schartz?

22        MR. SCHARTZ:  We haven't made up our mind, but we

23  would consider --

24        THE COURT:  Mr. Schartz, what is the collateral for

25  your client's loans?

- P R O C E E D I N G -                                    30

1          MR. SCHARTZ:  They're two rigs, the Eirik Raude and

2     Leiv Eiriksson.  They're owned by two entities that are

3     indirectly owned by the debtor-entity called Drill Rig Holdings.

4     One of them on contract to a customer called Lundin, and is one

5     is what they call "cold stacked".  They're both in waters far

6     outside the Cayman Islands.  I believe one's off the Nordic

7     coast, and one's in Greece.

8          THE COURT:  Is there any other collateral other than

9     the two rigs?

10         MR. SCHARTZ:  There are share pledges below the DRH

11    level.

12         THE COURT:  All right.  And those shares are being

13    held by a custodian in New York?  Is that correct?

14         MR. SCHARTZ:  That is our understanding.

15         THE COURT:  Okay.

16         MR. SCHARTZ:  And we would love to --

17         THE COURT:  Are there any other tangible assets other

18    than the two rigs?

19         MR. SCHARTZ:  Well, Your Honor, that's a really good

20    question; probably number one on our list, which is where's the

21    cash in our stack?  We don't know where the cash is in our

22    stack.  And if there isn't a lot of cash in our stack, where did

23    it go?  So, we have no visibility really into that.  We have no

24    visibility into inner-company claims.  And there's an

25    interesting part about the RSA that we just sort of picked up

- P R O C E E D I N G -                                                31

1    on, which is just before the commencement of proceedings, the

2    company conducted apparently, a settlement of intercompany

3    claims, presumably with the consent of the parties to the RSA.

4    And we have no idea what happened there.  We don't know if our

5    claims were affected; we have no idea.  If other parties' claims

6    were affected?  You know, we have no idea if that would

7    constitute a fraudulent conveyance.  We really have no idea.

8    So, high on our list is understanding exactly the question you

9    asked.

10             THE COURT:  Are the owners of the rigs guarantors of

11   your notes?

12             MR. SCHARTZ:  The owners of the rigs are guarantors of

13   our notes.  Yes, sir.

14             THE COURT:  And they're non-debtors?

15             MS. SCHARTZ:  They are non-debtors.

16             THE COURT:  And the notes are in default?

17             MR. SCHARTZ:  Yes, they are in the default and they

18   have been accelerated for a number of reasons.

19             THE COURT:  Have you taken any action to foreclose on

20   your collateral?

21             MR. SCHARTZ:  No, Your Honor.  We're not here -- like

22   Highland, we are not here --

23             THE COURT:  I'm just asking questions.  I'm just

24   asking questions, okay?  I'm not suggesting you should or not.

25   Your collateral, two rigs, owned by non-debtors.  I'll assume

- P R O C E E D I N G -                              32

1    for now you have perfected security interest in them; share

2    pledges with the shares held by custodians in New York.   That

3    was what I gathered from earlier pleadings in the case.   And it

4    was just simply a question.   The loans are in default; have you

5    taken any actions.   I'm not suggesting you should, but I'm just

6    trying to ascertain whether you took any action to try and

7    foreclose on the collateral.

8            MR. FEDER:  May I be heard, Your Honor?

9            MR. SCHARTZ:  We have not taken any actions to

10   foreclosure on the collateral.   And the reason we've done that

11   is, we're still thinking about whether that's the right thing to

12   do obviously.  But we're here --

13           THE COURT:  I would share that concern.  I'm not

14   encouraging you to do it, I'm just trying to ascertain facts.

15   Mr. Feder has stood in the courtroom.  Come on up to the

16   microphone, as you're not going to address the Court from back

17   there, Mr. Feder.  If you're going to address the Court, you're

18   going to come up to the microphone, indicate who you are, who

19   you represent.  Mr. Schartz, do you have anything else you want

20   to say?

