**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ) | **FOR PUBLICATION** |
| In re ) | |
| ) | Chapter 15 |
| OCEAN RIG UDW INC., *et al.*, ) | Case No. 17-10736 (MG) |
| ) | |
| Debtors in Foreign Proceedings. ) | (Jointly Administered) |
| ) | |

**MEMORANDUM OPINION GRANTING RECOGNITION OF**
**FOREIGN DEBTORS' CAYMAN ISLANDS PROCEEDINGS AS**
**FOREIGN MAIN PROCEEDINGS**

*A P P E A R A N C E S :*

ORRICK, HERRINGTON & SUTCLIFFE LLP
*Counsel for the Petitioners, Simon Appell and Eleanor Fisher,*
*in their capacities as the Joint Provisional Liquidators and*
*Proposed Foreign Representatives*
51 West 52nd Street
New York, New York 10019
By:    Evan C. Hollander, Esq.
          Raniero D'Aversa, Jr., Esq.
          Monica A. Perrigino, Esq.


                    and

LAW OFFICE OF STEVEN J. FINK PLLC
*Counsel for the Petitioners, Simon Appell and Eleanor Fisher,*
*in their capacities as the Joint Provisional Liquidators and*
*Proposed Foreign Representatives*
81 Main Street, Suite 405
White Plains, NY 10601
By:    Steven J. Fink, Esq.

LAW OFFICES OF TALLY M. WIENER, ESQ.
*Objector to Recognition*
119 West 72nd Street, PMB 350
New York, NY 10023
By:    Tally M. Wiener, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

In these four jointly administered chapter 15 cases, Simon Appell and Eleanor Fisher, the joint provisional liquidators and authorized foreign representatives (the "JPLs") of Ocean Rig UDW Inc. ("UDW"), Drill Rigs Holdings Inc. ("DRH"), Drillships Financing Holding Inc. ("DFH") and Drillships Ocean Ventures Inc. ("DOV") (UDW, DRH, DFH and DOV, together, the "Foreign Debtors"), seek recognition in this Court as foreign main proceedings or foreign nonmain proceedings of four proceedings pending before the Grand Court of the Cayman Islands (the "Cayman Court"). The four proceedings in the Cayman Court are Financial Services Division Cause Nos. FSD0057/2017 (UDW), FSD0059/2017 (DRH), FSD0056/2017 (DFH) and FSD0058/2017 (DOV) (the "Cayman Provisional Liquidation Proceedings"). The Foreign Debtors are each holding companies, with UDW owning each of the other three Foreign Debtors and they, in turn, owning a large group of non-debtor companies that directly or indirectly own a fleet of deepwater oil drilling rigs that are generally leased to exploration oil and gas companies. UDW stock is publicly traded in the U.S. and elsewhere. The sharp decline in oil and gas prices over the last few years has taken a major toll on the finances of the Foreign Debtors, with most of their drilling rigs currently not in operation.

The JPLs' goal is to have the Cayman Court sanction four schemes of arrangement (one for each of the Foreign Debtors) negotiated and proposed by the Foreign Debtors, and then, if sanctioned by the Cayman Court, have this Court recognize and enforce the schemes in these chapter 15 cases. The four schemes propose a major restructuring of the Foreign Debtors' financial debt, issuing new debt and cash and converting much of their fixed debt into equity, very substantially diluting the current equity ownership of UDW. The Cayman Court authorized

2

the Foreign Debtors to convene creditors' meetings and vote on the four proposed schemes.  The

creditors' meetings took place on August 11, 2017, and according to a status report filed in this

Court by the JPLs, the creditors voted to support the four schemes.[1]  Sanction hearings are

scheduled in the Cayman Court on September 4, 5, and 6, 2017.  *See Fourth Status Report of*

*Joint Provisional Liquidators and Foreign Representatives Simon Appell and Eleanor Fisher*

(ECF Doc. # 109).

At least one substantial UDW creditor, Highland Capital Management LP ("Highland"),

is expected to oppose sanctioning of the UDW scheme.  If the Cayman Court nevertheless

sanctions the schemes, this Court anticipates that Highland will oppose recognition and

enforcement of the UDW scheme in this Court.  Highland previously objected to recognition of

the UDW proceeding as a foreign main or nonmain proceeding, but Highland dropped that

objection, reserving its right to contend that the UDW scheme should not be recognized and

enforced by this Court if it is sanctioned by the Cayman Court.  But after Highland withdrew its

objection to recognition, Tally M. Wiener, Esq. ("Wiener"), a lawyer who asserts that she is a

shareholder of UDW, filed an objection to recognition.  The Court held an evidentiary hearing on

the contested recognition motion on August 16, 2017.  Until sometime in 2016, each of the

Foreign Debtors had its center of main interests ("COMI") in the Republic of the Marshall

Islands ("RMI").  It is the shift in COMI from the RMI to the Cayman Islands, where the

provisional liquidation and scheme of arrangement proceedings are pending, that is the focus of

the issues that must be addressed in determining whether to recognize the foreign proceedings as

foreign main, or in the alternative, foreign nonmain proceedings.

---

[1]     The specific terms of the four schemes of arrangement are not at issue at this time.  The only issues
currently before the Court concern recognition of the four Cayman Court proceedings.

For the reasons explained below, the Court concludes that each the four Cayman Court proceedings should be recognized as a foreign main proceeding.

## I.    BACKGROUND[2]

The JPLs commenced chapter 15 cases for each of the Foreign Debtors (collectively, the "Chapter 15 Cases") by filing the *Verified Petition of Ocean Rig UDW Inc., et al. (in Provisional Liquidations) and Motion of the Joint Provisional Liquidators for (A) Recognition of the Cayman Proceedings as Foreign Main Proceedings or, in the Alternative, as Foreign Nonmain Proceedings, and (B) Certain Related Relief* (ECF Doc. # 1) (together with each Foreign Debtor's Form of Voluntary Petition, the "Verified Petition").  The JPLs seek (i) entry of an order granting recognition of (a) the Cayman Provisional Liquidation Proceedings and (b) subsequent applications for the sanctioning of schemes of arrangement in respect of the Foreign Debtors under section 86 of Part IV of the Companies Law (the "Cayman Schemes," and, together with the Cayman Provisional Liquidation Proceedings, the "Cayman Proceedings") as foreign main proceedings or, in the alternative, as foreign nonmain proceedings, and (ii) certain related relief.  In support of the Verified Petition, the JPLs submitted a Memorandum of Law (ECF Doc. # 3).  The JPLs supported their requested relief with the *Declaration of Simon Appell Pursuant to 28 U.S.C. § 1746 and Statements and Lists Required by Bankruptcy Rule 1007(a)(4)* (the "Appell Declaration," ECF Doc. # 4), the *Declaration of Antonios Kandylidis Pursuant to 28 U.S.C. § 1746* (the "Kandylidis Declaration," ECF Doc. # 5), the *Declaration of Rachael Reynolds in Support of the Verified Petition* (the "Reynolds Declaration," ECF Doc. # 6)[3] and the

---

[2]        The Background section includes the Court's findings of fact pursuant to FED. R. BANKR. P. 7052, which incorporates FED. R. CIV. P. 52.

[3]        Reynolds is a lawyer who practices law in the Cayman Islands.  Her declaration was offered and admitted in evidence supporting an explanation of Cayman Islands law pursuant to FED. R. CIV. P. 44.1.

4

*Declaration of Dennis Reeder Pursuant to 28 U.S.C. § 1746* (the "Reeder Declaration," ECF

Doc. # 7). On July 10, 2017, Wiener filed an objection to the JPLs' recognition request. *See*

*Objection to the Motion of the Joint Provisional Liquidators of Ocean Rig UDW Inc. et al. for*

*Recognition of Foreign Main or Nonmain Proceedings* ("Wiener Objection," ECF Doc. # 89).