21           MR. SCHARTZ:  Just one last point, Your Honor, which

22   is that we are evaluating all of our options here.  And our

23   perspective, my group's perspective is that we want to maximize

24   value.  And we don't think the current scheme does anything

25   close to maximizing value.  We have significant concerns about

- P R O C E E D I N G -                    33

1    what's going on in the Cayman in public, but also behind the

2    scenes.  And if it turns out that an involuntary, together with

3    Highland, should Your Honor so rule, is something that maximizes

4    value, it is something that our group would seriously consider,

5    because we haven't been given a fair shake yet.  And we look

6    forward to having a fair shake.  Thank you.

7         THE COURT:  Well, have you seen the scheme or been

8    told what the terms are, because what I'm being told is it

9    hasn't been prepared yet?

10        MR. SCHARTZ:  We have not seen the scheme, we have not

11   seen the X-Plan.  We have agreed that we'll receive the X-Plan

12   four weeks before all the other creditors.  I would expect that,

13   like a disclosure statement, it's going to say a lot, but

14   probably not as much as we would like.  So, I don't really hang

15   my hat on that solving all of our issues, or answering all of

16   our questions.

17        THE COURT:  Okay.  Thanks, Mr. Schartz.

18        MR. SCHARTZ:  Thanks.

19        THE COURT:  Mr. Feder?

20        MR. FEDER:  Good afternoon, Your Honor.  Thank you for

21   allowing me to speak.  For the record, Benjamin Feder, Kelley

22   Drye & Warren, on behalf of U.S. Bank, as Indenture Trustee for

23   the 6.5% Senior Secured Notes, which are the notes that are held

24   by the ad hoc group, represented by Mr. Schartz.

25        And so, I just wanted to clarify for the record that

- P R O C E E D I N G -                                    34

1   we, as Indenture Trustee, and Deutsche Bank, as collateral agent

2   for the notes, have not taken any action to foreclose, or to

3   exercise remedies against any entity.  I just wanted to state

4   that on the record.  We have not received a direction from any

5   holders of the notes.

6           THE COURT:  What percentage of the holders have to

7   give you a direction?

8           MR. FEDER:  Over 50 percent, Your Honor.

9           THE COURT:  Okay.

10          MR. FEDER:  So, I just wanted to state that for the

11  record and make that clear.

12          THE COURT:  Thanks very much, Mr. Feder.

13          MR. FEDER:  Thank you.

14          THE COURT:  Mr. Hollander?

15          MR. HOLLANDER:  Thank you, Your Honor.  Evan

16  Hollander, counsel for the Petitioners.  Just a couple of

17  points, Your Honor.  It is kind of like chasing after ghosts

18  because the main proceeding is down in Cayman, and people are

19  making allegations about documents and things, and for unfair

20  treatment, and we think that they should be directed to the

21  Cayman proceeding to make those arguments.

22          I will note, with respect to the DRH creditors, the

23  senior secured noteholders, represented by Kirkland, that they

24  have a blocking position, and if they don't like the plan, they

25  can vote the DRH plan down.  So, they don't even need to take an

- P R O C E E D I N G -                                35

1    enforcement action.  When the scheme is proposed, they can vote

2    the DRH plan down, they're end up with their collateral, if

3    that's what they really want.  We think that we have a fair

4    valuation, and this, I think, is well-beyond the scope of what

5    we came here to talk about today.

6             I point out a couple of things, Your Honor.  One, Mr.

7    Sabin pointed to 1528, and the limitation of the automatic stay

8    to the territorial jurisdiction of the United States.  The

9    interesting thing about that is that only applies if you find

10   that as a foreign main proceeding.  So, what Mr. Sabin is trying

11   to do is to take the power away before you even decide whether

12   there's a --

13            THE COURT:  You're arguing if it's a foreign main

14   proceeding.

15            MR. HOLLANDER:  I am arguing.  Also, we're backing up

16   as a non-main proceeding in the papers, so, I just want to point

17   out that before you can make a determination of whether there's

18   a foreign main proceeding, they want to take the jurisdiction

19   and have basically the effect of the extraterritorial effect of

20   the automatic stay.

21            Also, Your Honor, if I can go back, you know, there

22   was affidavit that was filed with the pleadings.  I understand

23   the Cayman counsel is not here today to be crossed, but I think

24   that's okay, because reading through that affidavit, I don't

25   think it really says anything remotely to what Mr. Sabin says it

- P R O C E E D I N G -                              36

1    does.  And it's very interesting.  And what I think we can say

2    today, Your Honor, is that Highland is saying that they have no

3    other alternative but to bring the involuntary, or all their

4    rights are going to go away.  That's the demonstrably not true.