The Wiener Objections asserts that Wiener is a shareholder of Ocean Rig UDW Inc., an assertion

she has never backed up with any evidence. (*Id.* at 1.)

As directed by the Court, the counsel for the JPLs and Wiener prepared a *Recognition*

*Hearing Joint Pretrial Order* ("Pretrial Order") that was approved and entered by the Court on

July 26, 2017. (ECF Doc. # 102.) The Pretrial Order identified the issues to be tried, and

included the JPLs' witness list (with direct evidence offered by declaration and with in-court

cross examination), and the list of trial exhibits that each side proposed to offer. The JPLs

identified four trial witnesses, but based on a stipulation between counsel, only three of the

witnesses—Simon Appell, Antonios Kandylidis, and Rachel Reynolds—testified at trial with

direct testimony by declaration (Appell Declaration, PX-5; Kandylidis Declarations, PX-6 and

PX-10 and exhibits; and Reynolds Declaration, PX-8). Wiener objected to portions of the

Appell, Kandylidis and Reynolds Declarations; the Court ruled on the objections at the final

pretrial conference on August 14, 2017. As limited by the stipulation of the parties and the

Court's ruling on Wiener's objections, the Appell, Kandylidis and Reynolds Declarations were

admitted in evidence as the witnesses' direct testimony. Wiener cross-examined each of these

witnesses during the trial. Wiener did not identify any witnesses in the Pretrial Order or call any

witnesses during the trial. Numerous exhibits offered by both sides were admitted in evidence

during the trial as well.

In a letter to the Court dated August 15, 2017, Wiener challenged whether venue of these chapter 15 cases in the Southern District of New York is proper. (ECF Doc. # 112.) The JPLs responded to and opposed Wiener's venue argument in a letter also filed on August 15, 2017. (ECF Doc. # 114.) Venue was not identified as an issue for trial in the Pretrial Order. In any event, as set forth below, Wiener's venue argument is simply wrong; venue properly lies in this Court.

While Wiener asserted in her Objection that she is a UDW Inc. shareholder, she in fact offered no evidence at trial supporting that contention. Therefore, Wiener failed to establish that she is a party-in-interest with standing to contest recognition of the Foreign Debtors' Cayman Proceedings. Because this Court nevertheless must find that the JPLs have established that recognition is proper in order to grant the recognition motion, the Court will treat Wiener's Objection as if she had established her standing to object to recognition and rule on her arguments on the merits.

### A.    The Businesses of the Foreign Debtors

UDW is the holding company of the Ocean Rig Group (the "Group") and the direct parent of the three other Foreign Debtors (DFH, DOV and DOH (collectively, the "Subsidiary Debtors")).

UDW registered in April 2016 as an exempted company limited by shares under § 202 of the Cayman Companies Law. Before then, UDW was registered as a non-resident corporation in the RMI. The Subsidiary Debtors are registered as non-resident corporations in the RMI and are registered as foreign companies under § 186 of the Cayman Companies Law. UDW and the Subsidiary Debtors maintain their only offices in the Cayman Islands. None of the Foreign Debtors has ever conducted operations or directed their affairs from the

RMI.  (Kandylidis Decl. ¶ 4.)

The Group is composed of four separate operating divisions.  Each of the Subsidiary

Debtors is a holding company and the parent of one of three of these operating Subsidiary

Debtors' divisions.[4]  Each of the operating divisions has its own financing, but UDW has

guaranteed that debt and has pledged the shares of the applicable Subsidiary Debtor to secure its

respective guaranty obligations (*e.g.*, the shares of DRH have been pledged to secure the DRH

facility).  (*Id.* ¶ 5.)

**B.     The Financial Debt of the Group**

UDW and the Subsidiary Debtors incurred the following financial debt:

*1.     The DRH Facility*

DRH issued US $800 million of 6.5% Senior Secured Notes due 2017 (the "SSNs"),

pursuant to an indenture dated September 20, 2012 (as amended by a supplemental indenture

dated January 23, 2013) (as amended, the "DRH Indenture").  U.S. Bank National Association is

the Indenture Trustee under the DRH Indenture and Deutsche Bank Trust Company Americas is

the collateral trustee.  The SSNs are guaranteed by UDW (the "DRH Indenture Guaranty") and

certain of DRH's direct and indirect subsidiaries (the "DRH Subsidiary Guarantors").  UDW

pledged the shares of DRH to secure the DRH Indenture Guaranty, and DRH and the DRH

Subsidiary Guarantors have pledged their assets (including shares of their subsidiaries) to secure

their obligations in respect of the DRH Indenture.  All pledged shares are held by the collateral

trustee in the United States.  Approximately US $460 million remains outstanding under the

DRH Indenture.  (*Id.* ¶ 6(a).)

---

[4]      The parent holding company of the fourth operating division, Drillship Alonissos Shareholders Inc.
("DAS") is not a debtor herein or a part of the restructuring.

7

2.    *The DFH Facility*

DFH is a borrower under a US $1.9 billion Credit Agreement dated July 12, 2013 (as amended and restated from time to time, including on February 7, 2014) between, amongst others, DFH and Drillships Projects Inc., as borrowers and Deutsche Bank AG New York Branch, as administrative and collateral agent (the "DFH Credit Agreement"). The DFH Credit Agreement has been guaranteed by UDW (the "DFH Credit Agreement Guaranty") and certain of DFH's direct and indirect subsidiaries (the "DFH Subsidiary Guarantors"). UDW pledged the shares of DFH to secure the DFH Credit Agreement Guaranty, and DFH and the DFH Subsidiary Guarantors have pledged their assets (including shares of their subsidiaries) to secure their obligations in respect of the DFH Credit Agreement. All pledged shares are held by the collateral agent in the United States. Approximately US $1.83 billion remains outstanding under the DFH Credit Agreement. (*Id.* ¶ 6(b).)

3.    *The DOV Facility*

DOV is a borrower under a US $1.3 billion Credit Agreement dated July 25, 2014 between, amongst others, DOV and Drillships Ventures Projects Inc., as borrowers, and Deutsche Bank AG New York Branch, as administrative and collateral agent (the "DOV Credit Agreement" and, together with the DFH Credit Agreement, the "Credit Agreements"). The DOV Credit Agreement has been guaranteed by UDW (the "DOV Credit Agreement Guaranty") and certain of DOV's direct and indirect subsidiaries (the "DOV Subsidiary Guarantors"). UDW has pledged the shares of DOV to secure the DOV Credit Agreement Guaranty, and DOV and the DOV Subsidiary Guarantors have pledged their assets (including shares of their subsidiaries) to secure their obligations in respect of the DOV Credit Agreement. All pledged shares are held by the collateral agent in the United States.

8

Approximately US $1.27 billion remains outstanding under the DOV Credit Agreement.  (*Id.* ¶ 6(c).)

### 4.   The UDW Facility

UDW issued US $500 million of 7.25% Senior Unsecured Notes due 2017 (the "SUNs"), pursuant to an indenture dated March 26, 2014 (the "SUN Indenture").  Deutsche Bank Trust Company Americas is the Indenture Trustee under the SUN Indenture.  The SUNs are not guaranteed by any member of the Group.  Approximately US $131 million of unsecured notes remain outstanding under the SUN Indenture.  The amounts outstanding in respect of the SUN Indenture, the DRH Indenture and the Credit Agreements are collectively referred to as the "Scheme Indebtedness."  (*Id.* ¶ 6(d).)