5            First of all, I count nine different things they can

6    do.  They can meet with the JPLs and attempt to persuade the

7    JPLs of the merits of their actions, so that the JPLs petition

8    the Cayman court to grant authority to bring the actions, which

9    is specified in the affidavit.  If they're unsuccessful in

10   persuading the JPLs, or they choose not to try that route, they

11   can seek to have the JPLs removed, because they appear to think

12   the JPLs are not independent.  That's what I'm hearing.  They

13   could try that.  And they could put in more sympathetic JPLs to

14   bring the actions.

15           Highland also has the option to petition the Cayman

16   court directly for authority to bring the claims on behalf UDW.

17   Highland can bring the claims now as direct claims in the Cayman

18   Islands.  Highland can bring the claims now if they had a

19   complaint that didn't seek relief against the Debtors as direct

20   creditor claims here in New York under the Debtor and Creditor

21   Law.

22           THE COURT:  I'm not sure they could, but that's a

23   different issue.

24           MR. HOLLANDER:  They seem to think they can.  Highland

25   can await the results of the scheme process in the Caymans.

- P R O C E E D I N G -                                37

1   This is something that you suggested.  This is the sixth

2   alternative.  If the schemes are successful, they can wait for

3   me to come back to this Court, seeking an enforcement order,

4   which is obviously a very critical component of getting this

5   deal done.  And they can seek to have this Court deny such

6   relief on the grounds that their fundamental rights have been

7   abrogated.

8           THE COURT:  You know the last several times that --

9   well, I guess I've only approved one.  I approved the Hong Kong

10  scheme.  I recognized and enforced the Hong Kong scheme.  I know

11  some of my colleagues have also recognized schemes.  You know,

12  it was a condition to the effectiveness of the scheme that the

13  Chapter 15 court recognize and enforce the scheme.  That seems

14  to be a common --

15          MR. HOLLANDER:  It's very common; it's very critical I

16  believe, quite frankly.  But even if they lose then, and Your

17  Honor says their fundamental rights were not trampled, they

18  don't run out of options then, notwithstanding what they said.

19  If they lose on that basis, they can petition the independent

20  directors of the reorganized company because there is no release

21  of the third-party claims, notwithstanding what Mr. Sabin says.

22  The way he kind of says it is, well, we lose our standing as

23  creditors, so that's a release.  But the estates will not lose

24  those claims.  They can petition the independent directors to

25  bring those claims.

- P R O C E E D I N G -                                   38

1          If the independent directors refuse to bring the

2     claims, Highland can petition the Cayman court directly for

3     permission to bring the claims as derivative claims post-

4     reorganization.  And if the schemes fail, because they seem to

5     think that the schemes are so fundamentally flawed, then

6     official liquidators will be appointed, and they can seek to

7     have the official liquidators bring the claims.

8          So, I don't really buy into this whole idea that they

9     don't get the ability to file an involuntary petition, which

10    will take away the ability of the JPL in the Cayman court to

11    make a determination, where they're main proceeding, as we

12    believe.  Take that away before you make a determination, and

13    bring it to a U.S. court to decide whether those claims could be

14    pursued.  Because it's not a foregone conclusion even in an

15    involuntary converted to a voluntary that there would be

16    authorization to bring those claims.  They'd still have to

17    persuade the court.  I'm sorry if I'm a little worked up, Your

18    Honor.

19         THE COURT:  What I'd like you to do now is -- if you

20    want to get some more off your chest, go ahead and do it, but at

21    the start of Mr. Sabin's argument, I raised several questions.

22    As I read the papers and read cases, it seemed to me that he

23    agreed, I think it was clear, that the order that I entered on

24    April 7 has the effect of enjoining them from filing an

25    involuntary, at least against the Debtor; not against non-

- P R O C E E D I N G -                                          39

1   debtors.  And so, the two questions that seem to me that arose

2   from that is one, do I have the authority to do what I did?  Or

3   did I exceed the authority provided in the Bankruptcy Code by

4   extending the automatic stay in the gap period?