### C.   The Business of the Group

The Group operates as an international offshore oil drilling contractor, owner and operator of drilling rigs.  It provides drilling services for offshore oil and gas exploration, development and production, and specializes in the ultra-deepwater and harsh-environment segments of the offshore drilling industry.  Through various subsidiaries, the Group operates 11 ultra-deepwater offshore drilling units, the details of which are set forth in the Kandylidis Declaration and will not be repeated here.  (*See id.* ¶ 8.)  Additionally, the Group has contracted for the construction of an additional three so-called seventh generation drilling units with a major shipyard in South Korea.  The delivery dates for these new vessels were previously scheduled for 2017, 2018, and 2019, respectively, but the delivery dates of two vessels have been postponed, and construction on the third vessel has been suspended. UDW's guarantees in respect of these drilling rigs have also been released.  (*Id.* ¶ 9.)

The Group employs the drilling rigs to drill wells for customers primarily on a "day

rate" basis for periods of between two months and six years.  Payments are set at a fixed

amount for each day that the rig is operating under a contract at full efficiency.  A higher

"day rate" is charged on days when actual drilling operations are being undertaken; lower

rates are charged during periods of mobilization, or when drilling operations are interrupted

or restricted by equipment breakdowns, adverse environmental conditions or other conditions

beyond the company's control.  Contracts are generally obtained through a competitive

bidding process with other contractors.  The Group's customers are typically major oil

companies, integrated oil and gas companies, state-owned national oil companies and

independent oil and gas companies.  (*Id.* ¶ 10.)

Currently, the Group's revenues are dependent on five drilling rigs, operating offshore

near Norway, Brazil, and Angola; six other rigs are currently uncontracted and have been laid-

up.  Only one rig is under a long term contract, expiring in September 2020; two rigs are under

contracts that expire during the second half of 2017, and two rigs are under contracts that expire

during the first half of 2018.  Laid-up rigs must be deactivated and either "cold stacked" or

"warm stacked" to preserve the rigs pending reactivation.  Rig deactivation costs are

approximately $5 million per unit.  The daily costs for "warm stacked" rigs are approximately

$40,000 per day; the daily costs for "cold stacked" rigs are approximately $5,000 per day.  (*Id.*

¶ 12.)

### D.    The Group's Financial Situation

The oil and gas drilling industry is currently in a down-cycle.  Crude oil prices have

fallen during the past several years, falling from over $100 per barrel in March 2014, to

approximately $52 per barrel in March 2017.  UDW's share price has fallen from a high of

$19.87 on June 20, 2014, to $0.73 as of March 24, 2017.  UDW expects that the significant

decrease in oil prices will continue to reduce customer demand in the industry during 2017. Many of the Groups' customers have revised their budgets, decreasing projected expenditures for offshore drilling. "Day rates" and rig utilization have declined, putting severe financial pressure on the Group. UDW does not expect that its inactive rigs will begin work under new contracts until January 2020 at the earliest. Deepwater rig demand, currently at a utilization rate of only approximately 45% of available rigs, is not expected to begin to improve until 2019. Rig utilization rates are expected to remain below 60% of rig availability until the first quarter of 2020. (*Id.* ¶ 13.)

### E.   The Foreign Debtors' Decision to Restructure

The Foreign Debtors had significant debt payments due during 2017. They did not expect to have sufficient cash available to make these payments without further borrowing. Failure to make any of these payments when due would trigger cross-default provisions under the Credit Agreements. Faced with expected payment defaults and cross-defaults, the Foreign Debtors explored restructuring alternatives. The parties stipulated that the RMI, where these Foreign Debtors previously maintained their COMI, does not have a statute or any procedures permitting reorganization, making liquidation the likely outcome. The Cayman Islands, however, does have statutory laws and procedures permitting restructuring. It is the premise of chapter 11 of the Bankruptcy Code, and the law of an increasing number of jurisdictions, that reorganization of a potentially viable entity (as opposed to liquidation) may be value maximizing, benefitting creditors, employees faced with the prospect of loss of employment, and other public and private interests.

Increasingly, foreign jurisdictions—including the United Kingdom, Hong Kong, Singapore, and the Cayman Islands—provide statutory authority for schemes of arrangement as a

11

way of permitting companies in financial distress to restructure their financial debt, as these

Foreign Debtors are attempting to do here.  While the U.S. Bankruptcy Code does not currently

include provisions authorizing schemes of arrangement,[5] U.S. bankruptcy courts, including this

Court, have found that a foreign scheme of arrangement proceeding (including in the Cayman

Islands) may satisfy section 101(23)'s definition of a collective judicial proceeding providing for

the adjustment of debt that qualifies for recognition.

The Foreign Debtors in these proceedings acted prudently in exploring their restructuring

alternatives.  The Court finds that the directors of the Foreign Debtors properly concluded that

changing their COMI to the Cayman Islands, and, if necessary, commencing restructuring

proceedings there, and also commencing chapter 15 proceedings in the U.S., offered them the

best opportunity for successful restructuring and survival under difficult financial conditions.

Of course, more than good intentions are required before a U.S. bankruptcy court can

recognize a foreign proceeding as either a foreign main or foreign nonmain proceeding.  For

example, a so-called "letter box company," with no real establishment or other required indicia

for its proposed COMI, cannot support recognition.  *See In re Bear Stearns High Grade*

*Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129–31 & n.8 (Bankr. S.D.N.Y.),

*aff'd*, 389 B.R. 325 (S.D.N.Y. 2007) (stating that "the COMI presumption may be overcome

particularly in the case of a 'letterbox' company not carrying out any business" in the country

---

[5]    The National Bankruptcy Conference has recommended adoption of a new chapter 16 of the Bankruptcy
Code that would permit restructuring of bond and credit agreement debt, similar to foreign schemes of arrangement.
See http://nbconf.org/our-work/2015 December 18 Proposed Amendments to Bankruptcy Code to Facilitate
Restructuring of Bond and Credit Agreement Debt.

where its registered office is located) (citation omitted).  The question that must be addressed

here is whether the Foreign Debtors' change of COMI from the RMI to the Cayman Islands

satisfies the requirements of the Bankruptcy Code, permitting this Court to recognize the

Cayman Proceedings as a foreign main proceeding.  A U.S. bankruptcy court that is asked to

recognize a foreign proceeding as a foreign main proceeding must decide where a foreign debtor

has its center of main interest.

### F.       The Debtors' Move to and Current Connections with the Cayman Islands

As previously noted, UDW is now a Cayman Islands registered corporation.  UDW

migrated from the RMI, where it had been a non-resident domestic corporation, on April 14,

2016.  The Subsidiary Debtors are each wholly-owned direct subsidiaries of UDW.  They are

RMI non-resident domestic corporations; they registered as foreign companies in the Cayman

Islands on October 18, 2016.  Each of the Foreign Debtors is a holding company whose primary

assets are the equity interests in their respective subsidiaries.  Each Foreign Debtor maintains its

head office in the Cayman Islands in office space provided by an affiliate, Ocean Rig SEZ Co.

(defined below).  (Kandylidis Decl. ¶ 23.)

UDW was previously a tax resident of Cyprus, but it ceased being a tax resident there

effective December 31, 2016.  UDW no longer maintains any presence in Cyprus.  UDW also

maintains a "law 89 establishment" in Greece.  Law 89 permits foreign commercial and

industrial companies to maintain an establishment in Greece exclusively for the provision of

limited types of services for head offices or affiliates outside of Greece.  (*Id.* ¶ 24.)

Foreign companies with a law 89 license in Greece are required to spend US $50,000

per year in Greece.  UDW established its "law 89 establishment" with the intention of

providing ship-brokerage services to affiliates, but the brokerage services were never provided

13

as intended.  As a result, the company is in the process of having its law 89 establishment

license terminated.  Affiliates of the Foreign Debtors also maintain offices in Norway, Angola,

Brazil and Jersey.  (*Id.*)

The evidence establishes that none of the Foreign Debtors have ever conducted

operations or directed their affairs from the RMI, have ever maintained administrative,

management or executive offices in the RMI, have ever had any directors who were residents

or citizens of the RMI, or have ever held a meeting of its directors or shareholders in the RMI.