5          MR. HOLLANDER:  Thank you, Your Honor.

6          THE COURT:  I referred to *Vitro* and *Pro-Fit* and *Ran*.

7   And I don't know whether there are other cases you think.  What

8   is it that you believe supports the authority of the bankruptcy

9   court in the gap period before the recognition period --

10         MR. HOLLANDER:  Thank you, Your Honor.

11         THE COURT:  -- to extend the automatic stay to, here

12  specifically, enjoin to prevent the filing of involuntaries?

13         MR. HOLLANDER:  Well, I believe all those cases,

14  perhaps not *Ran*, are in our brief, Your Honor.  We cited to

15  those cases, and we think they do provide support.  I think

16  there's one issue that the parties agree on, and that's that the

17  automatic stay does not come into effect upon the filing of a

18  Chapter 15.  We quickly part ways after that.

19         THE COURT:  So, I did sign an order.

20         MR. HOLLANDER:  Yes.

21         THE COURT:  The question is, did I have the authority?

22         MR. HOLLANDER:  Well, we believe, Your Honor, that

23  it's always within the Court's discretion to grant that relief.

24  And if you look at --

25         THE COURT:  Well, I have problems with that.  But go

- P R O C E E D I N G - 40

1   ahead.

2       MR. HOLLANDER:  That the Court has the discretion?  We

3   think if you look 15 -- first of all, the statement that Section

4   303(b) provides creditors with an unfettered right to file

5   bankruptcy is not true.  In fact, even in 303(a), there's a

6   limitation on being able to file involuntaries.  There's an

7   absolute prohibition on filing involuntaries against non-

8   debtors.  But moreover, the Second Circuit I believe in SEC v.

9   Byers, 609 F.3d 87 (2010), squarely rejected the argument that

10  creditors have an absolute right to file involuntary petitions,

11  and upheld a court's exercise of broad equitable powers to

12  enjoin creditors from filing involuntaries.  We also think that

13  the language of 1519 supports the ability of this Court to enter

14  the order.

15      THE COURT:  Explain what's in 1519.

16      MR. HOLLANDER:  Well, Your Honor, 1519, as you pointed

17  out, 1519(a) is open-ended; has the language "including" and,

18  Your Honor, in Sections (d) and (f), there's express limitations

19  on the relief that the Court can grant.  You can't enter an

20  order that violates police and regulatory powers, and you can't

21  enter an order that enjoins actions that couldn't be enjoined

22  under 362, under the automatic stay.  Interestingly, there's

23  no --

24      THE COURT:  What does 1521(a)(7) provide?  Because it

25  does get pulled back in to 1519.  It's the granting of "any

- P R O C E E D I N G -                                      41

1    additional relief that may be available to a trustee, except"

2    and then as the "avoidance actions".

3              MR. HOLLANDER:  Right.  Right.

4              THE COURT:  That doesn't come into play.  I didn't see

5    anybody really deal with -- I guess in *Atlas Shipping*, I dealt

6    with what 1521(a)(7) means, which I'm not quite sure *Vitro* --

7    1521 also uses "including".  1521(a) uses "including".  There's

8    1521(a)(7), which would be drawn into 1519(a)(3).  Does granting

9    additional relief available to a trustee, include what I did?

10             MR. HOLLANDER:  I believe so, Your Honor, but I don't

11   think you even have to get to that point, because I think the

12   limitations in 1519 are the limitations.  The Court could

13   clearly have said that you can't grant the relief under

14   362(a)(1) or limit it in some way.  The way we look at the

15   statute, Your Honor, and I think it's the correct way to look at

16   the statute, is that the Court always has the discretion.  It's

17   not automatic, but the Court has the discretion.  1520(c), all

18   it does is says "upon recognition of a foreign main proceeding,

19   the automatic stay comes into effect."  (c) says the fact that

20   the automatic stay comes into effect, that, in and of itself,

21   does not prohibit the filing of an involuntary.  So, we would

22   even say, although it's not before the Court today, that under

23   1521, it's always within the discretion of the Court, and

24   1520(c) merely makes it clear that the Court always has the

25   discretion.

- P R O C E E D I N G -                                    42

1          THE COURT:  What are you referring to 1521 that you

2     say would give them the authority to file an involuntary?