Public notice of the opening of UDW's head office in the Cayman Islands was provided by

SEC Form 6-K on September 27, 2016 and the Foreign Debtors gave notice of their

registration in the Caymans by subsequent press release.  (*Id.* ¶ 25.)  Other indicia likewise

support the *bona fides* of the COMI shift to the Cayman Islands.  The Court concludes with no

difficulty that the Foreign Debtors have established by a preponderance of the evidence that

each of their COMIs, as of the filing of the chapter 15 petitions, was the Cayman Islands.  The

Court summarizes the evidence supporting this conclusion:

### 1.    *Directors and Board Meetings*

Michael Pearson, one of six members of the board of directors of UDW, has his primary

residence in the Cayman Islands.  The other five UDW directors reside in Monaco and Greece.

Two of four directors of DRH, Michael Pearson and Casey McDonald, have their primary

residences in the Cayman Islands.  The boards of directors of DFH and DOV each has three

directors, one of whom, Michael Pearson, has his primary residence in the Cayman Islands, and

the other two directors have residences in the Cayman Islands.  (*Id.* ¶ 26.)

UDW board meetings have been held exclusively in the Cayman Islands since a regular

meeting held in the Cayman Islands on November 17, 2016.  Meetings of the UDW board were

14

also held in the Cayman Islands on February 3, 2017, February 21, 2017 and March 23, 2017.

Meetings of a special committee of the UDW board were held in the Cayman Islands on March

7, 2017 and March 16, 2017. Board meetings of the Subsidiary Debtors have been held

exclusively in the Cayman Islands since February 3, 2017. Meetings of the boards of the

Subsidiary Debtors were also held in the Cayman Islands on February 21, 2017 and March 23,

2017, and meetings of special committees of each of the Subsidiary Debtors were held in the

Cayman Islands on March 7, 2017 and March 16, 2017. As noted, no directors have ever been

located in the RMI and no directors' meetings ever took place there. (*Id.* ¶ 27.)

2.    *Company Officers*

The President and Chief Financial Officer, the Company Secretary, and the Vice

President of Business Development of UDW have residences in the Cayman Islands and work

in the Cayman Islands in office space provided by Ocean Rig SEZ Co. pursuant to the terms of

their Zone Employment Certificates. All of the officers of the Subsidiary Debtors have

residences in the Cayman Islands and work in the Cayman Islands in office space provided by

Ocean Rig SEZ Co. pursuant to the terms of their Zone Employment Certificates. Each of

these officers use mobile phones with Cayman Islands phone numbers. (*Id.* ¶ 28.)

3.    *Notice of Relocation to Cayman Islands*

a)    Paying Agents

The paying agent under the SUNs issued by UDW was notified on November 1, 2016

to address all future invoices for payment to the registered office of Ocean Rig SEZ Co. in the

Cayman Islands. The paying agent under the SSNs issued by DRH was notified on November

2, 2016 to address all future invoices for payment to the registered office of Ocean Rig SEZ

Co. in the Cayman Islands. The paying agent under the DFH Credit Agreement was notified

on January 23, 2017 to address all future invoices for payment to the registered office of

Ocean Rig SEZ Co. in the Cayman Islands.  The paying agent under the DOV Credit

Agreement was notified on January 23, 2017 to address all future invoices for payment to the

registered office of Ocean Rig SEZ Co. in the Cayman Islands.  (*Id.* ¶ 29(a).)

b) <u>Indenture Trustees, Administrative and Collateral Agents</u>

The Indenture Trustee under the SUN Indenture was notified on February 6, 2017 to

direct all notices for UDW to the registered office of Ocean Rig SEZ Co. in the Cayman

Islands.  The Indenture Trustee and the Collateral Agent, Registrar and Paying Agent under the

DRH Indenture were notified on February 6, 2017 to direct all notices for UDW and DRH to

the registered office of the Ocean Rig SEZ Co. in the Cayman Islands.  The Administrative

Agent and the Collateral Agent under the DFH Credit Agreement was notified on February 6,

2017 to direct all notices for UDW and DFH to the registered office of the Ocean Rig SEZ Co.

in the Cayman Islands.  The Administrative Agent and the Collateral Agent under the DOV

Credit Agreement was notified on February 6, 2017 to direct all notices for UDW and DOV to

the registered office of the Ocean Rig SEZ Co. in the Cayman Islands.  (*Id.* ¶ 29(b).)

c) <u>Investment Service Providers</u>

Investment service providers, including Moody's Investors Service, Inveshare,

Broadridge and Standard & Poor Global Ratings, were notified of UDW's change of address in

November 2016 and have remitted invoices, as directed, to the company in the Cayman Islands.

(*Id.* ¶ 29(c).)

d) <u>Public Notice and General Recognition of Relocation</u>

On September 27, 2016, UDW filed a Form 6-K report with the SEC updating the

address of its principal executive offices to its registered office in the Cayman Islands.  On

16

February 6, 2017, each of the Debtors issued a press release advising that it had relocated its

principal place of business to the Cayman Islands and that the address for all postal

communications to the companies should be directed to Ocean Rig SEZ Co. in the Cayman

Islands.  Also on February 6, 2017, UDW announced that its 2017 Annual General Meeting

would be held on April 24, 2017 at the company's business office in the Cayman Islands.  The

contact details for the Debtors on the Group's website list the Foreign Debtors' Cayman Islands

address.  Media reports have been published acknowledging the relocation of UDW's principal

executive offices to the Cayman Islands.  The Company has been served in an English legal

proceeding in the Cayman Islands.  (*Id.* ¶ 29(d).)

### 4.    *Location of Operations*

The Foreign Debtors' subsidiaries do business throughout the world, principally on the

high seas.  Head office and administrative service functions for the Foreign Debtors, formerly

performed by an affiliate located in Cyprus, are now performed by an affiliate, Ocean Rig SEZ

Co., in the Cayman Islands.  Ocean Rig SEZ Co. is licensed to operate and is located in the

Maritime Park in the Special Economic Zone at Cayman Enterprise City in the Cayman Islands,

where it provides office space and administrative support services to the Foreign Debtors.  One

of the employees of Ocean Rig SEZ Co. has her primary residence in the Cayman Islands.  All

of the other employees of Ocean Rig SEZ Co. have residences in the Cayman Islands.  The

Services Agreement between Ocean Rig SEZ Co. and the Foreign Debtors is governed by

Cayman Islands law.  (*Id.* ¶ 30.)

### 5.    *Location of Assets*

Each of the Foreign Debtors is a holding company. The share certificates of DRH, DFH

and DOV are pledged to secure the UDW Guarantees and are held by the respective collateral

agents and collateral trustee in the United States.  The share certificates of the subsidiary

guarantors under the DRH Indenture, the DFH Credit Agreement and the DOV Credit

Agreement are also held by the respective collateral agents and collateral trustee.  The share

certificates of other subsidiaries are unpledged and represent valuable interests in these

subsidiaries' cash and rigs.  These certificates are held in the Cayman Islands.  (*Id.* ¶ 31.)

### 6.    *Location of Bank Accounts*

Each of the Foreign Debtors has a bank account in the Cayman Islands.  The paying

agents for the Foreign Debtors' financial indebtedness have been instructed to address all

invoices for payment due to the office of Ocean Rig SEZ Co. in the Cayman Islands.  Payments

to professionals have been made from the Cayman accounts, including a retainer of $250,000

paid by each of the Foreign Debtors (total $1 million) to the Foreign Debtors' U.S. restructuring

counsel, Orrick, Herrington & Sutcliffe LLP.  These retainers are being held in their counsel's

client trust account at Citibank Private Bank in New York.  (*Id.* ¶ 32.)