3          MR. HOLLANDER:  I think that there's the same amount

4     of discretion in 1521 that --

5          THE COURT:  Is there a particular subsection of 1521?

6          MR. HOLLANDER:  Hold one second.

7          (Pause.)

8          MR. HOLLANDER:  It's the same argument as 1519

9     predominantly, Your Honor.  The limitations are the same

10    limitations as there are in (d) and (f).  I don't know what

11    subsections there are.

12         (Pause.)

13         MR. HOLLANDER:  Yeah.  1521(d) and 1521(f) are the

14    limitations.  So, I think we read those provisions holistically,

15    and that all 1520(c) does is say, by the way, the fact that the

16    automatic stay is imposed, does not take away the discretion of

17    the Court to permit or deny the ability to file involuntaries.

18         THE COURT:  Did you have a gloss on, in 1520(c), the

19    word "entity"?

20         MR. HOLLANDER:  I don't know the answer to that

21    question, Your Honor, but I will assume for this argument that

22    "entity" would --

23         THE COURT:  So, let's assume that I recognize your

24    Cayman proceeding as a foreign main proceeding. Can they just

25    run off and file an involuntary then?

- P R O C E E D I N G -                                      43

1          MR. HOLLANDER:  If you recognize it as a foreign main

2    proceeding, and we do not have an order that precludes that,

3    then they could file an involuntary.

4          THE COURT:  And under what section of the Code would I

5    have the discretion to enjoin them from filing an involuntary

6    after recognition?

7          MR. HOLLANDER:  1521.

8          THE COURT:  1521?  Which subsection?  In 1521(a)(1) --

9          MR. HOLLANDER:  1521(a)(1).  Yes.

10         THE COURT:  Stop.  Stop.  Let me ask a question.

11         MR. HOLLANDER:  Yes.

12         THE COURT:  1521(a)(1) says that upon recognition, the

13   Court may, and may is discretionary -- I've written on that

14   subject -- at the request of the foreign representative, grant

15   any appropriate relief, including staying the commencement.

16         MR. HOLLANDER:  And by the way, also, if you agree

17   that it's permissible under 1519, 1521(a)(6) would extend any

18   relief.  I think there's an ability under both independently,

19   only restricted by (d) and (f).  And the Court has broad

20   discretion.  But if you thought it was only, otherwise under

21   1519, 1521(a)(6) would.

22         THE COURT:  I don't know.  I genuinely don't know.  I

23   mean that's why I went off to read the cases.  I think Mr. Sabin

24   acknowledged there are no cases.  He views it as a question of

25   first impression.  I suppose if you define the issue narrowly

- P R O C E E D I N G -                                      44

1    enough, it's a question of first impression.

2              MR. HOLLANDER:  Correct.

3              THE COURT:  I read *Vitro*, Judge Hale's decision in

4    *Vitro*; *Pro-Fit* is a little different; *Ran*, I suppose it's *dicta*

5    because that's not the issue before me.  It's whether the

6    bankruptcy court had denied recognition.  But in the course of

7    it, they refer to 1519(a) as including, so, it seems to support

8    it.  Do you know of any cases that limit what the Court can do

9    under 1519(a)?  Limited beyond what's in 1519(a)(1)-(3)?

10             MR. HOLLANDER:  Limited?  I'm not sure.  Where they

11   might say that they're exclusive?

12             THE COURT:  Look, I started by reading the statute.  I

13   look at it, and it says including (1), (2), (3).  Well, (1),

14   (2), (3) don't directly deal with the issue I have.  Maybe (3)

15   does, because (3) is plainly 1521(a)(7).

16             MR. HOLLANDER:  I think the Bankruptcy Code itself

17   says that the term "including" is not limited, Your Honor.  We

18   cite it in our papers.  If I could just have a moment?

19             (Pause.)

20             THE COURT:  So, this week, Mr. Hollander, when I

21   taught my class at Columbia Law School, the issue of

22   interpreting 1129(b)(2)(a)(ii), this is the issue of whether

23   creditors have a right to credit bid in a sale and a plan, or

24   does (iii), the indubitable equivalent language say that the

25   Court can deny the right credit bit.  And Supreme Court Justice

- P R O C E E D I N G -                           45

1   Scalia said no, I know it says includes, but the specific

2   controls the general.  And the specific, I'm analogizing, but

3   the specific for 1519(a) is (1), (2) and (3).  I don't know.