### 7.    *Books and records*

The minute book of UDW has been maintained in the Cayman Islands since November

2016.  The minute books of each of the Subsidiary Debtors have been maintained in the

Cayman Islands since January 2017.  (*Id.* ¶ 33.)

### 8.    *Restructuring Activities*

Face-to-face creditor meetings were held in the Cayman Islands on November 21-23,

2016 and February 7-9, 2017.  Numerous conference calls with creditors have been hosted by

the Foreign Debtors from the Cayman Islands.  The Foreign Debtors' have also met frequently

in the Cayman Islands with their legal and financial advisers.  (*Id.* ¶ 34.)

## II.    DISCUSSION

### A.    Standards for Recognition of Foreign Main and Nonmain Proceedings

The Second Circuit has held that foreign debtors seeking chapter 15 relief must satisfy

the debtor eligibility requirements set forth in section 109(a) of the Bankruptcy Code.  *See*

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247–51

(2d Cir. 2013).  As explained below, each of the Foreign Debtors satisfies the requirements of

section 109(a).  The remaining requirements for recognition of a foreign proceeding under

chapter 15 are set forth in section 1517(a).  Subject to section 1506, a foreign proceeding must

be recognized if the following requirements are met:

> (1) such foreign proceeding for which recognition is sought is a
> foreign main proceeding or foreign nonmain proceeding
> within the meaning of section 1502;
>
> (2) the foreign representative applying for recognition is a person
> or body; and
>
> (3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a); *see also In re Millard*, 501 B.R. 644, 651 (Bankr. S.D.N.Y. 2013) (stating

that section 1517 provides a "'statutory mandate' that recognition be granted upon compliance

with the requirements of section 1517(a)(1), (2) and (3)") (citing *Lavie v. Ran (In re Ran)*, 607

F.3d 1017, 1021 (5th Cir. 2010)); *see also In re ABC Learning Centres Ltd.*, 728 F.3d 301, 306

(3d Cir. 2013) (stating that recognition is mandatory when an insolvency proceeding meets the

criteria of section 1502).

### B.    The Debtors Satisfy Section 109(a)

Section 109(a) provides that "only a person that resides or has a domicile, a place of

business, or property in the United States, or a municipality, may be a debtor" under the Code.

11 U.S.C. § 109(a).  Where a foreign debtor does not have a place of business in the United

States, the question often arises whether the foreign debtor has "property in the United States"

as a condition precedent to eligibility under section 1517.  *See In re Cell C Proprietary Ltd.*,

Case No. 17-11735 (MG), 2017 WL 3190568, at *6–7 (Bankr. S.D.N.Y. July 27, 2017).

Section 109(a) does not address how much property must be present or when or how long

property must have a situs in the United States.  As this Court recently explained in *In re U.S.*

*Steel Canada Inc.*, Case No. 17-11519 (MG), 2017 WL 3225914 (Bankr. S.D.N.Y. July 31,

2017):

> Some courts, including this one, have held that an undrawn
> retainer in a United States bank account qualifies as property in
> satisfaction of section 109(a).  *See, e.g.*, [*In re Octaviar Admin.*
> *Pty Ltd.*, 511 B.R. 361, 372–73 (Bankr. S.D.N.Y. 2014)] ("There
> is a line of authority that supports the fact that prepetition deposits
> or retainers can supply 'property' sufficient to make a foreign
> debtor eligible to file in the United States.") (citing *In re Cenargo*
> *Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003)); *see also In*
> *re Berau Capital Resources Pte Ltd.*, 540 B.R. 80, 82 (Bankr.
> S.D.N.Y. 2015) ("The Court is satisfied that the retainer provides
> a sufficient basis for eligibility in this case."); *In re Global Ocean*
> *Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000) (holding that
> a $400,000 retainer paid on behalf of the debtors to bankruptcy
> counsel in that case qualifies as sufficient property in the United
> States under section 109(a)).
>
> Further, "[c]ontracts create property rights for the parties to the
> contract.  A debtor's contract rights are intangible property of the
> debtor."  *Berau Capital*, 540 B.R. at 83 (citing *U.S. Bank N.A. v.*
> *Am. Airlines, Inc.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013),
> *aff'd,* 730 F.3d 88 (2d Cir. 2013)).  Those property rights can be
> and typically are tied to the location of the governing law of the
> contract.  *See id.* at 84 (holding that the situs of intangible property
> rights governed by New York law was New York).  Accordingly,
> debt subject to a New York governing law clause and a New York
> forum selection clause constitutes property in the United States.
> *See In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650,
> 655 (Bankr. S.D.N.Y. 2016) ("[D]ollar-denominated debt subject
> to New York governing law and a New York forum selection

20

> clause is independently sufficient to form the basis for
> jurisdiction.") (citation omitted); *Berau Capital*, 540 B.R. at 84
> ("The Court concludes that the presence of the New York choice
> of law and forum selection clauses in the Berau indenture satisfies
> the section 109(a) 'property in the United States' eligibility
> requirement.") (footnote omitted).

*Id.* at *7–8; *see also In re Suntech Power Holdings Co.*, 520 B.R. 399, 412–13 (Bankr.

S.D.N.Y. 2014) (concluding that establishment of a bank account in New York prior to

commencement of the chapter 15 proceeding was sufficient to satisfy section 109(a)); *In re*

*Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) (finding that debtors'

maintenance of original business documents in the United States constituted "property in the

United States" under section 109).

In *Berau Capital*, 540 B.R. at 83, this Court held that New York governing law and

forum selection clauses in a debtor's indenture satisfied the "property in the United States"

requirement in section 109(a). *See id.* at 84 ("The Court concludes that the presence of the

New York choice of law and forum selection clauses in the Berau indenture satisfies the

section 109(a) 'property in the United States' eligibility requirement.").

The Foreign Debtors satisfy section 109(a)'s requirement of property in the United

States. Each of the four Foreign Debtors paid its New York counsel a separate $250,000

retainer, for a total of $1 million, currently held in counsel's client trust account in New York,

where they will remain pending final billing in these proceedings. (Kandylidis Decl. ¶ 32;

Appell Declaration ¶ 32(f).) The indebtedness that is the subject of the Debtors' restructuring

efforts consists of approximately $4.5 billion face amount of U.S. dollar denominated debt, with

approximately $3.7 billion outstanding on the Petition Date. (*Id.* at ¶ 6.) This debt is governed

by four instruments, each of which was admitted in evidence at the hearing (PX-11, PX-12, PX-

13 and PX-14), and each of those debt instruments is governed by New York law.  (PX-11 §

12.06, PX-12 § 13.06, PX-13 § 6, and PX-14 § 10.08.)  The two term loan agreements,

accounting for $3.2 billion face amount of the $4.5 billion total indebtedness, include exclusive

New York forum selection provisions.  (PX-13 § 6, PX-14 § 10.08; s*ee also* Kandylidis

Declaration ¶ 6.)

The Foreign Debtors' debt instruments governed by New York law also satisfy the venue

requirements for these proceedings in the Southern District of New York.  The Foreign Debtors

have no substantial assets in the United States other than the New York law governed debt.  The

venue requirement in 28 U.S.C. § 1410 to maintain these chapter 15 cases in the Southern

District of New York is satisfied.  *See Berau Capital*, 540 B.R. at 82 n.1.

### C.      The Verified Petition Meets the Requirements of Section 1515

These chapter 15 cases were properly commenced in accordance with sections 1504,

1509 and 1515.  The Verified Petition for recognition of foreign proceedings was filed pursuant

to section 1515(a), and were accompanied by all documents and information required by sections

1515(b) and (c) and the relevant Bankruptcy Rules.