4   Where I look right now, the only three decisions I found that

5   address it seem to say the Bankruptcy Court has the authority to

6   do what I did.  Then the issue becomes well, have they shown

7   cause to lift the stay.  And they really haven't.

8          The pleadings I have before me, don't frame the issue

9   that way.  Okay, Judge, we acknowledge you have the power, or

10  you've determined you have the power.  Now, here's the evidence

11  that supports cause to lift the stay to permit us to file the

12  involuntary.  And it would seem to me, if that's the issue, then

13  they'd have to have an evidentiary hearing.  I entered the

14  order.  I was satisfied that you had shown cause for getting

15  that relief in the gap period.  I granted it.  Now, they filed

16  pleadings saying you don't have the power to do it, Judge.  They

17  don't cite any cases in support of it.  I read three cases that

18  say you do.

19         Let's say, I assume, okay, I think I have the power.

20  Then the issue is, have they shown cause to lift the stay?  And

21  that requires evidence.  And what I see is a food fight between

22  all of you at this stage.  And I have the real concern that the

23  effect of lifting the stay and having an involuntary is to try

24  and totally bollix up the Cayman proceeding, which I'm not

25  anxious to do.  That's what I'm sitting here thinking about.

- P R O C E E D I N G -                                    46

1    What doesn't give me a lot of confidence or a lot of confidence

2    in the long term, the part of this that bothers me about the

3    Debtor's foreign representative's position is you say oh, we

4    invited them to talk, but you won't give them information.

5    You'll say, oh, yes, we have; they'll say, no, they haven't.  I

6    see you all playing hardball, and I see this as a big food fight

7    and I don't want to join that mix.

8           If you were able to persuade me that the foreign

9    representatives are seriously trying to engage with the senior

10   secured noteholders and with the unsecured noteholders, and sit

11   down and provide them with information.  Mr. Sabin said we've

12   already signed an NDA.  I would say his argument for cause to

13   lift the stay, he's not shown any cause for doing it.  But

14   you're not giving me any of that.  All right, I've heard enough.

15          I conclude -- I've already described the research that

16   I've done, so, I conclude based on the Fifth Circuit's decision

17   in _Ran_, 607 F.3d 1017 (5th Cir 2010), the bankruptcy court's

18   decision in _Vitro_, Judge Hale's decision in _Vitro_, Northern

19   District of Texas Bankruptcy Court, 455 B.R. 571 (2011).  I

20   already referred to his discussion at Page 579 in his opinion,

21   and the _Pro-Fit Int'l Ltd._ decision at 391 B.R. 850, 864 (Bank.

22   C.D. Cal. 2008), Judge Bufford.  I conclude I had the authority

23   to enter the order, granting provisional relief, which enjoins

24   creditors from commencing or continuing any actions against the

25   Debtors or their property within the territorial jurisdiction of

- P R O C E E D I N G -                                          47

1   the United States.   And on the record before me, the Court

2   concludes that cause has not been established to lift the stay

3   at this stage.

4          The Court requests under 1525 -- well, I'll leave it

5   at 1525.   There are other sections that arguably provide it as

6   well.   I think that I would benefit from court-to-court

7   communication with Judge McMillan in the Cayman.   I'm directing

8   the parties to meet and confer, and try and -- I don't know

9   whether Judge McMillan is prepared to do that or not.   I think

10  in the first instance, I think parties should meet and confer

11  and try and agree on a protocol for court-to-court

12  communication.   I have a trial starting Monday, I'm going to be

13  completely consumed for the next two weeks.   Please, so, not in

14  that period.   There are no hearings scheduled in the Cayman at

15  this point.   So, I'm not sure that it's something that needs to

16  be done in the next few weeks.   But what I am directing is that

17  the parties meet and confer and try to agree on a protocol.

18         The protocol would also include having the parties'

19  Cayman counsel ascertain whether Judge McMillan would be

20  prepared to have a court-to-court communication pursuant to the

21  protocol that the parties would be asked to prepare, and have

22  the courts agree on.   I'm not dictating what the protocols

23  should provide.   Certainly, the ALI triple 'I' -- I can't

24  remember the precise name of the document, but that deals with

25  cooperation in cross-border proceedings.   It has a whole series

- P R O C E E D I N G -                                        48

1   of sections and commentary about court-to-court communications.