### D.      Each of the JPLs Qualifies as a "Foreign Representative"

A chapter 15 case is commenced by the filing of a petition for recognition (and related

documents) by the "foreign representative."  *See* 11 U.S.C. 1504, 1509(a), 1515(a).  A

bankruptcy court may presume that the person petitioning for chapter 15 recognition is a foreign

representative if the decision or certificate from the foreign court so indicates.  11 U.S.C. §

1516(a).  The Bankruptcy Code defines "foreign representative" as "a person or body, including

a person or body appointed on an interim basis, authorized in a foreign proceeding to administer

the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative

of such foreign proceeding."  11 U.S.C. § 101(24).

The Cayman Court appointed the JPLs as "the duly authorised foreign representative[s]

of the [Foreign Debtors]" and authorized the JPLs "to seek relief under Chapter 15 of Title 11 of

the United States Bankruptcy Code, and to take such steps arising in connection therewith that

the JPLs may consider appropriate."  (PX-3 (the "Cayman Orders") ¶ 3.)  The Cayman Court

granted the JPLs the power to "seek recognition of their appointment in any jurisdiction the JPLs

deem necessary."  (*Id.* ¶ 5(e); *see also* Reynolds Declaration ¶ 53.)  The JPLs are each proper

"foreign representatives" of the Foreign Debtors within the meaning of section 101(24).  (*See*

*also* Appell Declaration ¶¶ 23–26; Reynolds Declaration ¶¶ 52–53.)

### E.    The Cayman Proceedings Are "Foreign Proceedings"

The Cayman Proceedings are "foreign proceedings" as required for recognition under

section 1517(a) of the Bankruptcy Code.  *See* 11 U.S.C. 1517(a)(1).  A "foreign proceeding" is

defined as

> a collective judicial or administrative proceeding in a foreign
> country, including an interim proceeding, under a law relating to
> insolvency or adjustment of debt in which proceeding the assets
> and affairs of the debtor are subject to control or supervision by a
> foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

The Cayman Provisional Liquidation Proceedings and the proposed Cayman Schemes are

"collective judicial proceedings" commenced under Parts V and IV, respectively, of the Cayman

Companies Law.  The statute is applicable to corporate insolvencies (in the case of the

provisional liquidations) or the adjustment of debt (in the case of the contemplated schemes)—it

is a "law relating to insolvency or adjustment of debt."  (*See* Reynolds Decl. ¶ 51.)  Under the

23

Cayman Companies Law, a Cayman Court may (i) give regard to the wishes of creditors for all matters related to the winding up of an insolvent company, (ii) make all debts payable on a contingency basis and all present or future, certain or contingent claims against the company admissible in the proceeding, (iii) appoint a liquidator who is required to convene meetings of the creditors, and (iv) apply the property of the debtor in satisfaction of its liabilities *pari passu* and distribute such property to creditors according to their rights and interests. (*See* SX-3 (the "Companies Law") §§ 105, 115, 139(1), 140(1).) The JPLs are "[o]fficers of the [Cayman] Court," and subject to the control of the Cayman Court. The JPLs or any creditor may apply to the Cayman Court for an order for the continuation of the winding up under the supervision of the Cayman Court. (*See* Companies Law §§ 108(2), 104(4), 131-133; *see also* Reynolds Decl. ¶¶ 31, 34.) A Cayman debtor's assets and affairs are subject to the control or supervision of the Cayman Court in both provisional liquidation proceedings and proceedings seeking sanctioning of schemes of arrangement. (*See id.* ¶ 51.) The purpose of the Cayman Provisional Liquidation Proceedings is reorganization or, should the reorganization fail, liquidation; the purpose of the contemplated Cayman Schemes is reorganization by way of an adjustment of debt. (*See generally* Cayman Orders; Reynolds Decl. ¶ 51.)

This Court and others have previously held that insolvency or debt adjustment proceedings (including provisional liquidations) and schemes of arrangement under Cayman Islands law qualify as foreign proceedings under chapter 15 of the Bankruptcy Code. *See, e.g.*, *In re Suntech Power Holdings Co.*, 520 B.R. 399 (Bankr. S.D.N.Y. 2014) (provisional liquidation); *In re Platinum Partners Value Arbitrage Fund et al.*, No. 16-12925 (SCC) (Bankr. S.D.N.Y. Nov. 23, 2016) (ECF Doc. # No. 27) (official liquidation); *In re Ardent Harmony Fund, Inc.*, No. 16-12282 (MG) (Bankr. S.D.N.Y. Sept. 1, 2016) (official liquidation) (ECF Doc.

24

# 17); *In re Caledonian Bank Ltd.*, No. 15-10324 (MG) (Bankr. S.D.N.Y. Mar. 17, 2015) (ECF

Doc. # 39) (official liquidation); *In re LDK Solar Co.*, No. 14-12387 (PJW) (Bankr. D. Del. Nov.

21, 2014) (ECF Doc. # 43, 44) (provisional liquidation and scheme of arrangement).  In response

to a question from the Court during trial, Wiener could not point to any case in which a U.S.

bankruptcy court found that a Cayman liquidation or scheme proceeding did not satisfy the

requirements of section 101(23) as a collective insolvency or debt adjustment proceeding subject

to judicial control.

## F.    The Cayman Proceedings Are "Foreign Main Proceedings"

The Cayman Proceedings are "foreign main proceedings" within the meaning of section

1502(4) of the Bankruptcy Code because each Debtor's COMI is the Cayman Islands.

### 1.    Each Debtor's COMI is in the Cayman Islands

The Bankruptcy Code defines a "foreign main proceeding" as "a foreign proceeding

pending in the country where the debtor has the center of its main interests."  *See* 11 U.S.C. §

1502(4).  A foreign proceeding "shall be recognized" as a foreign main proceeding if it is

pending where the debtor has its COMI.[6]  *See* 11 U.S.C. § 1517(b)(1).  While the Bankruptcy

---

[6]     The construct of the "center of main interests" was first used in insolvency laws in countries in the
European Union.  UNCITRAL's Model Law on Cross-Border Insolvency ("Model Law") incorporated the construct
in the Model Law.  Article 2 (Definitions) of the Model Law provides that "*(b)* 'Foreign main proceeding' means a
foreign proceeding taking place in the State where the debtor has the centre of its main interests . . . ."  The
UNCITRAL Guide to Enactment of the Model Law explains that "[t]he Model Law does not define the concept
'centre of main interests'.  However, an explanatory report (the Virgos-Schmit Report), prepared with respect to the
European Convention, provided guidance on the concept of 'main insolvency proceedings' and notwithstanding the
subsequent demise of the Convention, the Report has been accepted generally as an aid to interpretation of the term
'centre of main interests' in the EC Regulation.  Since the formulation 'centre of main interests' in the EC
Regulation corresponds to that of the Model Law, albeit for different purposes . . . , jurisprudence interpreting the
EC Regulation may also be relevant to interpretation of the Model Law."  *UNCITRAL Model Law on Cross Border
Insolvency with Guide to Enactment and Interpretation* ¶ 82 (2014).
        The terms "center of main interests" is used but not defined in chapter 15 of the Bankruptcy Code.  *See* 11
U.S.C. §§ 1502(4), 1516(c), 1517(b)(1).  "Center of main interests," included within chapter 15, is not used in other
chapters of the Bankruptcy Code; eligibility to file under chapters 7 or 11, for example, is controlled by section
109(a), discussed elsewhere in this Opinion.  Section 1508 directs a court interpreting chapter 15 to "consider its
international origin, and the need to promote application of this chapter that is consistent with the application of