2   There recently have been the guidelines on court-to-court

3   communications.  I don't think the Cayman was part of this.

4   It's been agreed to; it was negotiated with courts in Singapore,

5   Delaware, New York.  I think we put it on the website.  I don't

6   know the exact status of it currently.  So, there's more and

7   more movement about efforts to foster court-to-court

8   communications across borders.

9           So, for now, the stay remains in place.  Is discovery

10  underway with respect to the recognition?

11          MR. HOLLANDER:  Yes, Your Honor.  The parties

12  exchanged discovery requests last Friday and objections are due

13  this Friday.

14          THE COURT:  I would like counsel to file a status

15  letter with the Court by five o'clock on May 10, addressing

16  efforts to negotiate a protocol for court-to-court

17  communication.  I would encourage that before that happens that

18  you confer with other counsel about having Cayman counsel

19  inquire of Judge McMillan whether it's something he's prepared

20  to consider.  If he's not prepared to consider it, that might --

21  there are judges in some parts of the world who just won't do

22  it.

23          MR. HOLLANDER:  Yep.

24          THE COURT:  I mean the only court that I've had court-

25  to-court communications with is a Canadian court.  And

- P R O C E E D I N G -                                          49

1  obviously, it's a lot easier with courts that speak the same

2  language.  But if Cayman doesn't permit it, I've been told there

3  are some countries that their rules don't permit it.  I have no

4  idea whether Cayman does or not.  Whether they've engaged in

5  court-to-court communications and then the cases are not.  And I

6  would urge that you confer with other counsel about who would

7  make the inquiry and indicate where the inquiry is coming from.

8  And find out if Judge McMillan, if he doesn't want to do it,

9  then that, as far as I'm concerned, ends the subject.  But I'd

10 like a status letter by May 10.

11            MR. HOLLANDER:  Thank you, Your Honor.

12            THE COURT:  Anything else for today?

13            MR. HOLLANDER:  That's it, Your Honor.

14            THE COURT:  Mr. Sabin, I'll ask you, and maybe you

15 have to talk to your client's first; but do you have a position

16 on court-to-court communication?

17            MR. HOLLANDER:  Do I?

18            THE COURT:  I'm asking Mr. Sabin first.

19            MR. SABIN:  We welcome that, Your Honor.

20            THE COURT:  Okay.

21            MR. SABIN:  As part of our argument in terms of not

22 convincing you obviously in terms of your authority, but had we

23 obviously had the right, 1525 gives you exactly what you did.

24            THE COURT:  And Mr. Hollander, what's your position?

25 Do you have a position on court-to-court communication?

```
                    - P R O C E E D I N G -                    50
```

1        MR. HOLLANDER:  I think our clients will be amenable

2    to that.

3        THE COURT:  Okay.

4        MR. SABIN:  I know you've ruled, but I ask for a

5    shorter period to respond.  I want to respond to --

6        THE COURT:  No.  Once I rule, I rule.

7        MR. SABIN:  Understood.  Fair enough.

8        THE COURT:  Look, I don't think the issues today were

9    easy issues.  I've spent time reading the cases, thinking about

10   the issues, and I think I've already ruled.  But the one thing I

11   want to make clear and this ought to be clear from my comments,

12   I'm declining for now to modify or lift the stay.  That doesn't

13   mean that that's forever.

14       MR. SABIN:  I appreciate it, and I just want to make

15   sure that for the record, to the extent we want to reserve

16   appeal rights, whether they're of right or interlocutory, that

17   the record itself and your decision on the record is what we

18   will use.

19       THE COURT:  I'm so-ordering the transcript.  You can

20   order the transcript.

21       MR. SABIN:  Right.  Thank you, Your Honor, very much.

22       THE COURT:  All right.  Thanks very much.

23       MR. SABIN:  Thank you for your time.

24                       - o0o -

25

51

CERTIFICATION

1

2

3       I, Rochelle V. Grant, certify that the foregoing is a

4   correct transcript from the official electronic sound recording

5   of the proceedings in the above-entitled matter.

6   Dated:  April 22, 2017

7

8

9                        Signature of Approved Transcriber

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25