Code does not define "center of main interests," section 1516(c) provides that, in the absence of evidence to the contrary, a debtor's registered office or habitual residence "is presumed to be the center of the debtor's main interests." *See* 11 U.S.C. § 1516(c); *see also In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 76 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 88 (S.D.N.Y. 2012) ("The party seeking to rebut a statutory presumption must present enough evidence to withstand a motion for summary judgment"); *In re ABC Learning Centres Ltd.*, 445 B.R. 318, 333 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir. 2013) (holding that debtor's registered jurisdiction was its COMI where no objection was raised or evidence presented rebutting the section 1516 presumption). The legislative history indicates that this presumption was "designed to make recognition as simple and expedient as possible" in cases where COMI is not controversial. H. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 112-13 (2005). "This presumption is not a preferred alternative where there is a separation between a corporation's jurisdiction of incorporation and its real seat." *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. at 128 (emphasis added) (citation omitted). In this case, the Foreign Debtors shifted their COMI from the RMI to the Cayman Islands. The Court finds that the Foreign Debtors' COMI shift was done for proper purposes to facilitate a value-maximizing restructuring of the Foreign Debtors' financial debt. The Foreign Debtors' COMI

---

similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. It is therefore appropriate for U.S. bankruptcy courts to consider interpretations from other international jurisdictions that have adopted the Model Law. The Cayman Islands has not adopted the Model Law, and it does not appear that center of main interests provides a standard for eligibility to file in the Cayman Islands. To the extent that a determination of center (or "centre," as spelled elsewhere) of main interests is relevant to eligibility to file proceedings in other countries, and has been decided by the foreign court, it may well be appropriate for a U.S. bankruptcy court to give deference or comity to the determination of the foreign court in the jurisdiction in which the foreign proceeding is filed. But since the Cayman Court has not decided the issue here, no issue of deference or comity arises.

shift to the Cayman Islands was "real," satisfying the factors or indicia considered by courts in

determining a foreign debtor's COMI.

Courts have identified several additional factors that may be considered in a COMI

analysis, including:

> the location of the debtor's headquarters; the location of those who
> actually manage the debtor (which, conceivably could be the
> headquarters of a holding company); the location of the debtor's
> primary assets; the location of the majority of the debtor's
> creditors or of a majority of the creditors who would be affected
> by the case; and/or the jurisdiction whose law would apply to most
> disputes.

*In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006); *In re Bear Stearns High-Grade*

*Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. at 128.  While each of these factors is a

"helpful guide" in determining a debtor's COMI, the factors are not exclusive, and none of the

factors is required nor dispositive.  *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield*

*Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013) (explaining that "consideration of these specific

factors is neither required nor dispositive" and warning against mechanical application).

The Second Circuit and other courts often examine whether a chapter 15 debtor's COMI

would have been ascertainable to interested third parties, finding "the relevant principle . . . is

that the COMI lies where the debtor conducts its regular business, so that the place is

ascertainable by third parties . . . .  Among other factors that may be considered are the location

of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes." *In*

*re Fairfield Sentry*, 714 F.3d at 130.  As the Second Circuit explained, by examining factors "in

the public domain," courts are readily able to determine whether a debtor's COMI is in fact

"regular and ascertainable [and] not easily subject to tactical removal."  *Id.* at 136–37; *see also In*

*re British Am. Ins. Co.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's

27

COMI should be readily ascertainable by third parties."); *In re Betcorp Ltd.*, 400 B.R. 266, 289 (Bankr. D. Nev. 2009) (looking to ascertainability of COMI by creditors).

In assessing these factors, a chapter 15 debtor's COMI is determined as of the filing date of the chapter 15 petition, without regard to the debtor's historic operational activity. *See In re Fairfield Sentry*, 714 F.3d at 137 ("[A] debtor's COMI should be determined based on its activities at or around the time the chapter 15 petition is filed, as the statutory text suggests."). However, as discussed in greater detail below, to the extent that a debtor's COMI has shifted prior to filing its chapter 15 petition, courts may engage in a more holistic analysis to ensure that the debtor has not manipulated COMI in bad faith.

The JPLs submit that, as of the Petition Date, each Debtor's "center of main interests" within the meaning of chapter 15 of the Bankruptcy Code was in the Cayman Islands and that COMI was not manipulated prior to the filing in bad faith. As explained more fully below, the Court agrees. The Court concludes that the Cayman Proceedings are foreign main proceedings based on the facts discussed at considerable length in Section F. of the Background section (I.) above. Those facts establish that, among other things, the Foreign Debtors (i) conduct their management and operations in the Cayman Islands, (ii) have offices in the Cayman Islands, (iii) hold their board meetings in the Cayman Islands, (iv) have officers with residences in the Cayman Islands, (v) have bank accounts in the Cayman Islands, (vi) maintain their books and records in the Cayman Islands, (vii) conducted restructuring activities from the Cayman Islands, (viii) provided notices of relocation to the Cayman Islands to paying agents, indenture trustees, administrative and collateral agents, and investment service providers, and (ix) filed a Form 6-K with the SEC showing that their office was in the Cayman Islands.

28

2.    *Each Debtor Established its COMI in the Cayman Islands Prior to the Petition Date*

As described above, the Foreign Debtors are holding companies of the Group and conduct their business throughout the world, principally on the high seas.  (*See* Kandylidis Decl. ¶ 30.)  Accordingly, the nature of the Group's business and the mobility of their assets complicate the COMI analysis.

However, the Foreign Debtors have engaged in various activities supporting their COMI in the Cayman Islands for almost a year—beginning with the incorporation of UDW in the Cayman Islands in April 2016.  Among other things, the Foreign Debtors have (i) hosted meetings with creditors and advisors in relation to the proposed restructuring in the Cayman Islands, (ii) provided specific notice of relocation to paying agents, parties to the SUN Indenture, DRH Indenture, DFH Credit Agreement and DOV Credit Agreement, and investment service providers, and, perhaps most importantly, (iii) provided public notice and general recognition of relocation through UDW's Form 6-K report with the SEC, press releases and media reports. (*See generally* Kandylidis Decl. ¶¶ 23–34.)  Additionally, the Foreign Debtors' boards of directors and officers have been actively managing the Debtors from the Cayman Islands by, among other things, convening regular and special meetings in the Cayman Islands over the last few months.  (*See id.* ¶¶ 24–26.)  The Cayman Orders specifically grant them the authority "to continue to exercise all powers of management conferred on them by the [Foreign Debtors] and conduct the ordinary, day-to-day, business operations of the [Foreign Debtors]."  (Cayman Orders ¶ 6.)  Courts have found activities such as these to establish a debtor's COMI.  *See In re Suntech*, 520 B.R. at 418 ("Centered in the Cayman Islands, the JPLs took the necessary steps to centralize the administration of the Foreign Proceeding there.  They published notices of the

Foreign Proceeding directing interested parties to contact [management] in the Cayman Islands. They changed the Debtor's address on SEC filings and informed the Debtor's lenders to send future notices to their offices in the Cayman Islands. They conducted Board meetings and creditor meetings, largely through telephonic participation, from the Cayman Islands and appointed a Cayman Island[s] director."). Thus, the Foreign Debtors' COMI was clearly the Cayman Islands before and on the Petition Date. (*See also* Appell Decl. ¶ 31.)

Moreover, it does not matter that the Subsidiary Debtors are registered as non-resident corporations in the RMI. While section 1516(c) creates a presumption that a debtor's COMI is the situs of its registered office, such presumption is rebuttable and should only be invoked "[i]n the absence of evidence to the contrary." 11 U.S.C. § 1516(c); *see also In re Fairfield Sentry Ltd.*, 440 B.R. 60, 64 (Bankr. S.D.N.Y. 2010) ("[A]s the Objectors have advanced evidence in support of their position that New York is the proper COMI, the Court cannot rely solely upon this presumption, but rather must consider all of the relevant evidence."); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. at 335 ("However, section 1516(c) creates no more than a rebuttable evidentiary presumption, which may be rebutted notwithstanding a lack of party opposition. . . . Such a rebuttable presumption at no time relieves a petitioner of its burden of proof/risk of non-persuasion.") (citation omitted); *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 48–49 (Bankr. S.D.N.Y. 2008) (declining to presume that the debtor's COMI is where its registered office is located because there is enough "evidence to the contrary" to rebut section 1516(c)). The Subsidiary Debtors are *also* registered as foreign companies under the Companies Law in the Cayman Islands where, together with UDW, they maintain offices. (*See* Kandylidis Decl. ¶ 4.) Thus, section 1516(c) does not indicate that the Subsidiary Debtors' COMI is the RMI.

30

It also does not matter that UDW is classified as "exempted" under the Cayman Companies Law, even though "exempted" company status appears to limit that company's activities in the Cayman Islands.  Section 163 of the Cayman Companies Law provides: "Any proposed company applying for registration under this Law, *the objects of which are to be carried out mainly outside the Islands*, may apply to be registered as an exempted company." (Companies Law § 163 (emphasis added); *see also id.* § 174 (prohibiting exempted companies from trading in the Cayman Islands except in furtherance of its business outside the Cayman Islands).)  The vast majority of Cayman companies are incorporated as exempted companies under the Companies Law.  (*See* Reynolds Decl. ¶ 16.)  While exempted companies are prohibited from *trading* in the Cayman Islands, except in furtherance of their business outside the Cayman Islands, they may still be *managed* from there:

> Section 174 clarifies that it is not to be construed so as to prevent the exempted company from effecting and concluding contracts in the Cayman Islands and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.  An exempted company can therefore, for example, maintain premises and employ staff and appoint directors and other agents who are resident in the Cayman Islands, in furtherance of the company's business outside the Cayman Islands.

*Id.* ¶ 18; c*f. In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. at 338 (mentioning the debtors' status as exempted companies in discussing the debtors' lack of activities in the Cayman Islands); *In re Basis Yield*, 381 B.R. at 49 (finding that the debtor was not entitled to the presumption under section 1516(c) because "there is at least a *question* in the Court's mind as to whether this exempted company . . . would have its COMI in the Cayman Islands") (emphasis added).  Because the business of the Ocean Rig Group is primarily conducted on the high seas, the Court finds that the Group's business is generally

31

conducted outside of any jurisdiction in which it was managed.  Accordingly, the Cayman Islands is the site of the Debtors' "main interests"—it is the site where their business is run.

No evidence in the record suggests any other potential location for the Foreign Debtors' COMI.  First, the RMI is not the COMI for the Foreign Debtors—even the Subsidiary Debtors. The trial evidence shows that the Foreign Debtors never conducted operations or directed their affairs from the RMI; they never maintained administrative, management or executive offices in the RMI; never had any directors who were residents or citizens of the RMI; and never held a meeting of its directors or shareholders in the RMI.  (*See* Kandylidis Decl. ¶¶ 4, 25.)

Second, although UDW was previously a tax resident of Cyprus, it has not been a tax resident there since December 2016 and it no longer maintains any presence there.  (*See id.* ¶ 24.) The mobile nature of the Foreign Debtors' business, and the majority of COMI factors, point to the Cayman Islands as their COMI.  The Court expressly finds that the Foreign Debtors had their COMI in the Cayman Islands before the Petition Date and that it remains there today.  *See In re Millennium Glob.*, 458 B.R. at 79 ("In addition to the fact that Bermuda was the only COMI reasonably ascertainable by third parties, *there is insufficient evidence in this case that establishes the COMI in a location other than Bermuda. . . . On this record, the proof does not establish an alternative COMI.*  Since every entity has a center of main interests, the fact that the evidence does not disclose a COMI other than Bermuda operates in favor of granting recognition of the Bermuda proceedings as foreign main proceedings.") (emphasis added) (internal citation omitted).

### 3.    The Debtors Have Not Manipulated COMI in Bad Faith

"In any proceeding for foreign recognition, of great concern to the Court is the potential for mischief and COMI manipulation. . . .  Thus, even courts that have recently relegated the

COMI focus to the time of the petition for recognition . . . would likely support a totality of the

circumstances approach where appropriate." *In re Fairfield Sentry*, 440 B.R. at 65–66 (internal

citations omitted).  The Court finds that the Foreign Debtors purposefully established the

Cayman Islands as their COMI before the Petition Date.  The Foreign Debtors' actions in doing

so were not taken in bad faith.  There is no evidence in the record pointing to any "insider

exploitation, untoward manipulation, [and] overt thwarting of third party expectations," that

would support denying recognition here.  *See id.*  The evidence establishes that the Foreign

Debtors had a legitimate, good faith purpose for shifting their COMI from the RMI to the

Cayman Islands.

Although UDW was a non-resident corporation incorporated in the RMI until April 2016,

and DRH, DFH and DOV are still non-resident corporations in the RMI, the RMI has not

adopted a bankruptcy law or other insolvency statute.  (*See Stipulation as to Republic of

Marshall Islands Law* (ECF Doc. # 115) ("The RMI has not adopted the federal Bankruptcy

Code, has no bankruptcy or insolvency statute currently in force, and has no statutory,

regulatory, or administrative provisions regarding corporate restructuring.  In addition, there is

no judicial process under RMI law equivalent to a United States Chapter 11 or a Cayman scheme

of arrangement.").)  The only provisions under RMI law that address financially distressed

corporations—the Business Corporations Act and the Uniform Foreign Money-Judgments

Recognition Act—contemplate dissolution and, therefore, any insolvency process in the RMI

would invariably result in a value-destroying liquidation process.  Accordingly, the Foreign

Debtors' COMI shift to the Cayman Islands was done for legitimate reasons, motivated by the

intent to maximize value for their creditors and preserve their assets.  The Court finds that the

Foreign Debtors' COMI was not manipulated in bad faith.

33

### G.    Recognition of the Cayman Proceedings Would Not Be Manifestly Contrary to United States Policy

Section 1506 provides that a bankruptcy court may decline to grant relief requested if the action would be "manifestly contrary to the public policy of the United States."  11 U.S.C. §§ 1506, 1517(a).  This public policy exception is narrowly construed.  *In re Sino-Forest Corporation*, 501 B.R. 655, 665 (Bankr. S.D.N.Y., 2013) (explaining that section 1506's "public policy exception is narrowly construed"); *In re Toft*, 453 B.R. 186, 195 (Bankr. S.D.N.Y. 2011) ("[T]hose courts that have considered the public policy exception codified in [section] 1506 have uniformly read it narrowly and applied it sparingly."); *see also Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)*, 480 B.R. 129, 139 (S.D.N.Y. 2012); *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 33, 336 (S.D.N.Y. 2006).  Granting recognition of the Cayman Proceedings advances the public policy objectives of sections 1501(a) and 1508; nothing that has transpired here trenches upon the policy concerns underlying section 1506.

### III.    <u>CONCLUSION</u>

For the reasons explained above, following an evidentiary hearing, the Court finds and concludes that the Foreign Representatives established by a preponderance of the evidence that each of the four Foreign Debtors' proceedings pending in the Cayman Court is entitled to recognition as a foreign main proceeding.

34

If the Cayman Court sanctions the Foreign Debtors' schemes of arrangement, upon application of the Foreign Representatives, the Court will proceed to determine whether each scheme of arrangement should be recognized and enforced by this Court.[7]

A separate order recognizing the Foreign Debtors' Cayman Islands Proceedings as foreign main proceedings will be entered.

Dated:    August 24, 2017
          New York, New York

                              _Martin Glenn_____
                              MARTIN GLENN
                              United States Bankruptcy Judge

---

[7] Nothing in this Opinion addresses any of the issues that may need to be resolved if the Cayman Court sanctions the four schemes and this Court is asked to recognize and enforce the schemes. Highland, for one, has indicated that it will oppose recognition and enforcement of the UDW scheme if it is sanctioned by the Cayman Court. At the same time, nothing in this Opinion is intended to express any reasons why this Court will not recognize and enforce any of the schemes if they are sanctioned by the Cayman Court.